JUDGE HOLWELL     07 CV 3455

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MAY 01 2007

| | |
|---|---|
| BRICKMAN INVESTMENTS INC., On Behalf of Itself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>vs.<br><br>ALLOT COMMUNICATIONS LTD., YIGAL JACOBY, RAMI HADAR and ADI SAPIR,<br><br>    Defendants. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel (which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Allot Communications Ltd. ("Allot" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company) and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock of Allot pursuant and/or traceable to the Company's initial public offering on or about November 15, 2006 through April 2, 2007, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). This action concerns the initial public offering of Allot common stock which took place on or about November 15, 2006 (the "IPO" or the "Offering").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

3. This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

4. Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District and the IPO was actively marketed in this District.

5. In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ Stock Market ("NASDAQ"), a national securities exchange.

## PARTIES

6. Plaintiff Brickman Investments Inc. purchased Allot common stock, as set forth in the certification attached hereto and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

7. Defendant Allot is a designer, developer, marketer, and seller of broadband service optimization solutions. The Company's solutions provide broadband service providers and enterprises with real-time visibility into, and control of, network traffic. The Company's headquarters are located at 22 Hanagar Street, Neve Neeman Industrial Zone B, Hod-Hasharon, Israel 45240.

8. (a) Defendant Yigal Jacoby ("Jacoby") was, at all relevant times, Chairman of the Board and Founder of the Company. Jacoby signed the Registration Statement.

(b) Defendant Rami Hadar ("Hadar") was, at all relevant times, Chief Executive Officer, President and a Director of Allot. Hadar signed the Registration Statement.

(c) Defendant Adi Sapir ("Sapir") was, at all relevant times, Chief Financial Officer and Principal Accounting Officer of Allot. Sapir signed the Registration Statement.

(d) Defendants Jacoby, Hadar and Sapir are collectively referred to herein as the "Individual Defendants."

9. By reason of their management positions and their ability to make public statements in the name of Allot, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Allot to engage in the conduct complained of herein.

- 2 -

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

10.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all persons other than defendants who purchased the common stock of Allot pursuant and/or traceable to the Company's IPO on or about November 15, 2006 through April 2, 2007. Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

11.  The members of the Class are so numerous that joinder of all members is impracticable. Allot sold 6.5 million shares of common stock in the IPO. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Allot or its transfer agent or the underwriters to the IPO. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

12.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

13.  Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

14. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

15. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether the prospectus and registration statement issued by defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Allot and its business; and

(c) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

16. Defendant Allot describes itself as a "leading provider of intelligent IP service optimization solutions. Designed for carriers, service providers and enterprises, Allot solutions apply deep packet inspection ("DPI") technology to transform broadband pipes into smart networks."

17. The Company's products consist of NetEnforcer traffic management systems and NetXplorer application management suite. Its products are used by service providers to offer subscriber-based and application-based tiered services that enable them to optimize their service offerings. In other words, the Company's products allow service providers and enterprises to

"improve service quality by optimizing available bandwidth usage for different applications and prioritizing network traffic."

18. The Company markets and sells its products through its channel partners, which include distributors, resellers, OEMs, and system integrators principally to carriers, cable operators, wireless and wireline Internet service providers, educational institutions, governments, and enterprises primarily in the United States, Europe, Japan, Singapore, the Middle East, Africa, and the rest of Asia.

19. On October 31, 2006, Allot filed with the SEC a Form F-1 Registration Statement (the "Registration Statement") for the IPO. The Registration Statement stated that "[the Company anticipate[s] that the initial public offering price will be between $9.00 and $11.00 per ordinary share."

20. On November 15, 2006, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, became effective and 6.5 million shares of Allot's common stock were sold to the public at $12 per share, thereby raising more than $78 million.

21. The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

22. The Prospectus portrayed Allot in a highly positive light stating in pertinent part as follows:

> We are a leading designer and developer of broadband service optimization solutions using advanced deep packet inspection, or DPI, technology. Our solutions provide broadband service providers and enterprises with real-time, highly granular visibility into, and control of, network traffic, and enable them to efficiently and effectively manage and optimize their networks. Our carrier-class products are used by service providers to offer subscriber-based and application-based tiered services that enable them to optimize their service offerings, reduce churn rates and increase average revenue per user, or ARPU. The rapid growth of broadband networks, such as cable,

DSL and wireless, and the proliferation in the number and complexity of broadband applications have led broadband service providers to demand new ways to manage their networks. Costly infrastructure upgrades to increase network bandwidth capacity neither address service providers' need for network visibility nor prioritize revenue-generating applications. Furthermore, service providers have generally been unsuccessful in capturing the significant new revenue opportunities available from providing differentiated, premium broadband services that command higher prices. By capitalizing on new revenue opportunities and maximizing the capacity of existing network infrastructure, our DPI technology enables service providers to optimize returns on their investments and enhance the quality of the services they provide.

Our products consist of our NetEnforcer traffic management systems and NetXplorer application management suite. NetEnforcer employs advanced DPI technology, which identifies applications at high speeds by examining data packets and searching for application patterns and behaviors. NetXplorer enables the implementation of user-defined network management policies and the collection of detailed statistics on the network's users and applications. Our goal is to be the leading provider of independent network inspection and management solutions used by service providers and enterprises to transform generic access broadband networks into intelligent broadband networks.

23.    The Prospectus represented that the Company's purported competitive strengths included its "broad product portfolio" and its sales and marketing network. In this regard, the Prospectus stated in pertinent part as follows:

> • Broad product portfolio. Our broad product portfolio enables us to compete in a wide range of markets and enables our channel partners to serve a wider range of markets. Our NetEnforcer AC-400 and NetEnforcer AC-800 systems address the specialized needs of small and midsize service providers and enterprises, while our NetEnforcer AC-1000 and NetEnforcer AC-2500 address the needs of large service providers and enterprises. We believe that this breadth of products has enabled us to successfully target profitable markets, such as smaller service providers and universities, while our larger competitors generally target only large service providers or enterprises.
>
> * * * *
>
> • Global sales and marketing channels. We have a global sales and marketing network of over 300 distributors, resellers, OEMs and system integrators. We make substantially all of our sales through these channel partners, who are also responsible for installing our products and providing technical support. To date, we have deployed over 9,000 NetEnforcer systems in 118 countries. Our channel partners have enabled us to achieve a diverse revenue base and to target markets that we

would not have been able to address without significant investment in an internal sales and marketing force.

24. Moreover, with regard to its sale and marketing network, the Prospectus stated in pertinent part as follows:

> Channel Partners
>
> We market and sell our products to end-customers through our channel partners, which include distributors, resellers, OEMs and system integrators. Our channel partners generally purchase our products from us upon receiving orders from end-customers and are responsible for installing and providing initial customer support for our products. As of September 30, 2006, we had approximately 300 channel partners. Our channel partners are located around the world and address most major markets. Our channel partners target a range of end-users, including carriers, alternative carriers, cable operators, private networks, data centers and enterprises in a wide range of industries, including government, financial institutions and education. Our agreements with channel partners that are distributors or resellers are generally for an initial term of one year and automatically renew for successive one-year terms unless terminated. After the first year, such agreements may be terminated by either party upon 90 days prior notice. These agreements are generally non-exclusive and generally contain minimum purchase requirements and we are permitted to terminate the agreement in the event of a failure to meet such targets.
>
> We offer extensive support to all of our channel partners. This support includes the generation of leads through marketing events, seminars and web-based leads and incentive programs as well as technical and sales training.
>
> Our sales staff's direct contact with end-customers consists mainly of developing leads for our channel partners. Substantially all of our sales occur through our channel partners.

25. The Prospectus also represented how the Company would achieve its goal in becoming the leader in its industry. In this regard, the Prospectus stated in pertinent part as follows:

> • Continue to expand our sales and marketing channels. We intend to expand our world-wide sales and marketing channels to further address small and medium-sized service providers and enterprises, including in the government and education sectors. Through these channels, we have sold our products to a diverse range of end-customers and we intend to build on this success by continuously improving our channel relationships, creating mutual marketing campaigns and supporting their efforts to promote our products. We intend to seek channel partners in new geographical territories, as well as in vertical markets in countries where we have already established a presence.

- Focus on larger service providers. We intend to target larger service providers, including carriers, and cable and mobile operators, in response to increased demand from them for the ability to differentiate their service offerings. We believe that targeting large service providers is important to our revenue growth because sales to these end-customers are more likely to result in sustained demand for our NetEnforcer systems as they deploy our products throughout their networks. We believe that we are well-positioned to continue to target these end-customers with our carrier-class products, together with our management solutions, operating experience and installed base. We intend to target these end-customers by continuing to develop partnerships with system integrators and OEMs in order to leverage their existing relationships with larger service providers. We intend to supplement these efforts with direct business development and by tailoring our customer support capabilities to further enhance our ability to support system integrators and OEMs.

26.  The statements referenced above in ¶¶ 22-25 were inaccurate statements of material fact because they failed to disclose that at the time of the IPO, Allot was experiencing declining sales in its indirect distribution channels, such as enterprise, education and smaller ISP customers, in North America.

27.  The Prospectus purported to warn that Allot's performance and growth was subject to certain risks. In this regard, the Prospectus stated in pertinent part as follows:

Factors Affecting Our Performance

Our business, financial position and results of operations, as well as the period-to-period comparability of our financial results, are significantly affected by a number of factors, some of which are beyond our control, including:

- mix between product and service revenues;

- size of end-customers and sales cycles;

- declines in average selling prices; and

- cost of revenues and cost reductions.

\* \* \* \*

Size of end-customers and sales cycles. We believe that our growth can be accelerated by increasing sales to large service providers and have hired additional sales and marketing personnel in recent years in order to achieve this goal. The deployment of our products by small and midsize enterprises and service providers can be completed relatively quickly with a limited number of NetEnforcer systems compared to the number required by large service providers. Design wins with large

- 8 -

service providers, including carriers, are more likely to result in sustained demand for additional NetEnforcer systems as they deploy our products throughout their networks and as their networks grow. The increased deployment of our products in carriers' networks also enhances our reputation and name recognition in the market. We, therefore, expect that significant customer wins in the carrier market will positively impact future performance. However, our performance is also influenced by sales cycles for our products, which typically fluctuate based upon the size and needs of end-customers that purchase our products. Generally, large service providers take longer to plan the integration of DPI solutions into their existing networks and to set goals for the implementation of the technology. The varying length of our sales cycles creates unpredictability regarding the timing of our sales and may cause our quarterly operating results to fluctuate if a significant customer defers an order from one quarter to another. Furthermore, longer sales cycles may result in delays from the time we increase our operating expenses and make investments in inventory, until the time that we generate revenue from related product sales.

28.   The Prospectus purported to warn that the marketing and selling of Allot's products was subject to performance of third party channel partners, such as distributors, resellers, OEMs and system integrators. In this regard, the Prospectus stated in pertinent part as follows:

Risks Relating to Our Business

\* \* \* \*

We depend on third parties to market, sell, install, and provide initial technical support for our products.

We market and sell our products to end-customers through third party channel partners, such as distributors, resellers, OEMs and system integrators. Our channel partners are also responsible for installing our products and providing initial customer support for them. As a result, we depend on the ability of our channel partners to market and sell our products successfully to end-customers. If any significant channel partners fail, individually or in the aggregate, to perform as we expect, our sales may suffer. We also depend on our ability to maintain our relationships with existing channel partners and develop relationships in key markets with new channel partners. We cannot assure you that our channel partners will market our products effectively, receive and fulfill customer orders of our products on a timely basis or continue to devote the resources necessary to provide us with effective sales, marketing and technical support. Our products are complex and it takes time for a new channel partner to gain experience in their operation and installation. Therefore, it may take a period of time before a new channel partner can successfully market, sell and support our products if an existing channel partner ceases to sell our products.

Our channel partners install our products and provide initial customer support to end–customers of our products. Any failure by our channel partners to provide adequate support to end–customers could result in customer dissatisfaction with us or our products, which could result in a loss of customers, harm our reputation and delay or limit market acceptance of our products.

Our agreements with channel partners are generally not exclusive and our channel partners may market and sell products that compete with our products. Our agreements with our distributors and resellers are usually for an initial one year term and following the expiration of this term, they can be terminated by either party. We can give no assurance that these agreements will not be terminated upon proper notice and any such termination may adversely affect our profitability and results of operations.

29. These warnings were inadequate and not meaningful because at the time of the IPO, Allot was then experiencing declining sales in its indirect distribution channels, such as enterprise, education and smaller ISP customers, in North America.

30. On February 13, 2007, Allott issued a press release announcing its fourth quarter and year end results for 2006, the period ended December 31, 2006. For the quarter, the Company reported total revenues of $9.6 million and GAAP net income of $53,000, or $0.00 per diluted share. Defendant Hadar, commenting on the results, stated, in pertinent part, as follows:

> Allot's strong growth in revenue and profitability during 2006 is a clear demonstration of our leadership position in the global deep packet inspection market, enabling the intelligent optimization of today's IP broadband networks. Our growth was driven by rising demand among service providers who are seeking high performance solutions to transform broadband pipes into intelligent networks, as well as continued demand out of the enterprise market. Allot's strong performance in 2006 is a testament to our ability to meet our customers' evolving needs for network optimization solutions with the most technologically advanced DPI capabilities in the industry, and the hard work of our dedicated employees worldwide.
>
> The successful completion of our initial public offering during the fourth quarter of 2006 sets a solid foundation for the future, with a stronger balance sheet and increased brand awareness that we believe will allow us to continue to execute on our strategic global plan. We are continuing to expand our global channels and partners to address the enterprise and mid-tier service provider markets, as well as our direct touch activities with Tier-1 carriers. We continue to innovate and develop our product offerings. In 2006, we introduced our NetXplorer Management platform, our new Subscriber Management Platform and our high performance 5 GB/s NetEnforcer AC2500. We are in the advanced stages of the development of our next generation

platform that will function as a DPI-based service gateway enabling value added services by larger service providers. In its first version, it will support up to 20 GB/s throughput, providing support for 10G networks.

31.   Despite stating in its Prospectus that "revenues are lowest in the first quarter and our fourth quarter has tended to exhibit stronger results than other quarters, which we believe may result from the budgeting processes of many of our customers which are based on a calendar fiscal year," the Company issued positive guidance for the first quarter and year end of 2007. In that regard, the press release stated:

Financial Guidance

The company expects net revenues for the first quarter of 2007, which is traditionally slow in its sector, to be similar to the level of the fourth quarter of 2006 revenues, with growth to resume in the second quarter of 2007 and continue through the remainder of the year. Earnings per diluted share for the first quarter of 2007 will be similar to the fourth quarter of 2006. For the year 2007, the company anticipates net revenues in the range of $43-47 million, with earnings per diluted share, excluding the effect of share-based compensation, of between $0.27-0.33.

32.   Then, on April 2, 2007, Allot issued a press release announcing that revenues and earnings for the first quarter of 2007 and the 2007 fiscal year would be lower than its previous guidance – given less than two months ago. The press release stated, in pertinent part, as follows:

Management reported that weakness in sales from some of the Company's distributors, principally in the Americas, which are focused on sales to enterprise, education, and smaller ISPs, had resulted in lower than expected revenues. However, sales to larger customers, mainly Tier 2 service providers, which are conducted with the direct involvement of Allot's sales personnel, showed strong growth during the quarter. As a result of this, management expects that revenues for the first quarter of 2007 will be in the range of $8.2 - 8.3 million, compared to the Company's original guidance of a level similar to the $9.6 million in revenues recorded during the fourth quarter of 2006. As a result, Net income for the first quarter of 2007 will also decline.

``We were disappointed with the performance of some of our distributors during the quarter which may result in slower than expected growth throughout the year,'' said Rami Hadar, Allot's President and CEO. ``We are encouraged, however, by the progress we have made in larger accounts and the growth we saw in sales to these accounts during the quarter, both in terms of number of projects and sales. Overall,

we remain confident in our strategy and on the long-term outlook for our DPI products on a global basis."

Financial Guidance

As a result of the trends described above, the Company is updating its previous guidance for the year 2007, and currently anticipates that net revenues will total approximately $40 million. Earnings guidance will also be lowered as a result, and will be discussed in detail upon issuance of the Company's full financial results for the first quarter of 2007.

33. In response to the announcement about the Company's revised guidance, on April 2, 2007, the price of Allot stock declined precipitously falling from $9.15 per share to $7.11 per share – approximately 40% below the IPO price – on heavy trading volume.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

34. Plaintiff repeats and realleges each and every allegation contained above.

35. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

36. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

37. Allot is the registrant for the IPO. The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

38. As issuer of the shares, Allot is strictly liable to Plaintiff and the Class for the misstatements and omissions.

39. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

40. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

41. Plaintiff acquired Allot shares pursuant to the Registration Statement.

42. Plaintiff and the Class have sustained damages. The value of Allot common stock has declined substantially subsequent to and due to defendants' violations.

43. At the times it purchased Allot shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to April 2, 2007. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## COUNT II

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

44. Plaintiff repeats and realleges each and every allegation contained above.

45. This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

46. Each of the Individual Defendants was a control person of Allot by virtue of his position as a director and/or senior officer of Allot. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Allot.

47. Each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the

Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

    (a)    declaring this action to be a Plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

    (b)    awarding Plaintiff and other members of the Class damages together with interest thereon;

    (c)    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

    (d)    awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 30, 2007

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

_/s/ Samuel H. Rudman_
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR- 7564)
MARIO ALBA JR. (MA-7240)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Penn Plaza
Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF BRICKMAN INVESTMENTS INC.
## IN SUPPORT OF CLASS ACTION COMPLAINT

Brickman Investments Inc. ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed Class Period, plaintiff executed the following transactions in the stock of Allot Communications Ltd.. See Attachment A:

5. In the past three years, plaintiff has not served, nor sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of April, 2007.

*[signature]*
BRICKMAN INVESTMENTS NC.

ATTACHMENT A

| Date | Action | Amount | Price |
|---|---|---|---|
| November 17, 2006 | Buy | 1,000 shares | $14.178 |
| January 26, 2007 | Sell | 1,000 shares | $ 9.77 |