## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **IN RE ALLOT COMMUNICATIONS LTD. SECURITIES LITIGATION** | **CIVIL ACTION NO. 07-CV-03455 (RJH)** |
|  | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
|  | **JURY TRIAL DEMANDED** |

1.     This is a class action brought by Lead Plaintiffs on behalf of purchasers of Allot Communications Ltd. ("Allot" or the "Company") common stock pursuant to its November 15, 2006 Initial Public Offering ("IPO" or the "Offering") of 6.5 million shares of common stock. In connection with this Offering, Defendants raised gross proceeds of at least $78 million. The Class Period begins on November 15, 2006, the date of the IPO, and ends on April 2, 2007 when the true adverse facts were revealed to the public.

2.     Defendants herein are the Company as well as Yigal Jacoby, Rami Hadar and Adi Sapir, who served as officers and/or directors of Allot at the time of the IPO (collectively "Defendants"). Defendants are each charged with including or allowing the inclusion of materially untrue and misleading statements in the Registration Statement and Prospectus (collectively referred to herein as the "Registration Statement") issued in connection with the IPO in direct violation of the Securities Act of 1933 (the "1933 Act").

## INTRODUCTION

3.     Defendant Allot Communications Network, Ltd. is a designer, developer, marketer, and seller of broadband service optimization solutions. According to the Company's Registration

Statement, using deep packet inspection ("DPI") technology, the Company's solutions provide broadband service providers and enterprises with real-time visibility into, and control of, network traffic. At the time of the IPO, the Company sold two primary products, NetEnforcer, which examines data packets and identifies applications on the network, and NetXplorer, an application management suite which, *inter alia*, enables the implementation of user-defined network management policies. Whereas certain applications, such as voice-over-IP and Internet video, require larger amounts of bandwidth than e-mail or web-browsing, Allot's products enable customers to analyze and prioritize the broadband applications on their networks to maximize network performance. Allot broadly categorized the end-users of its products as either "enterprises," businesses or institutions which operate networks (such as educational institutions and government entities) or "service providers," companies who sell broadband services to their own customers (such as telecommunications companies and cable operators).

4.    Although Allot employed its own sales and marketing personnel, according to the Registration Statement, at the time of the IPO, "substantially all" of its sales were made through "a global sales and marketing network of over 300 distributors, resellers, OEMs (original equipment manufacturers) and system integrators" collectively known as "channel partners".

5.    A number of confidential witnesses, formerly employed by Allot or employed by companies with which Allot had done business, explained that prior to the IPO, Defendants had decided to radically change Allot's business strategy and direction away from channel sales to small to medium enterprise market to directly pursue more lucrative business from the larger Internet service providers ("ISPs"), commonly known as "Tier 1" companies.

6.    As a result of this sea change, Defendants abruptly withdrew financial support and

product development from the base of Allot's business --even though Allot did not yet have the product capabilities to compete for Tier 1 business. The refocusing of Allot's business strategy detrimentally affected both sales and relationships with channel partners.

      7.    Defendants made materially untrue and misleading statements and omissions in the Registration Statement, including that the Company:

- was maintaining strong relationships with its channel partners;

- offered extensive support to all its channel partners;

- made substantial and regular investments in marketing to support its channel sales, including the hiring of additional sales and marketing personnel;

- had a product line with features that could meet all of the needs of the lucrative large internet service provider ("ISP") market;

- was able to effectively compete in the ISP market;

- had received customer base and engineering capability benefits from its acquisition of NetReality; and

- had increased brand awareness and technological competitiveness, and was fully prepared for its move into the Tier 1 ISP market.

      8.    Specifically, by the time of the IPO, the Company was experiencing declining sales in its distribution channels. According to the confidential witnesses, sales were plummeting because of a lack of effort and commitment on the part of the Company to its theretofore core business.  At the same time, Defendants were ill-prepared to immediately compete for Tier 1 sales:

      (a)    The Company failed to supply funding to various channel partners—including, but not limited to, Layer 3 Technologies, Windstream Supply, and partners in Charlottesville, Seattle, Salt Lake City, Washington D.C., and South Dakota—to pursue marketing ventures necessary to support the Company's business. In particular, employees found it extremely difficult if

not impossible to obtain the necessary channel marketing funds from Sharon Hess, the Vice President of Marketing, whose own company, MarkeITing, had been responsible for Allot's marketing;

(b)     Allot halted its monthly distribution of a new product handbook focused on the channel partners. Three or four months prior to the IPO, Allot began to publish a different handbook, focused solely on Tier 1 ISP customers;

(c)     In a January 2006 annual sales meeting held in Cypress, Defendants laid out a new strategy: Allot was focusing its efforts on the large service provider market, adding and realigning personnel in the United States to target only that market;

(d)     Defendant Hadar announced, at the January 2006 annual sales meeting that no new application signatures would be added to NetEnforcer, a crucial feature for the ISP market they were ostensibly targeting. Moreover, the NetExplorer was incapable of handling the large bandwidth that would be required by large service providers;

(e)     Defendant Hadar also announced at the January 2006 annual sales meeting, that Allot would not be adding acceleration or compression features; these features were essential for the enterprise market;

(f)     During 2006, Allot declined to take advantage of opportunities in the enterprise and  educational markets;

(g)     As Allot began to frustrate its channel partners, their efforts waned. Allot even undermined its own marketing efforts by extending promotions at the end of a quarter, eliminating the pressure to complete a deal and allowing sales to slip into the next quarter. However, at the same time, Allot set and raised sales goals that its employees could not meet;

(h)    The Company was unable to immediately compete in the Tier 1 market because it had not yet obtained required certifications and was not otherwise prepared to deliver service on a level expected by Tier 1 providers; and

(i)    The Company's seminal shift into the Tier 1 market was further hampered by the fact that this market was already saturated with competitors, including Cisco, an industry giant, which had purchased P-Cube to compete in this potentially lucrative space.

9.    The Company's statements about its brand image, broad product portfolio, and ability to compete for Tier 1 business failed to disclose that Allot had neither the technology nor the increased responsiveness needed to compete in the Tier 1 market. While the Company publicly acknowledged that sales to Tier 1 customers generally occurred on longer sales cycles, the material omissions from the Registration Statement failed to meaningfully inform investors that Allot was much further away from landing substantial business in this market – or that Allot had abandoned its "bread and butter" smaller enterprise sales in the interim.

10.    It was only on April 2, 2007, that the risks posed by Defendants' undisclosed change in business strategy materialized.  Specifically, Defendants announced that weaknesses in sales from the Company's distributors – including sales to enterprise, education, and smaller ISPs – had resulted in much lower than expected revenues in the first quarter of 2007, the first full quarter of operations following the IPO.

11.    Even though Defendants had waited until February 13, 2007, halfway through the first quarter, to issue first quarter and full year revenue and earnings guidance, the Company announced, on April 2, 2007, that first quarter 2007 revenues would be more than a million dollars lower than those of the prior quarter. Similarly, full year revenue guidance was reduced from $43-47 million to

$40 million. (In February 2008, Allot reported 2007 revenues of a mere $32.5 million, a 5% decline from $34.1 million achieved in 2006.)

12.     Following this news, Allot stock price collapsed over 22% in a single trading day, from $9.15 per share to close at $7.11 per share on exceptionally high trading volume. This drop represented a fall of approximately 40% below the IPO price.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"). Jurisdiction is conferred by §22 of the Securities Act.

14.     Venue is proper pursuant to §22 of the Securities Act, as Defendant Allot and/or the Individual Defendants conduct business in—and the wrongful conduct took place in—this District.

## THE PARTIES

### Lead Plaintiffs

15.     Court-appointed Lead Plaintiffs Dikla Mondial Mutual Fund and the Chen Group (consisting of individuals Shichao Chen, Cynthia Hober, and Robert Jonkheer) purchased shares of Allot common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement, issued by Defendants in connection with the November 2006 IPO, including those shares detailed in the Lead Plaintiffs' certifications, submitted with the their lead plaintiff motions and incorporated here by reference, and were damaged thereby.

### Issuer Defendant

16.     Defendant Allot Communications Network, Ltd. is a designer, developer, marketer, and seller of broadband service optimization solutions. According to the Company's Registration Statement, the Company's solutions provide broadband service providers and enterprises with real-

time visibility into, and control of, network traffic. These "solutions" are software applications and hardware tools which monitor the inbound and outbound traffic, on a per-user or per-application basis, of local and wide-area networks. The Company's software, called NetXplorer, also analyzes traffic patterns and usage trends, identifies "malicious" traffic and neutralizes attacks on the network, and allows for usage control across the network. The Company's hardware tools, including the Subscriber Management Platform, the NetEnforcer, and the Service Gateway, shape bandwidth and customize traffic flow, and allow for different controls over network usage. The Company's headquarters are located at 22 Hanagar Street, Neve Neeman Industrial Zone B, Hod-Hashm'on, Israel 45240.

**Individual Defendants**

17.     The individuals identified as defendants in subparagraphs  (a)-(c) below, are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the materially untrue and misleading statements and omissions contained in the Registration Statement, as alleged herein. The Individual Defendants include the following:

(a)     Defendant Yigal Jacoby ("Jacoby") co-founded Allot in 1996 and is at the time of this filing and was at the time of the IPO Chairman of Allot's board of directors. He was also a principal shareholder, holding 12.5% of the Company's stock prior to the IPO and 8.5% immediately thereafter. Jacoby signed the materially untrue and misleading Registration Statement.

(b)     Defendant Rami Hadar ("Hadar") is now and was at the time of the IPO Chief Executive Officer, President, and a Director of the Company. Hadar signed the materially untrue and misleading Registration Statement.

(c)     Defendant Adi Sapir ("Sapir") served as the Company's Chief Financial

7

Officer at the time of the IPO. Sapir signed the materially untrue and misleading Registration Statement.

**MATERIALLY UNTRUE STATEMENTS AND OMISSIONS
IN THE REGISTRATION STATEMENT AND PROSPECTUS**

18.     On November 15, 2006, the Company conducted its IPO. In connection with the IPO, the Company filed a Registration Statement, including the Prospectus, with the SEC. Materially untrue statements and omissions in the Registration Statement included the following:

**Materially Untrue Statements and Omissions
Concerning Sales and Distribution Channels, Marketing and Funding**

19.     With respect to an overview of the Company, the Registration Statement, in relevant part, stated:

> **Channel Partners**
>
> We market and sell our products to end-customers through our channel partners, which include distributors, resellers, OEMs and system integrators. Our channel partners generally purchase our products from us upon receiving orders from end-customers and are responsible for installing and providing initial customer support for our products. As of September 30, 2006, we had approximately 300 channel partners.
>
> \*\*\*
> **We offer extensive support to all of our channel partners.** This support includes the generation of leads through marketing events, seminars and web-based leads and incentive programs as well as technical and sales training.
>
> Our sales staff's direct contact with end-customers consists mainly of developing leads for our channel partners. **Substantially all of our sales occur through our channel partners.**
>
> [Emphasis added.]

20.     With regard to the Company's competitive strengths, the Registration Statement, in relevant part, stated:

8

**Our Competitive Strengths**

\*\*\*

Global sales and marketing channels. We have a global sales and marketing network of over 300 distributors, resellers, OEMs and system integrators. **We make substantially all of our sales through these channel partners**, who are also responsible for installing our products and providing technical support. To date, we have deployed over 9,000 NetEnforcer systems in 118 countries. **Our channel partners have enabled us to achieve a diverse revenue base and to target markets that we would not have been able to address without significant investment in an internal sales and marketing force.**

[Emphasis added.]

21.    With regard to the Company's strategy, the Registration Statement, in relevant part,

stated:

**Our Strategy**

\*\*\*

**Continue to expand our sales and marketing channels. We intend to expand our world-wide sales and marketing channels to further address small and medium-sized service providers and enterprises, including in the government and education sectors. Through these channels, we have sold our products to a diverse range of end-customers and we intend to build on this success by continuously improving our channel relationships, creating mutual marketing campaigns and supporting their efforts to promote our products.** We intend to seek channel partners in new geographical territories, as well as in vertical markets in countries where we have already established a presence.

[Emphasis added.]

22.    With regard to the Company's sales and marketing, the Registration Statement, in

relevant part, stated:

**Sales and Marketing**

\*\*\*

**We focus our marketing efforts on product positioning, increasing brand awareness, communicating product advantages and generating qualified**

9

**leads for our sales organization.** We rely on a variety of marketing communications channels, including our website, trade shows, industry research and professional publications, the press and special events to gain wider market exposure.

[Emphasis added.]

23.     As explained in ¶¶30- 35, below, the above statements were materially untrue and/or misleading because they omitted to disclose that at the time of the IPO, the Company's channel partners were already experiencing a decline in sales as the Company switched its focus to direct Tier 1 ISP sales. Despite stating that the Company offered "extensive support" to all of their channel partners and that "substantially all" of their sales occurred through channel partners, at the time of the IPO Allot was in fact in the process of abandoning its channels and moving both its marketing support and the bulk of its new sales personnel to the large ISP market.

24.     In 2006, the complete change in business strategy was accompanied by changes in top management. Allot had, several years before the IPO, chosen a vice president whose expertise was in channel sales. A June 4, 2004, article on ChannelWeb[1] entitled "Allot Adds Channel Chief," described the hiring of Larry Schmidt:

> Traffic management vendor Allot Communications Monday plans to announce a new channel chief to oversee its North American partner sales.
>
> Larry Schmidt joined Allot this week as vice president of channel sales for North America, a newly created position in which Schmidt will be responsible for the company's partnerships with VARs, systems integrators and distributors in the United States and Canada, said PG Narayanan, CEO for Allot Americas, Eden Prairie, Minn.
>
> "We've always sold through the channel, but now it's more important. We're growing, we have lots of sales people in the field and we need a more focused approach," Narayanan said.
>
> Schmidt is a channel veteran, having served as executive vice president of

---

[1] The article can be accessed at: http://www.crn.com/networking/21401656

direct solutions at Norstan, a $225 million communications solution provider based in Minneapolis.

"What partners should expect is continued and, perhaps, even an increased focus on the types of support we are providing them from a sales and marketing perspective and increased demand generation," Schmidt said. "and partners can look for the opportunity to participate in the growth we're going to take this company through."

The company is also recruiting new channel partners to bolster its current ranks of about 100 North American solution providers.

"We're finding out demand for our solutions is growing exponentially, and we have to continue to focus on bringing on new partners to meet the demand," Schmidt said.

Allot's enterprise products include the NetReality line of traffic management devices. *Currently, about half of the privately held company's North America sales go through partners*, a figure that hopefully with grow as the vendor's overall sales grow, Narayanan said. (Emphasis supplied.)

25.    As the Registration Statement indicated, the business strategy embodied by Schmidt's hiring was quite successful: The Company's channel partners grew to 300 worldwide, providing "substantially all" of Allot's sales by the time of the IPO.

26.    Concurrent with its desire to switch its business focus to Tier 1 providers, in early 2006, defendants Jacoby and Allot tapped defendant Hadar to position the Company for an initial public offering. Allot's March 27, 2006, press release announcing Hadar's hiring stated, in relevant part:

Allot Communications has announced that Rami Hadar will assume the position of chief executive officer and president for the company. Hadar will take up his new duties immediately and join Allot's board. Current CEO and Chairman of the Board, Yigal Jacoby, will maintain his chairman duties and will continue to participate in the ongoing development of company strategy, vision and direction.

Hadar joins the existing management team at an exciting time. Allot has enjoyed tremendous growth in terms of revenue, company size and market awareness, and has taken this step to further strengthen its top management team.

 "I'm very pleased with the addition of Rami Hadar and am confident that his experience and management skills will help us scale the company to the next stage," said Yigal Jacoby, chairman of Allot's board of directors. "His experience in the broadband space and ability to deliver new services will help solidify our leadership position in this growing market."

Hadar added, "Allot is a company in the enviable position of having a very solid business foundation and great potential to expand into new markets with intelligent broadband management solutions that few competitors can match. I'm excited by the opportunity to help Allot achieve its business goals and feel that my experience in this market will be beneficial to the long term strategic growth of the company."

Hadar founded and served as CEO of CTP Systems (micro cellular networks) until its acquisition by DSP Communications. Hadar continued with DSPC's executive management team for two years, and thereafter, the company was acquired by Intel.

Hadar went on to co-found Ensemble Communications, a pioneer in the broadband wireless space and the WiMax standard, where he served as executive vice president, sales and marketing. Following as CEO of Native Networks, Hadar was instrumental in successfully shaping the company into a market-driven provider of MPLS-based solutions to tier-1 telecoms and in orchestrating the company's ultimate acquisition by Alcatel.

27.    In an interview which took place more than a year before Allot's IPO, Hadar explained the difference between the role of a CEO in a start-up company as opposed to a public company. In the former, the CEO "'cherry-picks' the right people, his 'stars' …" Once a company is "[o]n the IPO path – the CEO must see to the internal operations . . . . [T]here needs to be a clear definition to each role and position, and internal procedures must be defined and well implemented throughout the company." Confidential witnesses, former employees of Allot, did not see Hadar practicing what he preached.

(a)    A former Director of Marketing in the United States at the time of the IPO ("CW1"), claimed that Allot had no guidelines for channel partners with respect to the marketing programs it was willing to fund. Although CW1 developed such a program in early 2006, and presented it to management a dozen times, it was never approved. CW1 believed management never established marketing guidelines because they did not want to be committed to marketing programs; and

(b)    Another confidential witness, a former channel development manager for Allot in the United States ("CW2"), indicated that Hadar sought to establish credibility, because he never guided a company through an initial public offering before. However, CW2 believed that Hadar engaged in cronyism, bringing in his own people when Allot already had competence in the position.

28.    A critical management change – which reflected the radical change in the Company's business strategy – was not disclosed at the time of the IPO. Although Allot listed Larry Schmidt as its Vice President for the Americas, Schmidt planned to leave the company by the end of November 2006. The failure to reveal his upcoming departure was a material omission. CW1, who resigned in November 2006, recalled that Schmidt said he had resigned the same day. One of the reasons Schmidt left was because Allot was moving away from his area of expertise, in the enterprise market, toward the ISP market.

29.    Allot's Form 20-F, filed June 28, 2007, indicated that Vin Costello assumed Schmidt's title as Vice President of the Americas in 2006. Announcing Costello's appointment on January 8, 2007, Allot described him as not only someone with 20 years experience in the telecommunications industry, but a vice president of sales for Corvis, a start-up company in the

optical networking equipment business which "shifted its focus to become a service provider."

30.     Although Allot's public position was that it was going to maintain the enterprise business which, according to the press release announcing Hadar's appointment, represented a "very solid business foundation," confidential witnesses, whose recollections mirrored the same theme, painted a very different picture: Defendants failed to adhere to the adage that "a bird in the hand is worth two in the bush." Rather than maintain its current relationships while taking the necessary steps to expand into the larger service provider market, as indicated in the Registration Statement, Defendants completely withdrew resources from the smaller ISP and enterprise markets, and the channel providers who were responsible for "substantially all" of Allot's sales. As explained in detail by a number of confidential witnesses, Allot did not, as stated in the Registration Statement, provide "extensive support" or "creat[e] mutual marketing campaigns," to promote channel partners' sales of Allot's products. To the contrary, former marketing and sales employees of Allot were highly critical of the efforts of Sharon Hess, Allot's Vice President of Marketing, who was located in Israel. They complained both about the lack of adequate marketing materials and the failure to provide marketing funds."

31.     The lack of adequate marketing materials was universally attributed to the "outsourcing" of marketing to Hess's company, Hess MarkITing:

(a)     As CW1 explained, although Sharon Hess and her company's employees were responsible for website development, copywriting, graphics, and collateral (brochures and other material to support marketing), the materials they provided were only general product descriptions which were poorly written, poorly designed, and not delivered on a timely basis. Additionally,

although both CW1 and the channel partners repeatedly asked for collateral specific to the education and enterprise markets, none was ever produced;

(b)    While Hess hired a lot of writers and coordinators for marketing materials (sometime in late 2005 or early 2006), CW2 – whose focus was on the enterprise and education markets, never saw much in the way of collateral.  CW2 questioned just how much time Hess's employees were working on Allot's programs; and

(c)    A former National/Key Accounts Sales Manager employed throughout the Class Period ("CW3") stated that it was very difficult to get any marketing support. CW3 understood that Allot had only two marketing employees of its own, one in America and one in France, and the rest of the marketing personnel actually worked for Hess's company. Whenever CW3 asked Hess for a marketing person to produce collateral for a new market CW3 was trying to build, Hess would reply that Allot did not have the funds or the headcount to provide the requested support.

32.    Regarding expenditures for marketing – or, more accurately, the lack thereof -- CW1 indicated that it was Sharon Hess's position that if Allot designed the marketing tools, the channel partners should initiate the sales. CW2 had a similar impression, that the entire marketing program was contracted out to Hess's company such that the less money she spent, the greater her profit. Thus, while the channel partners wanted Allot to cut checks for marketing funds up front, Allot preferred instead to issue back end credits for purchases. Witnesses recalled a number of instances where channel partners were unable to obtain needed financial marketing support from Allot:

(a)    Larry Schmidt told CW1 that marketing funds were not provided to Layer 3 Technologies ("Layer 3"). CW 2 confirmed that Layer 3 could not get its marketing plans approved by Sharon Hess. CW2 specifically recalled a marketing program with Layer 3 for which Middle

Atlantic Channel Manager Ed Duran could not get approval; ultimately, Duran made a side deal with Layer 3 Vice President, Alan Krolick, involving an amateurish marketing program which did not yield a sale – and was fired for his efforts;

(b)     In September 2006 an Allot channel partner, Windstream Supply (in Little Rock, Arkansas), faced challenges supporting a product launch effort. Windstream as a channel had not done much in the way of sales volume and CW1 wanted to change that. CW1 wrote a summary with suggestions as to what would be needed, but could not get support from Sharon Hess. Therefore, the launch did not succeed;

(c)     Phillips Communications & Equipment Co., Inc. ("Phillips") in Charlottesville, Virginia, which was working primarily with small ISPs, submitted excellent marketing strategies to Allot. CW1 started putting together some marketing collateral, but could never get Allot past the design phase to do any real marketing. CW1 stated that, again, sales were not made;

(d)     There was a company outside of Washington, D.C. to which CW1 had wanted to provide support, but, other than lip service, these efforts were stopped short by Allot management;

(e)     According to CW1, Channel manager Tom Barr had worked with a reseller in Washington, just outside of Seattle, who made great efforts pursuing both the government and education markets, but Allot marketing did not give the reseller the support needed to get the effort off the ground;

(f)     CW1 also recalled that Barr had also worked with a reseller in Salt Lake City who had offered viable marketing programs, but Allot was not willing to provide funding to support them;

16

(g)       Barr had tried to work with a vendor out of South Dakota, who sold primarily to ISPs. The vendor did not have a good experience working with Allot. Although CW1 tried to repair the relationship, nothing came of it;

(h)       CW1 spent a substantial amount of time assembling marketing programs that included incentives as well as a recruiting process to find retailers, *i.e.*, to expand the channel partners' base. CW1 had worked closely with Alternative Technologies ("AT"), a large distributor, to develop new programs. But Allot again failed to put money behind these programs and none of the programs was implemented. CW4, a former sales employee at Alternative Technologies who worked with CW1 confirmed that AT only got a small amount of money, once, for a very basic program;

(i)       Once Allot announced its shift to target large service providers in early 2006, CW2 indicated that with respect to the education and enterprise markets, Allot had not allowed any new marketing programs to move forward; and

(j)       CW3, one of two employees who worked directly with customers, was responsible for sales to large enterprise accounts for which Allot wanted a direct relationship. CW3, who was supposed to develop new markets, could not get assistance preparing "solution briefs." Around February 2007, CW3 attended a sales meeting at a hotel in Eden Prairie, Minnesota (the location of Allot's U.S. offices) at which 20-25 sales, engineering and management employees were present. Vin Costello and Rami Hadar participated in the meeting. CW3 requested funds to buy lists of customers (typical cost, $2,000-$10,000) and for resources to prepare marketing templates. Even though existing staff could have prepared the templates, which could have been reused in other vertical markets, such as colleges, Hadar simply said "No." All of the sales personnel were shocked that Hadar said that Allot would not spend the money.

17

33.    Even though Allot's stated goal was to "further address small and medium-sized service providers and enterprises, including the government and education sectors," this statement was materially misleading.  Former employees recalled a number of occasions where Allot allowed opportunities to slip away:

(a)    CW1 put together a regional customer training program for Goldfield Telecom, demonstrating the capabilities of Allot's products. The audience was impressed by Allot's base technology and wanted Allot to add compliance features (which were very much in demand). CW1 gave this feedback to the main office, but nothing happened;

(b)    In the months leading up to the IPO, CW1 toured the United States, including the East Coast and the West Coast, in order to talk with distributors and retailers—the channel partners whom the Company purported to support—and get a sense of what they needed. CW1 had garnered substantial information concerning what customers wanted from Allot and issues which needed to be addressed. For example, a new law had gone into effect that required ISPs to implement "load balancing," a technique to spread work between two or more systems in order to optimize a function. This requirement would mean more business for Allot. CW1 stated that Allot's sales people had promised to fill this need, but the Company failed to implement the plans necessary to do so. CW1 said that Allot had "tons of opportunity" across the United States.

(c)    CW1 told Larry Schmidt about a federal government program involving load-balancing of classrooms kindergarten through 12th grade. The sale would be easy because the education institutions would obtain federal funding for the purchase of the products. Schmidt responded that filling out the paperwork was too much work;

18

(d)    CW2, who focused on the educational and enterprise markets recalled that in several quarters marketing programs were created in order to "finish" a quarter (make the numbers for that quarter). Near the end of the quarter, as sales were in the final stages of approval, the Company would send messages directly to channel partners telling them they were extending the program through the next quarter. This action had the effect of removing incentive-driven pressure on the sales deals in the pipeline. Consequently, the sale which had been expected would lapse into the next quarter and the sales goals for the preceding quarter would not be met;

(e)    CW3, who was supposed to build new markets, would research a market, compile facts about the market, including its size and the technology it needed. Because CW3 received no marketing assistance from Sharon Hess, there was no way for CW3 to address the new market; and

(f)    CW4, who worked in sales at AT, indicated that "Allot did not play at a level we wanted them to. They didn't show up at events we wanted." Even if Allot had paid money to attend the events, no one would show up. Consequently, Allot missed opportunities to meet AT's customers and to influence its sales people.

34.    Defendants' statements, in the Registration Statement, that it was the Company's strategy to focus its efforts on "increasing brand awareness" and to "support[] [channel partners'] efforts to promote our products," were untrue. Allot dropped these efforts in favor of focusing on large service providers. For example:

(a)    CW1 stated that just before the IPO Allot re-branded its products to make them more attractive for marketing to high-volume Tier 1 telecommunications customers. CW1

stated that the channel partners were offended that support for them was being abandoned in favor of the pursuit of Tier 1 customers. Consequently, CW1 was fielding "complaints upon complaints."

(b)    CW1 stated that in 2005, Allot had distributed a new product handbook every month which focused on retailers. The handbook was very well received by customers in the channel. However, three or four months prior to the IPO, Allot ceased this publication and, instead, issued a different handbook focused solely on Tier 1 customers.

35.    Even though Allot credited its channel partners for "substantially all" of its sales and for having "enabled us to achieve a diverse customer base," the statement that Allot "intend[s] to expand our world-wide sales and marketing channels to further address small and medium-sized service providers and enterprises, including the government and education sectors," was untrue. As explained generally above, and more specifically in this paragraph, former Allot employees agree that Defendants made the decision, prior to the IPO, to completely shift its focus from these customers to Tier 1 service providers, and cable and mobile operators:

(a)    CW1 stated that Allot ignored and offended its existing channel partners by seeking to move into the multiple system operator and Tier 1 telecommunications markets;

(b)    CW2 recalled that at the January 2006 annual sales meeting in Cypress, Defendants Hadar and Jacoby laid out the strategy to all Company sales people that Allot was moving into the service provider market. They also stated that Allot would not be doing acceleration or compression, which were features that the enterprise market needed. This decision was fatal to Allot's enterprise market, as Packeteer, Riverbed, Sandvine and Ellacoya already had enterprise products which offered acceleration and compression. During the presentation, Hadar stated that they were adding headcount in the United States only to sell to service providers. CW2 noted, as had

20

CW1, that this new strategy was a major change in the way the Company did business. Selling directly to large service providers meant that the channel providers would not be participating in these sales – the very channel partners described in the Registration Statement as being the source of "substantially all" of Allot's current business;

(c)    CW3 also recalled attending the January 2006 sales meeting and hearing defendants Hadar and Jacoby tell the sales force that Allot would be moving into the service provider market and would not be adding any new features for the enterprise market, including compression and acceleration (methods of speeding up and making more efficient a user's network browsing experience). CW3 further stated that at the meeting Hadar revealed that no new application signatures would be added to NetEnforcer. NetEnforcer allocates bandwidth to applications based on their signature. Without support to add more signatures, enterprise customers would not be able to have NetEnforcer functionality when new software applications were added; and

(d)    CW5, a former Allot Channel Development Manager during the Class Period, who worked with distributors and retailers, left because he/she was not happy with the Company's direction, which focused on Tier 1 carriers.

36.    Each of the witnesses attributed Allot's declining channel sales to these failures (set forth in ¶¶30-35) to live up to the goals and strategies set forth in the Registration Statement:

(a)    CW 1 said that as a result of this lack of effort on Allot's part, sales were generally flat from at least the end of 2005 through the time of the IPO. Although the sales force was having trouble meeting its targets, Allot continually raised the sales goals;

(b)    CW2 similarly described dysfunction in the channels, with few marketing programs in place. As a result of the lack of support, resellers would not do more than just take

customer orders. As did CW1, CW2 noted that at the 2007 annual sales meeting in Athens, Greece, the Company set the sales quotas too high; and

(c)    During the conference call for the first quarter of 2007, when Defendants attributed Allot's missed revenue figures to disappointing sales to the education, enterprise and smaller ISP channels, principally in the Americas, CW3 recalled thinking that the reason this occurred was because Allot had not provided the marketing dollars to make those channels successful. Like CW1 and CW2, CW3 commented that in all of the time CW3 worked for Allot, no one achieved his/her sales quotas – and Allot was always increasing them.

### Materially Untrue Statements and Omissions Concerning the Company's Focus Shift to ISP Customers

37.    With regard to the Company's focus and customer base, the Registration Statement, in relevant part, stated:

> **Size of end-customers and sales cycles. We believe that our growth can be accelerated by increasing sales to large service providers and have hired additional sales and marketing personnel in recent years in order to achieve this goal. The deployment of our products by small and midsize enterprises and service providers can be completed relatively quickly with a limited number of NetEnforcer systems compared to the number required by large service providers. Design wins with large service providers, including carriers, are more likely to result in sustained demand for additional NetEnforcer systems as they deploy our products throughout their networks and as their networks grow. The increased deployment of our products in carriers' networks also enhances our reputation and name recognition in the market. We, therefore, expect that significant customer wins in the carrier market will positively impact future performance.** However, our performance is also influenced by sales cycles for our products, which typically fluctuate based upon the size and needs of end-customers that purchase our products. Generally, large service providers take longer to plan the integration of DPI solutions into their existing networks and to set goals for the implementation of the technology. The varying length of our sales cycles creates unpredictability regarding the timing of our sales and may cause our quarterly operating results to fluctuate if a significant customer defers an order from one quarter to another. Furthermore, longer sales cycles may result in delays from the

22

the time we increase our operating expenses and make investments in inventory, until the time that we generate revenue from related product sales.

[Emphasis added.]

38.     The above statements were materially untrue and/or misleading because they omitted to disclose that the Company's addition of ISP providers, while retaining its prior customer base, was unrealistic for a number of reasons:

(a)     CW2, who worked in the industry for a number of years, indicated that the Company's products and organization were not ready to take on the service provider market. CW2 stated that service providers have a high expectation of support and that they would expect the Company to turn around bugs in a day or two. CW2 said that the whole execution of the Allot's organization would have had to move up a notch. Similarly, Allot could not break into the Multiple System Operator market "because they went after the elephants [but] they didn't have the bullets in the gun to do it";

(b)     CW2 stated that another former Allot employee, Leor Skivik, had attempted to make inroads with AT&T. However, as none of Allot's products had been Network Equipment Building System ("NEBS") certified as of the time of the IPO, Allot's products could not yet be considered. In light of the fact that the sales cycle at service providers was much longer, upwards of 18-24 months, it could be years until Tier 1 service providers would consider Allot's products;

(c)     CW5 indicated that while Defendants focused upon Tier 1 service providers, these carriers had a lot of requirements that had to be met before Allot could be successful in this market, and Allot's products were not yet ready for Tier 1 carriers; and

(d)     Most important, it was not Defendants' plan to *expand* but to *alter* its existing customer base, to capture what was perceived to be a more lucrative and growing market. As

discussed above, in the January 2006 annual sales meeting, Defendants Hadar and Jacoby stated that

Allot would *not* be doing bandwidth acceleration or compression and would *not* be adding new

application signatures to NetEnforcer – actions critical to retain its customer base in light of

competitors' offerings – and would *only* be adding personnel in the United States to sell to large

service providers.

<u>Materially Untrue Statements and Omissions Concerning</u>
<u>the Company's Ability to Compete</u>

39.    With regard to the Company's competitive strengths, the Registration Statement, in

relevant part, stated:

**Our competitive strengths include the following:**

- **Market-leading DPI technology and analytical capabilities.** Our focus on developing the most efficient means to search for hundreds of different applications, combined with our extensive database of algorithms that detect network applications**, provide us with a significant competitive advantage.** We believe that our NetEnforcer AC-2500, is currently the only commercially deployed solution with its level of functionality capable of supporting 5 gigabits/second performance and 2 million simultaneous connections.

- **Broad product portfolio. We believe that our broad product portfolio with offerings targeted at small, midsize and large service providers and enterprises enables us to compete in, and our channel partners to serve, a wider range of profitable markets than our competitors.**

- **Independence from underlying network infrastructure.** Our independent solutions are designed for easy deployment and to be less disruptive to existing networks than embedded solutions, which require changes or upgrades to the network infrastructure. In addition, independent solutions can be upgraded easily to respond to rapid changes in application behavior and subscriber demands, and offer end customers flexibility in choosing any infrastructure equipment vendor.

- **Global sales and marketing channels. Our global network of over 300 distributors, resellers and systems integrators, through which we make substantially all of our sales, have enabled us to achieve a diverse customer base.** We also rely on these third parties to install and provide basic technical support for our systems. To date, we have deployed over 9,000 NetEnforcer

24

systems in 118 countries.

- **Focus on service optimization solutions. We believe that our dedicated focus on DPI solutions differentiates the level of service and support that we provide to our channel partners and end-customers. This includes our responsiveness to the introduction of new applications** and effective integration of our products into our customers' existing billing, customer care and other business systems.

[Emphasis added.]

40.    The above statements were materially untrue and/or misleading because, as discussed above, Allot had no "competitive advantage" in the Tier 1 service provider field and would not integrate into its systems key components which were required by the enterprise market. For example, an IT architect at Owens & Minor, which is providing services for an enterprise customer listed in Allot's Form F-1, Perot Systems ("CW6"), plans to replace 60 NetEnforcer units purchased in September 2005 (with Cisco units) because, in 2006, CW3 told CW6 that Allot had dropped the acceleration and compression features that had been repeatedly promised to CW6 by former Allot account manager Tom Palman. CW6 purchased the units from Allot, in part, because of the promise that acceleration and compression features under development would soon be made available. Allot thus failed to be "responsive," not only to the needs of both service providers and enterprise customers, but to the needs of its channel partners.  Further, by failing to provide CW3 with marketing support to build new markets, Allot would not be able serve a "wider range of profitable markets" – even if it had the product portfolio to do so.

41.    With regard to how the Company planned to maintain its channel partnerships, the Registration Statement, in relevant part, stated:

### Our Strategy

Our goal is to be the leader in offering service providers and enterprises network inspection and management solutions to transform generic access broadband

networks into intelligent broadband networks. Our strategy to achieve this goal includes the following:

\*\*\*

- **Continue to expand our sales and marketing channels. We intend to expand our world-wide sales and marketing channels to further address small and medium-sized service providers and enterprises, including in the government and education sectors. Through these channels, we have sold our products to a diverse range of end-customers and we intend to build on this success by continuously improving our channel relationships, creating mutual marketing campaigns and supporting their efforts to promote our products.** We intend to seek channel partners in new geographical territories, as well as in vertical markets in countries where we have already established a presence.

[Emphasis added].

42. The above statements were materially untrue and/or misleading because they omitted to disclose that the Company was, as discussed above, failing to fund and support its channel partners, failing to invest in marketing in the channels, and adding personnel in the United States *only* for the large ISP market, not to improve its channel partnerships. Allot was not "continuously improving" its channel relationships; to the contrary, it was abandoning its channel partners at every opportunity in favor of a new strategy focused solely on the Tier 1 service provider market.

43. Further, with regard to how the Company planned to achieve its stated goal of becoming the leader in the industry, the Registration Statement, in relevant part, stated:

- **Focus on larger service providers.** We intend to target larger service providers, including carriers, and cable and mobile operators, in response to increased demand from them for the ability to differentiate their service offerings. **We believe that targeting large service providers is important to our revenue growth because sales to these end-customers are more likely to result in sustained demand for our NetEnforcer systems as they deploy our products throughout their networks. We believe that we are well-positioned to continue to target these end-customers with our carrier-class products, together with our management solutions, operating experience and installed base. We intend to target these end-customers by continuing to develop partnerships with system integrators and OEMs in order to leverage their**

26

**existing relationships with larger service providers.** We intend to supplement these efforts with direct business development and by tailoring our customer support capabilities to further enhance our ability to support system integrators and OEMs.

[Emphasis added.]

44.    The above statements were materially untrue. Allot was not "well-positioned" to target large service providers with "carrier-class products." In addition to the fact that Allot's products were not NEBS certified, Defendants omitted to disclose that the Company had neither the technology nor the ramped-up responsiveness necessary to effectively compete in the large service provider markets.

45.    For example, CW2 had sold 14 devices in a deal worth $1,000,000 to the New York City Board of Education. This deal was accomplished through Layer 3. At the time, that was the biggest deal that Allot had closed. However, at the time the software could not even manage 14 gigabit boxes, the "NetEnforcer" devices which were running the Company's NetXplorer program. CW3 said that NetXplorer couldn't handle the bandwidth, *i.e.*, couldn't respond to network traffic in a timeframe which manages the through flow effectively, meaning that packets would be "dropped," or lost in the network. CW2 stated that service providers would need up to 200 gigabit boxes and that there was no way for Allot to make 200 boxes work correctly if it couldn't be done with only 14.

## THE CLASS PERIOD ENDS

46.    On Sunday evening, April 1, 2007 (Monday morning April 2, 2007 in Israel), Allot published a release that lowered the Company's own guidance for 1Q and FY:2007, including lowering expected 1Q:07 revenue by over a million dollars, and stated that net income was expected to decline as well. This release stated, in part, the following:

**Allot Communications Updates Estimates for First Quarter 2007 and 2007 Fiscal Year**

HOD HASHARON, Israel, April 2, 2007 (PRIME NEWSWIRE) -- Allot Communications Ltd. (Nasdaq:ALLT), a leader in IP service optimization solutions based on deep packet inspection (DPI) technology, today announced that **revenues and earnings for the first quarter of 2007 and the 2007 fiscal year are anticipated by the Company to be lower than its previous guidance.**

**Management reported that weakness in sales from some of the Company's distributors, principally in the Americas, which are focused on sales to enterprise, education, and smaller ISPs, had resulted in lower than expected revenues.** However, sales to larger customers, mainly Tier 2 service providers, which are conducted with the direct involvement of Allot's sales personnel, showed strong growth during the quarter. **As a result of this, management expects that revenues for the first quarter of 2007 will be in the range of $8.2 - 8.3 million, compared to the Company's original guidance of a level similar to the $9.6 million in revenues recorded during the fourth quarter of 2006. As a result, Net income for the first quarter of 2007 will also decline.**

"We were disappointed with the performance of some of our distributors during the quarter which may result in slower than expected growth throughout the year," said Rami Hadar, Allot's President and CEO. "We are encouraged, however, by the progress we have made in larger accounts and the growth we saw in sales to these accounts during the quarter, both in terms of number of projects and sales. Overall, we remain confident in our strategy and on the long-term outlook for our DPI products on a global basis."

**Financial Guidance**

As a result of the trends described above, the Company is updating its previous guidance for the year 2007, and currently anticipates that net revenues will total approximately $40 million. **Earnings guidance will also be lowered as a result, and will be discussed in detail upon issuance of the Company's full financial results for the first quarter of 2007.**

[Emphasis added.]

47.     On the release of this news, shares of the Company's stock declined $2.04 per share, or 22.3 percent, from a close on March 30, 2007 of $9.15 to a to close the next trading day, April 2,

2007, at $7.11 per share on unusually heavy trading volume.

48.    The closing price on April 2, 2007 represented a post-IPO cumulative loss of $6.70 per share, or over 48.5 percent of the value of the Company's shares immediately following its IPO just months prior.

49.    By improperly characterizing the Company's sales position, marketing plan, customer base, relationship with channel partners, and its ability to compete in various markets, and thereby misrepresenting its future prospects, Defendants presented a misleading image of Allot's business and future growth prospects. Within the Registration Statement, Defendants repeatedly emphasized the Company's positive sales prospects and its ability to compete in higher-tier telecommunications markets. These claims caused and maintained the artificial inflation in Allot stock at the time of the November 2006 IPO and thereafter until the truth about the Company was ultimately revealed to investors.

50.    Defendants' materially untrue and misleading statements caused Allot shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $12.00 per share, and such shares reached an immediate trading high of $15.53 per share on November 16, 2006.

51.    As investors and the market ultimately learned, the Company's business prospects had been overstated, as was the Company's technological prowess and competitiveness. As this adverse information became known to investors, the prior artificial inflation was eliminated from Allot's share price, and shareholders were damaged as a result of this related share price decline.

52.    The timing and magnitude of Allot's stock price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to

Defendants' violations of the 1933 Act. During the same period in which Allot's share price fell over 22% as a result of Defendants' material misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

53.    The economic loss, *i.e.* damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

### ADDITIONAL ALLEGATIONS RE INDIVIDUAL DEFENDANTS

54.    It is appropriate to treat the individuals named as defendants herein as a group for pleading purposes (the "Individual Defendants") and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly-defined group of Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

55.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and traded on the NASDAQ

30

stock market exchange, and governed by the provisions of the federal securities laws, the Individual

Defendants each had a duty to disseminate promptly, accurate and truthful information with respect

to the Company's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings, and present and future business prospects, and to

correct any previously-issued statements that had become materially misleading or untrue, so that the

market price of the Company's publicly-traded common stock would be based upon truthful and

accurate information. The Individual Defendants' misrepresentations and omissions made in

connection with the issuance of common stock in November 2006 violated these specific

requirements and obligations.

56.     The Individual Defendants, because of their positions of control and authority as

officers and/or directors of the Company, were able to and did control the content of the various SEC

filings, press releases, and other public statements pertaining to the Company at the time of the

Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be

misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

responsible for the accuracy of the statements detailed herein and is therefore primarily liable for the

representations contained therein.

<u>**CLASS ACTION ALLEGATIONS**</u>

57.     This is a class action on behalf of all persons who purchased Allot shares, or traceable

stock, pursuant to the November 2006 IPO (the "Class"). Excluded from the Class are Defendants,

the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which Defendants have

31

or had a controlling interest. Class members are so numerous that joinder of them all is impracticable. The Class Period begins on November 15, 2006, the date of the IPO, and ends on April 2, 2007 when the true adverse facts were revealed to the public.

58.     Common questions of law and fact predominate and include: (i) whether defendants violated the Securities Act; (ii) whether the Registration Statement contained untrue and/or misleading material facts and omissions; and (iii) the extent and appropriate measure of damages.

59.     Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Specifically, the protections afforded by 15 U.S.C §78u-5 apply only to forward-looking statements and do not apply to misrepresentations and omissions of current or historical facts alleged herein. Further, the statutory safe harbor does not apply to statements made in connection with an initial public offering.  15 U.S.C §78u-5(b)(2)(D).

## CLAIM FOR RELIEF
### COUNT I
### For Violations of §11 of the Securities Act
### Against Allot

61.     Plaintiffs incorporate each and every allegation above as if stated herein.

62.     On or about November 15, 2007, the Company completed an IPO of 6.5 million

shares of Allot stock at $12 per share, for total proceeds of at least $78,000,000.

63.    Each of the statements alleged herein relating to Allot's prospects and financial results made in the Registration Statement were materially untrue and/or misleading when issued, or omitted to disclose a material fact necessary to make the statements not misleading. The true but undisclosed facts were that Allot was not operating according to plan, that the Company was already experiencing declining sales in its indirect distribution channels at the time of the IPO, that the Company was neither funding nor pursuing the marketing endeavors necessary to sustain its current business, and that the Company was unable to compete in the Tier 1 service provider market on which it was focusing. Allot is strictly liable for the material misstatements and omissions in the Registration Statement issued by it.

64.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

65.    By reason of the conduct herein alleged, Allot violated §11 of the Securities Act.

## COUNT II
### For Violations of §11 of the Securities Act
### Against the Individual Defendants

66.    Plaintiffs incorporate each and every allegation above as if stated herein.

67.    The Individual Defendants each signed Allot's Registration Statement with the SEC and distributed the Registration Statement to investors.

68.    The Individual Defendants owed to the purchasers of the stock, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in

the Registration Statement and Prospectus at the time it became effective, to ensure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

69.    The officers and directors of Allot were signatories to the Registration Statement. By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiffs and the Class have been damaged.

70.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

71.    By reason of the conduct herein alleged, each of the Individual Defendants violated §11 of the Securities Act.

## COUNT III

### For Violations of §15 of the Securities Act
### Against the Individual Defendants

72.    Plaintiffs repeat and re-allege each and every allegation contained above.

73.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

74.    Each of these Individual Defendants was a control person of Allot by virtue of his or her position as a director and/or senior officer of Allot or as a result of his or her large equity interest. The defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of Allot.

34

75.    Each of the Individual Defendants is liable for violating §15 of the 1933 Act based on their ability to control Allot, which violated §11 of the 1933 Act as alleged in Count I above. This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding Allot's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the Registration Statement and Prospectus.

76.    The Individual Defendants, by reason of their stock ownership and/or positions with Allot, were controlling persons of the Company and are liable under §15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

**Dated**: June 9, 2008                    **GLANCY BINKOW & GOLDBERG LLP**

Robin Bronzaft Howald (RH 9974)
Frederick W. Gerkens III (FG 7595)
**GLANCY BINKOW & GOLDBERG LLP**
1430 Broadway, Suite 1603
New York, New York 10018
Telephone: (212) 382-2221
Facsimile: (212) 382-3944

35

Lionel Z. Glancy
Marc L. Godino
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Kim E. Miller
Melissa R. Clark
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

Jacob Sabo
**THE LAW OFFICE OF JACOB SABO**
The Tower No.3 Daniel Frisch St. 15th Floor
Tel Aviv, Israel 64731
Telephone: 011 972 3 607 88 88
Facsimile: 011 972 3 607 88 89

**Lead Counsel for Lead Plaintiffs & the Class**

## CERTIFICATE OF SERVICE

I hereby certify that this Amended Complaint was filed on June 9, 2008 and will be served on the following parties via email and overnight courier on June 9, 2008.

**Gideon Alexander Schor**
Wilson Sonsini Goodrich & Rosati(NYC)
12 East 49th Street
30th Flr.
New York, NY 10017
(212)-999-5853
Fax: (212)-999-5899
Email: gschor@wsgr.com

**Jennifer J Lee**
Wilson Sonsini Goodrich & Rosati(SF)
One Market Street, Spear Tower, Suite 3300
San Francisco, CA 94105
(415)-947-2000
Fax: (415)-947-2099
Email: jlee@wsgr.com

**Kenneth Michael Murray**
Wilson Sonsini Goodrich & Rosati(NYC)
12 East 49th Street
30th Flr.
New York, NY 10017
(212)-999-5800
Fax: (212)-999-5899
Email: kmurray@wsgr.com

**Nina F. Locker**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300
Email: nlocker@wsgr.com