Gideon A. Schor (GS-5932)
Kenneth M. Murray (KM-8728)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel.: (212) 999-5800
Fax: (212) 999-5899

Nina F. Locker (admitted *pro hac vice*)
Jennifer J. Lee (JL-6985)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304
Tel.: (650) 493-9300
Fax: (650) 493-6811

*Attorneys for Defendants*
*Allot Communications Ltd., Yigal Jacoby,*
*Rami Hadar, and Adi Sapir*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALLOT COMMUNICATIONS LTD. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br>ALL ACTIONS | **MASTER FILE**<br>**07 Civ. 3455 (RJH)**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    The Company ...................................................................................... 3

    B.    The Initial Public Offering ................................................................ 4

    C.    The April 2, 2007 Press Release ....................................................... 4

    D.    The Complaint .................................................................................... 5

ARGUMENT .......................................................................................................... 6

I.      STANDARDS GOVERNING A MOTION TO DISMISS .......................... 6

II.    THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM .............. 7

    A.    Principles Governing Section 11 Claims ........................................... 7

    B.    The Prospectus Either Directly Contradicts Plaintiffs' Allegations or Disclosed the Information That Plaintiffs Contend Was Omitted ........................... 8

          1.    Declining Sales .................................................................... 9

          2.    Focus on Large Service Providers ..................................... 11

          3.    Failure to Support Marketing .............................................. 11

    C.    Plaintiffs' Claim That Allot's Statements Regarding Its Channel Partners Were False Impermissibly Relies on Allegations of Mismanagement ..................... 15

    D.    Plaintiffs' Claims Are Bereft of Supporting Factual Allegations ............................. 18

    E.    The Prospectus Bespeaks Caution ................................................... 21

    F.    Many of the Allegedly Misleading Statements Are at Most Inactionable Puffery .............................................................................................. 24

III.   PLAINTIFFS' SECTION 15 CLAIM AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED .......................................................... 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d. Cir 2007) ..........................................6

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................6, 7, 18, 19

*Belodoff v. Netlist, Inc.*, No. 07 Civ. 00677 (DOC), 2008 WL 2356699 (C.D. Cal. May
30, 2008) ......................................................................................................................19

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ...........................21

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) ........18

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999)......................................................7

*Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22,
2005) ...........................................................................................................................24

*DeMaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) .............................................9, 11, 14

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) .................................................................7

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992) ............................................................7

*Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123 (D.R.I. 1991).......................................................18

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)...............................................23

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)................................................................23

*Hinerfeld v. United Auto Group*, No. 97 Civ. 3533 (RPP), 1998 WL 397852 (S.D.N.Y.
July 15, 1998)................................................................................................................24

*In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171 (S.D.N.Y. 2003) ...........................7

*In re Allot Communications Ltd. Securities Litigation*, Master File No. 07 Civ. 3455
(RJH)............................................................................................................................5

*In re Authentidate Holding Corp.*, No. 05 Civ. 5323 (LTS), 2006 WL 2034644 (S.D.N.Y.
July 14, 2006)................................................................................................................7

*In re Axis Capital Holdings Ltd.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ....................................25

*In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749 (E.D. Va. 2004) .........................................18

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ......................................17

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357 (3d Cir. 1993) ...15, 16, 17

*In re Fox Hollow Techs., Inc., Sec. Litig.*, No. 06 Civ. 4595 (PJH), 2008 WL 2220600 (N.D. Cal. May 27, 2008) ................................................................................. 19

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........... 18

*In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004) ..................... 19, 20

*In re Leadis Tech., Inc. Sec. Litig.*, No. 05 Civ. 00882 (CRB), 2006 WL 496039 (N.D. Cal. Mar. 1, 2006) ................................................................................................. 21

*In re Merrill Lynch & Co., Research Reports Sec. Litig. (I)*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ................................................................................................. 7

*In re Merrill Lynch & Co., Research Reports Sec. Litig. (II)*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................................................. 18

*In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000) (*per curiam*) ......................................................................... 7, 8, 9

*In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1 (D. Mass. 1999) ................. 20, 21

*In re OPUS 360 Corp. Sec. Litig.*, No. 01 Civ. 2938 (JGK), 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) ......................................................................................... 23, 24

*In re Starter Corp. Sec. Litig.*, No. 94 Civ. 718 (TPG), 1996 WL 406624 (S.D.N.Y. July 19, 1996) ................................................................................................. 21

*In re Watchguard Sec. Litig.*, No. 05-civ-678 (LR), 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ................................................................................................. 18

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ...................................... 14

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ................................. 25

*Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97 (W.D.N.Y. 1993) ................................. 17

*Lewis v. Potlatch Corp.*, 716 F. Supp. 807 (S.D.N.Y. 1989) .......................................... 14

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) ...................................... 9, 22

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................. 3

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1994) ......................... 8, 9, 11, 22, 23

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ............................. 18

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...2, 8, 20, 23, 24

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .................................................... 21, 22

*Ross v. Bank of Am., N.A.*, 524 F.3d 217 (2d Cir. 2008) ........................................... 6, 18

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)..............................................................3

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996)........................................................................................................25

*Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785 (S.D.N.Y. 1997) ..................7, 8, 20, 21, 25

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996) ............................14

*Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000).................................9

*Stepak v. Aetna Life & Cas. Co.*, No. 90 Civ. 00886 (AVC), 1994 WL 858045 (D. Conn. Aug. 29, 1994), *aff'd*, 52 F.3d 311 (2d Cir. 1995)......................................................17, 18

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, No. 07 Civ. 1124, 2008 WL 2566557 (2d Cir. June 24, 2008) ...........................................................................21

## STATUTES

15 U.S.C. § 77k.............................................................................................................1

15 U.S.C. § 77k(a) ........................................................................................................7

15 U.S.C. § 77o.............................................................................................................1

## RULES

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1

Defendants Allot Communications Ltd. ("Allot" or the "Company"), Yigal Jacoby ("Jacoby"), Rami Hadar ("Hadar"), and Adi Sapir ("Sapir") ("Individual Defendants") (collectively with Allot, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws ("Complaint" or "ACCAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, plaintiffs' claims under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77o, fail to state a claim upon which relief can be granted. The Complaint should therefore be dismissed.

## INTRODUCTION

Plaintiffs allege that a prospectus issued by Allot for its November 2006 initial public offering ("IPO") misstated or failed to disclose a number of purportedly material facts in violation of Section 11. The thrust of plaintiffs' claims is that Allot's prospectus (i) failed to disclose that the Company had shifted its sales efforts towards large service providers and therefore had stopped supporting channel partners that sold to small and medium-sized enterprises,[1] (ii) failed to disclose that the Company was consequently experiencing declining sales, (iii) falsely asserted a commitment to support channel partners that sold to small and medium-sized enterprises, and (iv) falsely asserted an ability to compete for large service providers as customers.

Plaintiffs' Section 11 claims should be dismissed for failure to state a claim. As an initial matter, the financial statements in the prospectus – the accuracy of which plaintiffs do not dispute – directly contradict plaintiffs' allegation of declining sales. In addition, contrary to plaintiffs' allegations, the prospectus disclosed that Allot had shifted the focus of its business strategy to pursuing large service providers. Moreover, plaintiffs' contention that Allot falsely asserted a commitment to support channel partners that sold to small and medium-sized enterprises rests solely on allegations criticizing Allot's competence in dealing with its channel partners in general; these allegations amount to nothing more than a claim of corporate mismanagement and do not give rise to

---

[1] Channel partners are companies that purchase Allot's products and then resell them, in some
(continued...)

a viable cause of action under federal securities law.  Furthermore, the prospectus demonstrated that Allot was already competing in the large service provider market, that the majority of its product revenues in the fiscal year prior to the IPO was from sales to large service providers, and that Allot's sales to such providers had actually been increasing at the time of the IPO.  Finally, the prospectus extensively detailed the precise risks – namely, that Allot's sales might suffer if any of its channel partners failed, that Allot might be unable to compete in the large service provider market, and that Allot might not achieve profitability – that materialized several months after the IPO and are now the subject of this lawsuit.  Accordingly, the Complaint fails to plead a materially misleading omission or statement, which is a required element under Section 11.

Absent factual allegations pleading the existence of material misrepresentations, this case is a classic example of pleading by hindsight insofar as plaintiffs "question[] the accuracy of the offering statement in light of the much-later materialization" of disappointing sales to small and medium-sized enterprises.  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008).  Significantly, during the three months following the IPO, Allot's stock price drifted downward, even though Allot issued *no* announcements regarding its financial results or performance during that time.  Following Allot's April 2, 2007 press release – which announced that revenue for the first quarter of 2007 would fall short of the Company's guidance in February 2007 because of disappointing sales to small and medium-sized enterprises in North America – the stock price further declined by 22% to $7.11 per share.  To assert that the prospectus was misleading, plaintiffs simply borrow from the *April 2, 2007 press release* and *speculate* that the same problems prompting revision of the Company's February 2007 guidance existed *at the time of the November 2006 offering*.  Such pleading by hindsight is insufficient to sustain plaintiffs' Section 11 claims. *See Panther Partners, Inc.,* 538 F. Supp. 2d at 672 (dismissing Section 11 claim for pleading "by hindsight").

For these and the additional reasons set forth below, the Complaint should be dismissed as a

_____

(...continued from previous page)
form, to end-users.  *See infra* at 4.

matter of law.

**STATEMENT OF FACTS**

**A.    The Company**

Allot designs, develops, and sells broadband[2] service optimization solutions.  ACCAC ¶ 16. Allot's products utilize "deep packet inspection" (or "DPI") technology to provide its customers with real-time visibility into, and control of, their network traffic.  *Id.* ¶ 3.  Certain broadband applications, such as Internet video, require larger amounts of bandwidth and are more sensitive to network delays than other broadband applications, such as e-mail.  *Id.*; Ex. 3 at 1-2.[3]  Rather than incur the significant cost of upgrading infrastructure to increase bandwidth, customers may instead use Allot's products to prioritize their broadband applications – giving higher priority to delay-sensitive applications and lower priority to non-critical, bandwidth-intensive applications – to maximize network performance.  ACCAC ¶ 3.

Information is transmitted through the Internet in the form of "data packets."  Ex. 3 at 1.  DPI technology examines data packets more deeply than do conventional technologies, permitting more active prioritization and hence higher service quality.  *Id.*  Allot's products consist of its NetEnforcer traffic management systems, which examine data packets and identify applications on networks, and its NetXplorer application management suite, which enables the implementation of user-defined network management policies.  ACCAC ¶ 3.  Allot sells its products to two categories of customers: (i)  "service providers,"  which  are  businesses  that  provide  broadband  service,  such  as telecommunications companies (or "carriers") and cable and mobile operators; and (ii) "enterprises,"

---

[2] "Broadband" is shorthand for high-speed Internet access.  It is to be contrasted with dial-up (or modem) Internet access, which is much slower than broadband.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 974-75 (2005).

[3] "Ex." refers to exhibits to the Declaration of Gideon A. Schor submitted herewith.  It is well settled that in deciding motions to dismiss under the federal securities laws, a court may properly consider "any statements or documents incorporated in [the complaint] by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

which are other businesses that use Allot's products, such as financial institutions, as well as government entities and educational institutions. *Id.*; Ex. 3 at 1-2, 10-11, 58.

At the time of the IPO, Allot made substantially all of its sales through channel partners, which consisted of a global sales and marketing network of over 300 distributors, resellers, original equipment manufacturers ("OEMs"), and system integrators. ACCAC ¶ 3. In addition to selling Allot's products, the channel partners are responsible for installing the products and providing technical support after installation. Ex. 3 at 9. Allot's strategy for growing its business was to focus on large service providers – carriers as well as cable and mobile operators. Sales to these end-users were more likely to result in sustained demand for Allot's products, as they deploy Allot's products throughout their networks. *Id.* at 54. The Company intended to target large service providers principally through channel partners – namely, system integrators and OEMs. *Id.* These efforts would be supplemented with direct business development by Allot's own sales and marketing staff. *Id.* This strategy, as well as the rationale for the strategy, was fully disclosed in the Prospectus. *Id.*

**B.    The Initial Public Offering**

On October 31, 2006, Allot filed with the Securities and Exchange Commission ("SEC") a preliminary draft of its Registration Statement and Prospectus to offer 6,500,000 shares of its common stock for sale to the public. *See* Ex. 1. The Registration Statement was deemed effective and the final Prospectus was dated as of November 15, 2006 (Registration Statement and final Prospectus referred to herein collectively as the "Prospectus"). *See* Exs. 2, 3. Each of the Individual Defendants signed the Prospectus. ACCAC ¶ 17. At the time of the IPO, Yigal Jacoby was Allot's Chairman; Rami Hadar was its Chief Executive Officer and President, as well as a director; and Adi Sapir was its Chief Financial Officer. Ex. 3 at 63-64.

On November 15, 2006, Allot's stock began trading on NASDAQ at an offering price of $12 per share. *See* ACCAC ¶ 62.

**C.    The April 2, 2007 Press Release**

On February 13, 2007, Allot issued its earnings release for the fourth quarter of 2006 (ending December 31) and the 2006 fiscal year. *See* Ex. 4. The Company reported total revenues of $9.6

million for the fourth quarter, an 8.1% increase over the prior quarter, and total revenues of $34.1 million for fiscal year 2006, a 49% increase over the prior year. *See id.* (Ex. 99.1 at 1, 4); Ex. 3 at 44. Allot also issued guidance regarding revenue and earnings for the first quarter of 2007 (ending March 31) and the 2007 fiscal year. *See* Ex. 4 (Ex. 99.1 at 2). The Company stated that it expected revenues for the first quarter to be similar to those for the prior quarter and expected revenues for the full year to increase by at least 26-37% over the 2006 fiscal year. *See id.*

On April 2, 2007, Allot issued a press release in which it lowered its guidance regarding revenues and earnings for the first quarter of 2007 and the 2007 fiscal year, citing "'weakness in sales from some of the Company's distributors, principally in the Americas, which are focused on sales to enterprise, education, and smaller [Internet Service Providers].'" ACCAC ¶ 46 (quoting April 2, 2007 press release); *id.* ¶ 11. Following this announcement, Allot's share price closed at $7.11, a 22% decline from the previous trading day's closing price. *Id.* ¶ 12.[4]

**D.    The Complaint**

Between May 1, 2007 and June 8, 2007, four putative class action complaints were filed in the Southern District of New York. On March 27, 2008, the Court consolidated these actions into *In re Allot Communications Ltd. Securities Litigation*, Master File No. 07 Civ. 3455 (RJH), and appointed Dikla Mondial Mutual Fund and the Chen Group as lead plaintiffs. On June 9, 2008, lead plaintiffs filed the Complaint.

The Complaint alleges that the Prospectus was false and misleading and that Defendants thereby violated Section 11 of the 1933 Act. ACCAC ¶¶ 65, 71. In particular, the Complaint alleges that Allot misstated or failed to disclose a number of material facts that allegedly existed at the time of Allot's IPO. However, the Complaint appears to have two principal claims. First, plaintiffs claim

---

[4] According to plaintiffs, this price drop negates any inference that their losses were caused by changed market conditions or industry factors. ACCAC ¶ 52. However, Packeteer, Allot's principal competitor in the enterprise market, *see* Ex. 3 at 60, announced on April 4, 2007 – two days after Allot's April 2, 2007 release – that its first quarter revenues were approximately 25% lower than those of the previous quarter. *See* Ex. 5. Following the April 4, 2007 release, Packeteer's share price closed at $8.83, which was more than 29% lower than its previous trading day's closing price (continued...)

that the description in the Prospectus of Allot's business strategy, its relationship with channel partners, its competitive strengths, and its sales and marketing efforts was misleading because the Company failed to disclose that Allot (i) "was already experiencing declining sales in its indirect distribution channels," *id.* ¶ 63; *see also id.* ¶¶ 5-6, 8-9; (ii) "was neither funding nor pursuing the marketing endeavors necessary to sustain its current business" with small and medium-sized enterprises, *id.* ¶ 63; *see also id.* ¶¶ 5-6, 8-9; (iii) had redirected its strategic efforts toward targeting large service providers, *id.* ¶¶ 5-6, 8-10; and (iv) was unable to compete in the large service provider market, *id.* ¶¶ 5-6, 8-9, 63.  Second, plaintiffs allege that Allot's statement that it "offer[s] extensive support to all of [its] channel partners" was false because, in redirecting its efforts toward large service providers, it "abandoned" those channel partners that sold to small and medium-sized enterprises.  *Id.* ¶¶ 5, 6, 9, 23, 63.  The Complaint further seeks to impose derivative liability on the Individual Defendants under Section 15 of the 1933 Act as controlling persons of Allot, the alleged primary violator of Section 11, at the time of the IPO.  *Id.* ¶ 76.

Although plaintiffs filed their complaints in response to Allot's April 2, 2007 announcement that it was lowering its first quarter and fiscal year guidance of February 13, 2007 (*id.* ¶¶ 47-49), the Complaint does not assert any claim based on Allot's February 13, 2007 guidance or any other public statements following its IPO.

## ARGUMENT

## I.    STANDARDS GOVERNING A MOTION TO DISMISS

To survive a motion to dismiss, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d. Cir 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  The Second Circuit has recognized that *Twombly* "requires a heightened pleading standard in those contexts where [factual] amplification is needed to render [a] claim plausible." *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 225 (2d Cir. 2008) (internal quotation

---

(...continued from previous page)
of $12.57.  *See* Ex. 6.

marks omitted). Thus, even at the pleading stage, the mere "formulaic recitation of a cause of action's elements" does not suffice to state a Section 11 claim. *See Twombly*, 127 S. Ct. at 1965. For a Section 11 claim to survive a motion to dismiss, a plaintiff "must set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery . . . .'" *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47-48 (1st Cir. 1999).

## II.  THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM

### A.  Principles Governing Section 11 Claims

Section 11 creates a private remedy for any purchaser of a registered security if any part of the registration statement, when such part became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 imposes liability on an issuer of securities and its directors and officers if "a company fails to provide required information or includes misleading statements in the registration statements." *In re Authentidate Holding Corp.*, No. 05 Civ. 5323 (LTS), 2006 WL 2034644, at *6 (S.D.N.Y. July 14, 2006).

To state a Section 11 claim, the plaintiff "must allege that the defendant had a legal obligation to disclose the allegedly omitted information." *In re Merrill Lynch & Co., Research Reports Sec. Litig. (I)*, 289 F. Supp. 2d 429, 434 (S.D.N.Y. 2003) (citations omitted). A "material omission from a registration statement is actionable if the omitted facts (1) were required by SEC regulations to be stated therein, or (2) were necessary to make the disclosures in the registration statement not misleading." *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000) (*per curiam*); *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003). The Second Circuit has clearly distinguished between materiality and a duty to disclose, and has long acknowledged that federal securities laws do not require disclosure of a fact simply because it is material. *See Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) (so holding under Section 10(b) of Securities Exchange Act of 1934); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (so holding under Section 11). A misrepresentation is material "when an investor would attach importance to it in making an investment decision." *Schoenhaut v.*

*Am. Sensors, Inc.,* 986 F. Supp. 785, 790 (S.D.N.Y. 1997) (citations omitted).  An omission is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available."  *Id.* (citations and internal quotation marks omitted).  "[C]omplaints alleging securities laws violations often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage."  *Id.* at 790-91 (citation and internal quotation marks omitted).

In support of their Section 11 claims, plaintiffs contend that the Prospectus contained false statements of material fact and was misleading as a result of the omission of material information.[5] However, as discussed below, *none* of these allegations gives rise to a viable Section 11 claim for at least two independent reasons.  First, these allegations either directly contradict the uncontested plain language and disclosures contained in the Prospectus, which is controlling on this motion to dismiss, or otherwise lack factual support.  Second, the identified alleged omissions and misstatements are immaterial as a matter of law because they are protected under the "bespeaks caution" doctrine or because they constitute inactionable puffery.  Accordingly, plaintiffs' Section 11 claims should be dismissed for failure to state a claim.  *See Panther Partners, Inc.*, 538 F. Supp. 2d at 672 (dismissing Section 11 claim for lack of sufficient factual allegations).

### B.  The Prospectus Either Directly Contradicts Plaintiffs' Allegations or Disclosed the Information That Plaintiffs Contend Was Omitted

Plaintiffs' contention that the Prospectus was misleading because it omitted material information regarding Allot's business strategy, relationship with channel partners, competitive strengths, and sales and market efforts fails for the most fundamental reason:  it conflicts with the undisputed plain language of the Prospectus.  Dismissal of Section 11 claims is appropriate where the prospectus either directly contradicts plaintiffs' allegations or disclosed the information that plaintiffs contend was omitted.  *See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d

---

[5] Plaintiffs do *not* allege – and, on these facts, cannot allege – that any omitted information was required by SEC regulations to be disclosed in the Prospectus.  *See In re N2K, Inc.*, 82 F. Supp. 2d at
(continued...)

Cir. 1994) (affirming dismissal of Section 11 claim: where "the plaintiffs' claims are contradicted by the disclosure on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims"); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) (dismissing Section 11 claim: "the Prospectus made substantial disclosure with respect to the precise omissions that undergird plaintiffs' claim. . . . [C]ourts in this Circuit consistently have dismissed claims under Section 11 'if they charge omission of what was in fact disclosed.'") (citation omitted); *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (dismissing Section 11 claim: "If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint"); *see also Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007) (dismissing Section 11 claim; same).

In this instance, plaintiffs contend that Defendants failed to disclose that, at the time of the IPO, Allot (i) "was already experiencing declining sales in its indirect distribution channels," ACCAC ¶ 63; *see also id.* ¶¶ 5-6, 8-9; (ii) "was neither funding nor pursuing the marketing endeavors necessary to sustain its current business" with small and medium-sized enterprises, *id.* ¶ 63; *see also id.* ¶¶ 5-6, 8-9; (iii) had redirected its strategic efforts toward targeting large service providers, *id.* ¶¶ 5-6, 8-10; and (iv) was unable to compete in the large service provider market, *id.* ¶¶ 5-6, 8-9, 63. As discussed below, the Prospectus either directly contradicts plaintiffs' allegations or disclosed the information that plaintiffs contend was omitted. Under these circumstances, plaintiffs' Section 11 claims arising from these allegations must be dismissed.

### 1.    Declining Sales

Plaintiffs allege that the Prospectus failed to disclose that Allot "was already experiencing declining sales in its indirect distribution channels at the time of the IPO." *Id.* ¶ 63. "Indirect distribution channels" is plaintiffs' term for Allot's "channel partners." *Id.* ¶¶ 4, 63. However, the Prospectus's disclosures regarding Allot's financial results – the accuracy of which plaintiffs do not

---

(...continued from previous page)
207.

challenge – contradict plaintiffs' allegation of declining sales.

Substantially all of Allot's sales occurred through its channel partners. *Id.* ¶ 4. Allot's annual results, as disclosed in the Prospectus, showed that the Company's annual revenues from product sales increased by 26%, rising from $14.6 million in 2004 to $18.5 million in 2005. Ex. 3 at 41. Allot's quarterly results, as disclosed in the Prospectus, showed an even greater increase in product revenues: 64.29%, rising from $12.6 million for the nine months ended September 30, 2005, to $20.7 million for the nine months ended September 30, 2006. *Id.* at 6, 28, 44, F-5.[6] Thus, Allot's undisputed financial results disclosed in the Prospectus establish that *no* declining sales occurred – either generally or specifically with respect to its channel partners.

Insofar as plaintiffs meant to allege that Allot failed to disclose that it was experiencing declining sales "in the small to medium enterprise market," *see* ACCAC ¶ 5, the Prospectus did in fact disclose that the *rate* of growth in sales of products designed for small and medium-sized service providers and enterprises (which represented only a minority of Allot's revenues) *had slowed*:

- "The majority of our product revenues in 2005 were derived from sales of the NetEnforcer AC-1000, which is targeted primarily at service providers, and the balance from sales of the NetEnforcer AC-400 and AC-800. While we experienced **growth in sales** from **all NetEnforcer models, the rate of growth of the NetEnforcer AC-400 and AC-800 was slower than in previous years as we shifted our focus to the service provider market."** Ex. 3 at 41 (emphasis added).

- "Our NetEnforcer AC-400 and NetEnforcer AC-800 systems address the specialized needs of **small and midsize service providers and enterprises**, while our NetEnforcer AC-1000 and NetEnforcer AC-2500 address the needs of **large service providers and enterprises."** *Id.* at 53 (emphasis added).

In short, Allot's uncontested annual results, showing increased sales of *all* products, contradict the allegation of declining sales; insofar as Allot experienced a decline in the *rate* of sales

---

[6] At the time of Allot's IPO, the last period for which quarterly results were available was the nine-month period ended September 30, 2006, *see* Ex. 3 at 27-28, 43-44, and the last period for which annual results were available was the year ended December 31, 2005, *see id.* at 6, 27-28, F-2, F-5. The Company's subsequent financial results further undermine plaintiffs' allegation of declining sales: in the fourth quarter of 2006, total revenues increased by 8.1% to $9.567 million from $8.854 million in the third quarter. *See* Ex. 4 (Ex. 99.1 at 4); Ex. 3 at 44.

growth, that decline was fully disclosed.  *See Olkey,* 98 F.3d at 9; *DeMaria*, 153 F. Supp. 2d at 311.

### 2.    Focus on Large Service Providers

Plaintiffs allege that the Prospectus failed to disclose Allot's decision to focus on large service providers.  *See* ACCAC ¶ 10 (citing "undisclosed change in business strategy").  The Prospectus plainly contradicts this allegation.  The Prospectus expressly disclosed that Allot had been targeting large service providers prior to the IPO and that it would continue doing so thereafter. For example, the Prospectus stated:

- **"*Focus on larger service providers*.  We intend to target larger service providers**, including carriers, and cable and mobile operators, in response to **increased demand** from them for the ability to differentiate their service offerings.  We believe that **targeting large service providers** is important to our revenue growth . . . . We intend to **target these end-customers** by continuing to develop partnerships with system integrators and OEMs in order to leverage their existing relationships with **larger service providers**.  We intend to **supplement these efforts** with direct business development and by tailoring our customer support capabilities to further enhance our ability to support system integrators and OEMs."  Ex. 3 at 54 (emphasis added).

- **"*Year Ended December 31, 2005 Compared to Year Ended December 31, 2004. . . .* [W]e shifted our focus to the service provider market."**  *Id.* at 41 (emphasis added).

- "In 2004, we **increased** our sales and marketing efforts to the service provider market and **in late 2004 and in 2005 we accelerated sales to large service providers."**  *Id.* at 30 (emphasis added).

- "*Size of end-customers and sales cycles*. We believe that our growth can be accelerated by increasing sales to **large service providers** and have **hired additional sales and marketing personnel in recent years** in order to achieve this goal."  *Id.* at 35 (emphasis added).

- "We believe that the **largest service providers**, referred to as Tier 1 carriers, as well as cable and mobile operators, present a significant market opportunity and are an **important element of our long term strategy."**  *Id.* at 9 (emphasis added).

Thus, the Prospectus fully disclosed that Allot had shifted the focus of its business strategy to large service providers.  *See DeMaria*, 153 F. Supp. 2d at 311.

### 3.    Failure to Support Marketing

Plaintiffs allege that the purported decline in product sales occurred because Allot "was neither funding nor pursuing the marketing endeavors necessary to sustain its current business," and that Allot failed to disclose this lack of support in its Prospectus.  ACCAC ¶¶ 8, 63.  This allegation completely ignores the Prospectus's uncontested disclosures revealing that, leading up to the IPO,

Allot was *continually increasing* its expenditures on sales and marketing, expenses for sales and marketing were responsible for more of Allot's total operating expenses than any other item, the size of the Sales and Marketing Department was regularly increasing, and Sales and Marketing was the largest department in the company at the time of the IPO:

- For the year ended December 31, 2004, Allot spent $10.1 million on sales and marketing, and increased that amount by 16.67% to $11.9 million in the year ended December 31, 2005. For the nine months ended September 30, 2005, Allot spent $8.8 million on sales and marketing, and increased that amount by 12.5% to $10.9 million in the nine months ended September 30, 2006. Allot's total operating expenses for the nine months ended September 30, 2006 totaled $18.8 million. *See* Ex. 3 at 40, 42.

- Allot's sales and marketing staff increased steadily for years, rising 29.82% from 2003 to 2004, 8.11% from 2004 to 2005, and 20% from 2005 to September 30, 2006:

  **"Employees**

  As of September 30, 2006, we had 232 employees of whom 170 were based in Israel, 29 in the United States and the remainder in Asia and Europe. The breakdown of our employees by department is as follows:

  | Department | December 31, | | | September 30, 2006 |
  |---|---|---|---|---|
  | | **2003** | **2004** | **2005** | |
  | Manufacturing and operations | 10 | 14 | 14 | 22 |
  | Research and development | 44 | 64 | 75 | 95 |
  | **Sales, marketing, service and support** | **57** | **74** | **80** | **96** |
  | Management and administration | 9 | 11 | 15 | 19 |
  | Total | 120 | 163 | 184 | 232" |

  *Id.* at 61 (emphasis added).

Plaintiffs do not assert that any of these disclosures were inaccurate. Although plaintiffs assert that Defendants failed to disclose that its expenditures on sales and marketing were insufficient to sustain its current business, the premise of the assertion – that the expenditures *were* insufficient – is bereft of any supporting allegations in the Complaint.[7] Indeed, plaintiffs do not allege any facts – such as significant year-over-year cost increases – that would make the ever-

---

[7] Furthermore, plaintiffs overstate their allegations concerning Allot's enterprise business. Plaintiffs allege that Allot stated in a press release that its "enterprise business . . . represented a 'very solid business foundation . . . .'" ACCAC ¶ 30. However, that press release did not even mention Allot's enterprise business. Rather, it simply quoted Hadar as stating that "Allot is a
(continued...)

increasing expenditures insufficient. The undisputed plain language of the Prospectus, which establishes that Allot was continuously increasing its expenditures on sales and marketing, undercuts plaintiffs' allegation that Allot shifted resources away from these efforts.

### 4.    Inability to Compete in Large Service Provider Market

According to plaintiffs, Allot failed to disclose that it was "unable to compete" in the large service provider market. *See* ACCAC ¶ 63. As an initial matter, Allot was already "competing" in the large service provider market prior to the IPO. *See* Point II.B.1.-2., *supra*. In fact, Allot disclosed that it had experienced an increase in sales to large service providers, and that sales of its products designed for large customers represented the majority of its revenues. *See id.*[8] In addition, Allot emphasized that a significant percentage of its revenues in the time leading up to the IPO was derived from a single large service provider: "We derived 16% of our revenues in 2005 and 27% in the first nine months of 2006 from a single system integrator for our products in the United Kingdom, primarily in connection with the deployment of our products by NTL Group Limited, a leading United Kingdom cable operator." Ex. 3 at 31.

Plaintiffs challenge none of these disclosures concerning Allot's achievements in the large service provider market. Moreover, despite Allot's successes in the large service provider market, the Prospectus still prominently disclosed the risks that Allot faced in *continuing* to compete for business in this arena:

- ***"We may be unable to compete effectively with other companies in our market who offer, or may in the future offer, competing technologies.*** We compete in a rapidly evolving and highly competitive sector of the networking technology market. Our principal competitors are Cisco Systems, Inc. (through its acquisition of P-Cube, Inc.), Sandvine Inc. and Ellacoya Networks, Inc. in the service provider market and Packeteer Inc. in the enterprise market. . . . Our competitors may announce new products, services or enhancements that better meet the needs of customers or changing industry requirements, or may offer alternative methods to achieve customer objectives. One of our direct competitors, Cisco Systems, is substantially larger than we are and has significantly greater financial, sales and marketing, technical, manufacturing and other

---

(...continued from previous page)
company in the enviable position of having a very solid business foundation . . . ." *See id.* ¶ 26.

[8] Despite plaintiffs' criticism of Allot's decision and ability to focus on large service providers, the April 2, 2007 press release – on which the Complaint so heavily relies – stated that sales to large service providers "showed strong growth during the quarter." *See* ACCAC ¶ 46.

resources." *Id.* at 8 (emphasis in original).

- "Carriers, especially in North America, often require that products they purchase meet Network Equipment Building System (NEBS) certification requirements, which relate [to] the reliability of telecommunications equipment. Our NetEnforcer AC-1000 and AC-2500 are designed to meet NEBS certification requirements and are **currently undergoing the certification process, but carriers may not choose to use our systems until we receive the certification."** *Id.* at 10 (emphasis added).

- "We may . . . expend significant resources attempting to persuade large service providers to incorporate our products into their networks without success. . . . If a competitor succeeds in convincing a large service provider to adopt that competitor's product, it may be difficult for us to displace the competitor because of the cost, time, effort and perceived risk to network stability involved in changing solutions. As a result we may incur significant expense without generating any sales." *Id.*

Having disclosed the potentially debilitating obstacles that Allot faced in the large service provider market, Defendants had no *further* obligation to describe its ability to compete in that market in pejorative terms. *See, e.g., Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (affirming dismissal where plaintiffs alleged that company failed to disclose that its competitive position was "deteriorating," that funds were "insufficient" to compete "effectively," and that AT&T placed "great pressure" on company: "the use of a pejorative adjective will not alter the total mix of information available to the investing public"); *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (rejecting plaintiffs' claim that mortgage-backed securities at issue should have been characterized as "exotic mortgage derivatives": "Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested"); *Lewis v. Potlatch Corp.*, 716 F. Supp. 807, 811 (S.D.N.Y. 1989) ("there is no requirement that a proxy characterize disclosed information, as long as there is disclosure of all pertinent facts") (citations omitted). Indeed, the Prospectus "made substantial disclosures with respect to the precise omissions [here, the difficulties that Allot faced in competing in the large service provider market] that undergird plaintiffs' claim." *DeMaria*, 153 F. Supp. 2d at 311. Accordingly, plaintiffs' Section 11 claims arising from this alleged omission must be dismissed for failure to state a claim.

-14-

**C.    Plaintiffs' Claim That Allot's Statements Regarding Its Channel Partners Were False Impermissibly Relies on Allegations of Mismanagement**

Plaintiffs further allege that Allot's statements that it offered "extensive support" to all of its channel partners and intended to "improve" its channel relationships were false because, in redirecting its efforts toward large service providers, the Company "abandoned" its channel partners that sold to small and medium-sized enterprises. *Id.* ¶¶ 5, 6, 9, 23, 63.[9]

As an initial matter, plaintiffs' allegation is illogical. Allot disclosed that it had "shifted" its focus *to* large service providers. *See supra* at 11. Consequently, plaintiffs' claim that the Prospectus was misleading insofar as it failed to disclose this shift is unavailing. Thus, in an attempt to state a claim, plaintiffs are forced to allege not merely that Allot shifted its focus, but rather that Allot actually "abandoned" its small and medium-sized enterprise market and thus "abandoned" its channel partners that sold to that market. Yet, plaintiffs allege no reason why Allot would have abandoned such a significant market segment. Indeed, it would have been utterly irrational for Allot to do so.

Furthermore, plaintiffs' only support for their claim that Allot falsely described its commitment to channel partners is a host of allegations criticizing Allot's *execution* of its strategy for its channel partners that sold to small and medium-sized enterprises. For example, plaintiffs allege that the marketing materials Allot provided to its channel partners were "poorly written, poorly designed, and not delivered on a timely basis." *Id.* ¶ 31(a).[10] Similarly, plaintiffs allege that

---

[9] In particular, plaintiffs allege that the following statements regarding the channel partners that sold to small and medium-sized enterprises were false: "Our strategy [is to c]ontinue to expand our sales and marketing channels . . . . to further address small and medium-sized service providers and enterprises . . . ," Ex. 3 at 53 (*see* ACCAC ¶¶ 7, 21, 33, 35, 41); "[W]e intend to build on this success by continuously improving our channel relationships . . . and supporting their efforts to promote our products," Ex. 3 at 53-54 (*see* ACCAC ¶¶ 7, 21, 34); and "We offer extensive support to all of our channel partners," Ex. 3 at 58 (*see* ACCAC ¶¶ 7, 19, 23, 30).

[10] Plaintiffs concede, however, that "[t]he lack of adequate marketing materials was universally attributed to the 'outsourcing' of marketing to [Allot Vice President Sharon Hess's] company, Hess MarkITing." ACCAC ¶ 31. In this regard, plaintiffs' real criticism of Allot is *not* that Allot prepared inadequate marketing materials, but rather that Allot made the apparently unwise decision to outsource its marketing to Hess MarkITing. That business decision, regardless of its merits in (continued...)

-15-

Allot missed opportunities to meet customers because it failed to show up at certain marketing events, including ones that it paid to attend. *Id.* ¶ 33(d). Plaintiffs also allege that a marketing company, which worked primarily with small Internet service providers, submitted "excellent marketing strategies to Allot" but that Allot could not advance past the design phase. *Id.* ¶ 32(c). The Complaint is replete with similar allegations criticizing Allot's competence in dealing with its channel partners that sold to small and medium-sized enterprises.[11]  Significantly, the Complaint also contains numerous allegations criticizing Allot's competence in dealing with its channel partners that sold to *large* service providers, and with its channel partners generally. *See, e.g., id.* ¶ 27(a) ("Allot had no guidelines for channel partners with respect to the marketing programs it was willing to fund."); *id.* ¶ 32(g) ("Barr had tried to work with a vendor out of South Dakota, who sold primarily to ISPs. The vendor did not have a good experience working with Allot. Although CW1 tried to repair the relationship, nothing came of it."); *id.* ¶ 32(j) (CW3 "could not get assistance preparing 'solution briefs'" for large enterprise accounts); ¶ 32(a) (a telecommunications company wanted "Allot to add compliance features . . . but nothing happened"). The fact that plaintiffs' criticism extends to Allot's dealings with *all* of its channel partners – those selling to small and medium-sized enterprises *and* those selling to large service providers – demonstrates that, at most,

---

(...continued from previous page)

hindsight, does not give rise to an actionable cause of action under the 1933 Act. *See In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 376 (3d Cir. 1993).

[11] *See, e.g.,* ACCAC ¶ 30 (Allot "failed to adhere to the adage that a 'bird in hand is worth two in the bush'"); *id.* (former employees were "critical of the efforts" of Allot's VP of Marketing); *id.* ¶ 32(b) (a channel manager was fired because he "made a side deal with [a channel partner] involving an amateurish marketing program which did not yield a sale"); *id.* ¶ 33 ("Allot allowed opportunities to slip away"). Allegations attributed to confidential witnesses ("CWs") similarly charge incompetent management, asserting that Allot: did not pursue "necessary" marketing endeavors (*id.* ¶ 8(a)); distributed marketing materials that were not "adequate" (*id.* ¶ 31(a)); "preferred" to issue credits for purchases instead of providing funds up front (*id.* ¶ 32); did not "do any real marketing" when "excellent marketing strategies" were submitted to it (*id.* ¶ 32(c)); did not give a reseller the "support needed" to get his "great efforts" off the ground (*id.* ¶ 32(e)); "failed to implement the plans necessary" to take advantage of "tons of opportunities" (*id.* ¶ 33(b)); had "dysfunction in the channels, with few marketing programs in place" (*id.* ¶ 33(b)); and "set sales quotas too high" (*id.* ¶ 36(c)). As explained more fully below, all of these assertions concern Allot's business decisions and management judgments; they do not support a claim for disclosure violations.

plaintiffs' allegations support a claim that Allot was incompetent with respect to its channel partners generally. They do not support a claim that Allot abandoned those channel partners that sold to small and medium-sized enterprises in favor of those channel partners that sold to large service providers.

Fundamentally, plaintiffs fail to understand the distinction between the allegation that Allot *poorly executed* its channel strategy and the allegation that Allot *falsely described* its channel strategy in its Prospectus. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375, 377 (S.D.N.Y. 2004) ("[p]laintiffs' section 10(b) claim here – that participation in [Enron-related] transactions was *inconsistent* with Citigroup's *stated risk management policies and historical business practices* – amounts to nothing more than a charge that Citigroup's business was mismanaged"; allegations regarding Citigroup's *risk management policies* were not actionable under federal securities laws, which do not "provide an umbrella cause of action for the review of *management practices*") (emphasis added); *Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97, 102 (W.D.N.Y. 1993) (dismissing Section 11 claim based on allegations that issuer's "growth was not indicative of a strong, stable institution but was instead created by an *abandonment of conservative policies*, and had outstripped the Company's capability to prudently manage its financial condition[, which] are complaints of mismanagement rather than misrepresentations") (emphasis added). The former allegation – which amounts to nothing more than an allegation of corporate mismanagement – does not give rise to an actionable claim under federal securities law. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d at 376 (affirming dismissal of Section 11 claim: "[T]o the extent that the plaintiffs simply challenge the Partnership's decision to obtain only $75 million in capital contributions in comparison to the approximately $700 million in debt obligations, they plainly do not state a claim under the securities laws. It is well-established that the securities laws do not create liability for breaches of fiduciary duty or mismanagement.") (citations omitted); *Stepak v. Aetna Life & Cas. Co.*, No. 90 Civ. 00886 (AVC), 1994 WL 858045, at *11 (D. Conn. Aug. 29, 1994) ("In order to avoid 'federalizing' the state common law of corporations and fiduciary obligations, the Supreme Court and the Second Circuit have countenanced against 'bootstrapping' corporate

mismanagement claims into federal securities laws claims . . . ."), *aff'd*, 52 F.3d 311 (2d Cir. 1995).[12]   Accordingly, plaintiffs' Section 11 claims arising from Allot's statements regarding its channel partners must be dismissed for failure to state a claim.

### D.        Plaintiffs' Claims Are Bereft of Supporting Factual Allegations

Plaintiffs' claims fail for another independent reason:  the absence of sufficient factual allegations demonstrating that plaintiffs are entitled to relief under Section 11.  *See Twombly*, 127 S. Ct. at 1966 (well-pled factual allegations must "possess enough heft to show that the pleader is entitled to relief") (brackets and internal quotation marks omitted); *Ross*, 524 F.3d at 225 (*Twombly* "requires a heightened pleading standard in those contexts where [factual] amplification is needed to render [a] claim plausible.") (emphasis and internal quotation marks omitted).  Conclusory and vague assertions will not pass muster on this motion to dismiss.  *See In re Merrill Lynch & Co., Research Reports Sec. Litig. (II)*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003) (dismissing Section 11 claim:  "'[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal' of Section 11 claims") (citation omitted); *Oxford*

---

[12] *See Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("facts requiring a court to distinguish between conduct that is reasonable and unreasonable, or informed and uninformed, [involve] distinctions that are the hallmark of state fiduciary law, and therefore allegations of garden-variety mismanagement that are not actionable under Section 10(b)") (internal quotation marks omitted), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); *see also In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1094 (C.D. Cal. 2008) (dismissing Section 10(b) claim predicated on failure to remedy poor internal controls:  "Presuming these allegations are true, they establish that Impac's management team exhibited poor judgment, stubbornness, arrogance, and perhaps even incompetence.  However, because these allegations do not show any deceit on the part of Defendants Tomkinson and Johnson, they cannot support a fraud claim.  Federal securities laws do not create a cause of action for corporate mismanagement that is not accompanied by deception."); *In re Watchguard Sec. Litig.*, No. 05-civ-678 (LR), 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006) (dismissing Section 10(b) claim predicated on failure to disclose poor internal controls:  "'That the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim.'") (citation omitted); *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004) ("Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives."); *Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123, 1131 (D.R.I. 1991) (dismissing Section 11 claim predicated on failure to disclose overconcentration of bank's loan portfolio:  "Failing to disclose possible mismanagement or incompetence does not state a federal securities law claim.").

*Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192-94 (11th Cir. 2002) (affirming dismissal of Section 11 claim for failure to plead sufficient facts to support conclusory allegations regarding omissions in prospectus); *Belodoff v. Netlist, Inc.*, No. 07 Civ. 00677 (DOC), 2008 WL 2356699, at *12 (C.D. Cal. May 30, 2008) (dismissing Section 11 claim:  "[*Twombly*] serves to remind the district courts that they are entitled to 'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed'") (citation omitted).

Plaintiffs have failed to provide meaningful factual allegations to support a number of their claims.  For example, the Complaint challenges the statement in the Prospectus that Allot "had received customer base and engineering capability benefits from its acquisition of NetReality . . . ." ACCAC ¶ 7.  Notwithstanding the fact that the Complaint provides *no* basis upon which it could be reasonably inferred that this statement was false, plaintiffs completely ignore the disclosures in the Prospectus that (i) Allot had decided to stop selling NetReality products approximately two years prior to the IPO and (ii) Allot did not expect to derive any significant revenue from NetReality products in the future.  Ex. 3 at 33.  Given Allot's statements regarding the irrelevance of NetReality to its business model, no reasonable investor would have considered NetReality material to his or decision to buy Allot shares.

Plaintiffs also contend that the Prospectus's failure to disclose the "upcoming departure" of Larry Schmidt, Allot's former Vice President for the Americas, was a materially misleading omission.  ACCAC ¶ 28.  Yet, plaintiffs do not allege that Schmidt had even decided to leave Allot, let alone that he notified anyone at Allot of that decision, *by the time of the IPO*.[13]  *See In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) ("The truth of a statement made in the registration statement is judged by *the facts as they existed when the registration*

---

[13] Courts often dismiss claims where plaintiffs allege that statements are rendered misleading by the departure of employees.  *See, e.g.*, *In re Fox Hollow Techs., Inc., Sec. Litig.*, No. 06 Civ. 4595 (PJH), 2008 WL 2220600, at *18 (N.D. Cal. May 27, 2008) (dismissing claims where no reasonable investor could conclude from statements of corporate optimism that defendant intended to retain certain executive officers for long term).

*statement became effective*.") (emphasis added).[14]

Plaintiffs' allegation that Allot was experiencing declining sales to the small and medium-sized enterprise market at the time of the IPO is similarly lacking. The Complaint fails to plead a single fact to support the assertion that sales were declining *at the time of the IPO*.[15] Rather, plaintiffs appear to rely solely on the Company's April 2, 2007 press release – *issued five months after the IPO* – announcing weaker than anticipated sales to small and medium-sized enterprises. However, courts dismiss Section 11 claims where, as here, plaintiffs rely on post-IPO problems to claim that the adverse events were supposedly occurring at the time of the offering. As the Court in *Panther Partners, Inc.,* 538 F. Supp. 2d at 672, stated: "[Plaintiff] is engaging in retrospective pleading; it questions the accuracy of the offering statement in light of the much-later materialization of a . . . problem. . . . Plaintiff's attempts to plead this allegation by hindsight are unavailing and the claim is dismissed." *See In re No. Nine Visual Tech. Corp. Sec. Litig.,* 51 F. Supp. 2d 1, 16-17 (D. Mass. 1999) (dismissing Section 11 claim whose allegation of inventory overstatement was based on $8 million inventory write-down occurring eight months after IPO: "[T]he mere announcement, eight months later, of an inventory markdown is not sufficient to raise an inference that inventory

---

[14] Plaintiffs' failure to include meaningful factual allegations supporting their claims is further evidenced by their assertion that devices sold to the New York City Board of Education purportedly experienced technological issues. *See* ACCAC ¶ 45. According to plaintiffs, this allegation supports their claim that the Prospectus failed to disclose Allot's alleged inability to compete in the large service provider market. However, plaintiffs fail to allege: that the customer was a large service provider; that the product at issue is the same product that would be purchased by large service providers; that the customer did not deploy the system or cancelled its contract; when the purported technological issues occurred; or that any of the disclosures in the Prospectus concerning the technological capabilities of Allot's products were rendered false by the purported technological issues.

[15] In fact, Allot's sales were *increasing* at the time of the IPO. The February 13, 2007 press release announced total revenues for 2006 of $34.1 million, an increase of 49% over the $23 million in total revenues for 2005. Ex. 4 (Ex. 99.1 at 1). The release also announced total revenues for the fourth quarter of 2006 of $9.6 million, an increase of 35% over the $7.1 million in total revenues for the fourth quarter of 2005, and an increase of 8.1% over the $8.9 million in total revenues for the third quarter of 2005. *See id.*; Ex. 3 at 44; n.6, *supra*. Indeed, the *Schoenhaut* court held immaterial a *drop* in sales for the quarter in which the IPO occurred, given that sales were otherwise favorable prior to the IPO. *See* 986 F. Supp. at 791-92. Since Allot's sales *rose* during the quarter of its IPO (unlike those of the issuer in *Schoenhaut*) and were otherwise favorable prior to the IPO, *Schoenhaut*
(continued...)

was obsolete at the time of the Offering."); *In re Starter Corp. Sec. Litig.*, No. 94 Civ. 718 (TPG), 1996 WL 406624, at *3 (S.D.N.Y. July 19, 1996) (dismissing claim that prospectus falsely described inventory controls, where claim was based on significant write-downs occurring 18 months and 22 months after prospectus was issued:  "No possible inference can be drawn from these write-downs, occurring long after the prospectus, that the questioned statements in the prospectus about inventory controls were false."); *see also In re Leadis Tech., Inc. Sec. Litig.*, No. 05 Civ. 00882 (CRB), 2006 WL 496039, at *4-5 (N.D. Cal. Mar. 1, 2006) (allegations that sales had already declined at time of IPO necessarily sounded in fraud, and therefore dismissal of Section 11 claim was warranted as plaintiffs had not pled with particularity, but rather had merely pointed to post-IPO sales declines). Such improperly retrospective pleading is simply the Section 11 analog of fraud-by-hindsight pleading, which courts have long rejected.[16]

### E.    The Prospectus Bespeaks Caution

Besides disclosing the allegedly omitted facts, the statements in the Prospectus were surrounded by cautionary language adequately warning investors of the precise risks of which plaintiffs now complain.  "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."

---

(...continued from previous page)
mandates dismissal of plaintiffs' Section 11 claims.

[16] *See Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) ("Plaintiffs have failed to plead with particularity sufficient facts to show why any of the statements made in connection with the leasehold value, goodwill value, or business strategy were false when made.  In their pleadings plaintiffs note that these all changed five months after the Offering – the leaseholds and goodwill were devalued, Carothers left LHFI, and the business strategy altered course.  Based on these changes that occurred five months after the closing on the debt securities and which were not retroactive, plaintiffs conclude that statements about them in the Circular and at the Road Show must have been false when made.  The Second Circuit, however, does not recognize 'fraud by hindsight' pleading.") (citations omitted), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, No. 07 Civ. 1124, 2008 WL 2566557 (2d Cir. June 24, 2008); *see also Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 n.20 (3d Cir. 2004) ("[I]t is not reasonable to infer that Chubb's reported prior combined ratios were fraudulent from the fact that Chubb's reported combined ratio increased to 130% in the third quarter, especially in light of the recognized impact of Hurricane Floyd on this number.  Furthermore, such an allegation constitutes an unacceptable attempt to plead fraud by hindsight.").

*Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation and internal quotation marks omitted). "In assessing whether statements provided in the prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion." *Lazard*, 473 F. Supp. 2d at 579; *see Olkey*, 98 F.3d at 5 ("It is undisputed that the prospectuses must be read as a whole.") (citations and internal quotation marks omitted).

Even a cursory review of the cautionary language in the Prospectus reveals that plaintiffs' claims are meritless. The disclosures in the Prospectus expressly warned investors of the very risk – *i.e.,* that Allot's sales would suffer if any of its channel partners failed – that ultimately materialized. Specifically, the Prospectus cautioned investors:

- "We market and sell our products to end-customers through third party channel partners, such as distributors . . . . ***If any significant channel partners fail, individually or in the aggregate, to perform as we expect, our sales may suffer.***" Ex. 3 at 9 (emphasis added).

This is precisely what happened after the IPO, during the first quarter of 2007, resulting in the Company's announcement of disappointing – and declining – sales to small and medium-sized enterprises. *See* ACCAC ¶ 46 (quoting April 2, 2007 press release) ("Management reported that weaknesses in sales from some of the Company's distributors . . . had resulted in lower than expected revenues. . . . 'We were disappointed with the performance of some of our distributors . . . .'").

Similarly, the Prospectus emphasized not only that Allot faced direct competition from better-financed companies in the large service provider market, but also that this market was still developing and that large service providers might not adopt Allot's technologies:

- ***"We may be unable to compete effectively with other companies in our market who offer, or may in the future offer, competing technologies.*** We compete in a rapidly evolving and highly competitive sector of the networking technology market. Our principal competitors are Cisco Systems, Inc. (through its acquisition of P-Cube, Inc.), Sandvine Inc. and Ellacoya Networks, Inc. in the service provider market and Packeteer Inc. in the enterprise market. . . . Our competitors may announce new products, services or enhancements that better meet the needs of customers or changing industry requirements, or may offer alternative methods to achieve customer objectives. One of our direct competitors, Cisco Systems, is substantially larger than we are and has significantly greater financial, sales and marketing, technical, manufacturing and other resources." Ex. 3 at 8 (emphasis in original).

- ***"The market for our products in the service provider market is still emerging and our growth may be harmed if carriers do not adopt DPI solutions.*** The market for DPI

technology is still emerging and the majority of our sales to date have been to small and midsize service providers and enterprises. We believe that the largest service providers, referred to as Tier 1 carriers, as well as cable and mobile operators, present a significant market opportunity and are an important element of our long term strategy, but they are still in the early stages of evaluating the benefits and applications of DPI technology." *Id.* at 9 (emphasis in original).

In this regard, the Prospectus adequately warned investors that Allot might not succeed in its long-term plan of competing in the large service provider market.

Furthermore, the Prospectus plainly warned investors that the Company might not achieve profitability given its history of losses:

- "***We have a history of losses, may incur future losses and may not achieve profitability.*** We have incurred net losses in each fiscal year since we commenced operations in 1997. . . . Our losses could continue for the next several years as we expand our sales and marketing activities and continue to invest in research and development. We may incur losses in the future and may not generate sufficient revenues in the future to achieve profitability." *Id.* at 8 (emphasis in original).

It is hard to imagine what more could have been said to convey the risk of investing in Allot's stock. *See In re OPUS 360 Corp. Sec. Litig.*, No. 01 Civ. 2938 (JGK), 2002 WL 31190157, at *5 (S.D.N.Y. Oct. 2, 2002) (dismissing Section 11 claim: "Indeed, all of the statements should be read in the context of a prospectus that plainly laid out the risky nature of any investment. The Prospectus could not be clearer: 'We have a limited operating history and have never been profitable . . . We operate in a highly competitive market and expect to incur losses for the foreseeable future.'"); *see also Olkey*, 98 F.3d at 5 (affirming dismissal of Section 11 claim: "the prospectus[ ] when read in [its] entirety [is] not overly sanguine but instead bespeak[s] caution") (citation and internal quotation marks omitted). Indeed, no reasonable investor "could have been misled about the nature of the risk [here, the risks that Allot's sales might suffer if its channel partners failed, that Allot might be unable to compete effectively in the large service provider market, and that Allot might not achieve profitability in light of its history of losses] when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). Where, as here, "an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment," and the claim must be dismissed. *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999); *see also Panther Partners, Inc.*, 538 F. Supp. 2d at

674 (dismissing Section 11 claim where risk disclosure in prospectus concerning possibility of future market downturn came to fruition: "[The risk disclosure] clearly identifies the risk later realized"); *Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *9 (S.D.N.Y. Aug. 22, 2005) (dismissing claim that issuer failed to disclose risk that IPO would not provide it with sufficient capital to proceed with business plan where prospectus disclosed risk that issuer would have to obtain additional financing after IPO: "the 'bespeaks caution' doctrine precludes liability because the Prospectus adequately informed plaintiffs of the risks of which they now complain").[17] Accordingly, because the Prospectus "bespoke caution" regarding the nature, magnitude, and consequences of the risks inherent in Allot's channel strategy and focus on large service providers, plaintiffs' Section 11 claims should be dismissed for want of materiality.

**F.    Many of the Allegedly Misleading Statements Are at Most Inactionable Puffery**

Many of the Prospectus's statements that plaintiffs call misleading are generalized statements of corporate optimism and "puffery."  In particular, plaintiffs allege that the purported omissions caused the following statements in the Prospectus to be materially misleading:  that Allot offers "extensive support" to its channel partners (ACCAC ¶ 19); that Allot wanted to "continue to expand" and "build on [the] success" of its sales and marketing channels (*id.* ¶ 21); that Allot believed that its "growth [could] be accelerated" (*id.* ¶ 37); that Allot had "market-leading" technology (*id.* ¶ 39); and that Allot was "well-positioned to compete" in the large service provider market (*id.* ¶ 43).

Such statements have been consistently held to be inactionable under the federal securities

---

[17] *See also In re OPUS 360*, 2002 WL 31190157, at *7 (dismissing Section 11 claim:  "the Prospectus is replete with warnings indicating that OPUS' existing and future customer relationships were in flux and subject to change, based on a wide variety of factors.  These statements caution investors not to rely upon any prior agreements in evaluating OPUS' future revenue prospects."); *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533 (RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing Section 11 claim based on issuer's alleged failure to disclose that "already weaker than expected sales" would be exacerbated by manufacturers' discontinuation of sales incentives and rebates, where prospectus warned investors about role of manufacturer rebates and other special offers in pricing and about link between issuer's success and manufacturers' marketing and distribution capabilities).

laws. *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (dismissing Section 11 claim: statements that company had "commitment to create opportunities" and that "business strategies [would] lead to continued prosperity" were inactionable puffery); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statement that company was "optimistic" about its earnings and that it "should deliver income growth consistent with its historically superior performance" was inactionable puffery); *see also Schoenhaut*, 986 F. Supp. at 791 (dismissing Section 11 claim arising from company's statement that its products were experiencing "continued strong demand" despite fact that sales had declined by 11 percent: "The phrase ['continued strong demand'] does not contain information of reasonable specificity or impart a definite indicia of performance; rather, it constitutes nothing more than a vague assertion on which no reasonable investor would rely.") (citations omitted). For the same reason, plaintiffs' Section 11 claims arising from Allot's statements regarding its channel partners and ability to compete in the large service provider market should be dismissed for failure to state a claim.

## III.    PLAINTIFFS' SECTION 15 CLAIM AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED

Plaintiffs' Section 15 claim fails as well. "To state a claim for controlling person liability, plaintiffs must adequately allege: '(1) an underlying primary violation; and (2) the individual defendant had control over the primary violator.'" *In re Axis Capital Holdings Ltd.*, 456 F. Supp. 2d 576, 599 (S.D.N.Y. 2006) (Holwell, J.) (citation omitted). As discussed above, plaintiffs have failed to allege a primary violation under Section 11; accordingly, plaintiffs' Section 15 claim must be dismissed.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed with prejudice.

Dated: August 8, 2008

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ Gideon A. Schor
    Gideon A. Schor (GS-5932)