# EXHIBIT 3
# PART 2 OF 2

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Our policy is to enter into transactions with related parties on terms that, on the whole, are no more favorable, or no less favorable, than those available from unaffiliated third parties. Based on our experience in the business sectors in which we operate and the terms of our transactions with unaffiliated third parties, we believe that all of the transactions described below met this policy standard at the time they occurred.

### Financing Transactions

*Original Rounds of Financing.*  Since our founding, we have raised capital through multiple rounds of financing. Between 1997 and 2002, we raised capital through sales of our Series A ordinary shares and Series A, B, C and C-1 preferred shares. In 2002, in connection with the sale of our Series B preferred shares, a portion of our Series C preferred shares and all of our Series C-1 preferred shares were converted into Series B preferred shares and, in addition, such sale triggered an anti-dilution adjustment to the Series C preferred shares, increasing the number of ordinary shares resulting from conversion of the Series C preferred shares from 204,328, assuming a one-to-one conversion, to 223,820. Subsequently, we raised additional capital though our Series D and Series E financings as more fully described below.

*Series D Financing.*  In 2004, we sold Series D preferred shares, convertible into 1,785,961 ordinary shares, at a price per underlying ordinary share of $4.49538 for an aggregate investment of $8.0 million. The issuance of the Series D preferred shares triggered an anti-dilution adjustment to the Series C preferred shares, increasing the number of ordinary shares resulting from conversion of the Series C preferred shares to 242,195. Each Series D preferred share will convert into one ordinary share upon the closing of this offering and additional ordinary shares will be issued to reflect the share dividend to be effected prior to the closing of this offering. The following table sets forth the number of ordinary shares resulting from conversion at the closing of this offering of the Series D preferred shares purchased by entities which, as of the date of this prospectus, beneficially own more than 5.0% of our ordinary shares assuming the conversion of all of outstanding preferred shares:

| | Aggregate Purchase Price | Number of Ordinary Shares Resulting from the Conversion of Series D Preferred Shares |
|---|---|---|
| Entities affiliated with the Gemini Group | $        1,681,025 | 373,950 |
| Entities affiliated with Tamir Fishman Group | 1,000,000 | 222,454 |
| Entities affiliated with Partech International Group | 5,000,000 | 1,112,258 |

*Series E Financing.*  In 2006, we sold Series E preferred shares convertible into 1,028,517 ordinary shares, at a purchase price per underlying ordinary share of $5.34758 in consideration for an aggregate investment of $5.5 million. The issuance of the Series E preferred shares triggered an anti-dilution adjustment to the Series C preferred shares, increasing the number of ordinary shares resulting from a conversion of the Series C shares to 250,329. Each Series E preferred share will convert into one ordinary share upon the closing of this offering and additional ordinary shares will be issued to reflect the share dividend to be effected prior to the closing of this offering. The following table sets forth the number of ordinary shares resulting from conversion at the closing of this offering of the Series E preferred shares purchased by entities which, as of the date of this prospectus, beneficially own more than 5.0% of our outstanding ordinary shares assuming the conversion of all of outstanding preferred shares:

**Number of Ordinary**

| | Aggregate Purchase Price | Shares Resulting from the Conversion of Series E Preferred Shares |
|---|---|---|
| Entities affiliated with Tamir Fishman Group | $ 1,800,000 | 336,610 |
| Entities affiliated with Partech International Group | 900,000 | 168,304 |
| Entities affiliated with Jerusalem Venture Partners | 2,500,000 | 467,503 |

**Series C Preferred Anti-dilution Protection**

Our articles of association provide that if the price per share at which our ordinary shares are sold in an initial public offering, when multiplied by the number of ordinary shares resulting from conversion of Series C preferred shares, will not yield to the holders of the Series C preferred shares an amount equal to at least three times the price paid to us for the issuance of all Series C preferred shares, then upon the conversion of the Series C preferred shares into ordinary shares in such initial public offering, additional ordinary shares will be issued to the holders of the Series C preferred shares in accordance with the formula stated in our articles of association. Currently, an initial public offering price which is lower than $33.92 per share would entitle the holders of Series C preferred shares to be issued additional ordinary shares. Accordingly, upon the conversion of the Series C preferred shares into ordinary shares in connection with this offering, based on the initial public offering price of $12.00 per share, the holders of the Series C preferred shares will be issued 190,491 ordinary shares in excess of the number of ordinary shares they would have received had such conversion taken place prior to this offering. In addition to this amount, the holders of the Series C preferred shares will also be entitled to receive upon conversion an additional 46,001 ordinary shares in respect of an anti-dilution adjustment arising out of prior financings.

The following table sets forth the number of ordinary shares resulting from the conversion of the Series C preferred shares that are held by entities which, as of the date of this prospectus, beneficially own more than 5.0% of our ordinary shares assuming the conversion of all of outstanding preferred shares into ordinary shares:

|  | Number of Ordinary Shares Resulting from the Assumed Conversion of Series C Preferred Shares Prior to this Offering | Number of Ordinary Shares Resulting from the Conversion of Series C Preferred Shares Upon the Closing of this Offering |
|---|---|---|
| Entities affiliated with Tamir Fishman Group | 87,239 | 153,625 |
| Entities affiliated with Jerusalem Venture Partners | 56,943 | 100,275 |

**Rights of Appointment**

Our current board of directors consists of seven directors. Under our articles of association in effect prior to this offering, a majority of the holders of our ordinary shares are entitled to elect three members of our board of directors and each of Jerusalem Venture Partners, Partech International Group, The Gemini Group, The Tamir Fishman Group and The Genesis Group, each a beneficial owner of greater than 5.0% of our ordinary shares, are currently entitled to appoint one director. Our Chief Executive Officer, Rami Hadar, serves as a director, *ex-officio.*

In addition, NJI Investment Fund Ltd., a holder of our Series B preferred shares, BancBoston Investments, Inc., a holder of our Series B, C and D preferred shares and Tamar Technology Investors (Delaware) LP together with Tamar Technology Investors (Israel) LP, holders of our ordinary shares and Series B preferred shares are currently each entitled to appoint an observer to attend meetings of our board of directors. All rights to appoint directors and observers will terminate upon the closing of this offering, although currently-serving directors that were appointed prior to this offering will continue to serve pursuant to their appointment until the annual meeting of shareholders at which the term of their class of director expires.

We are not a party to, and are not aware of, any voting agreements among our shareholders.

**Registration Rights**

We have entered into an amended and restated investors rights agreement with certain of our shareholders, pursuant to which 10,931,110 ordinary shares resulting from conversion of our issued and outstanding preferred shares are entitled to certain registration rights as described below. This amount does not include

81

shares issuable upon the exercise of options and warrants, which are also entitled to registration rights as described under "— Registration Rights — Certain Options and Warrants." In accordance with such agreement, the following entities which, as of the date of this prospectus, beneficially own more than 5.0% of our ordinary shares assuming the conversion of all of outstanding preferred shares, are entitled to registration rights: the Tamir Fishman Group; the Gemini Group; the Genesis Group; the Partech International Group; and Jerusalem Venture Partners and our Chairman, Yigal Jacoby, and Odem Rotem Holdings, a company wholly-owned and controlled by Mr. Jacoby.

*Demand registration rights.*  We are required to file a registration statement in respect of ordinary shares held by our former preferred shareholders as follows:

- • two registrations at the request of one or more of our shareholders holding ordinary shares representing in the aggregate a majority of ordinary shares resulting from conversion of our Series A preferred shares, Series B preferred shares (the "B Registrable Securities") and Series C preferred shares and all ordinary shares issued in respect of such shares;

- • one registration (a "Preferred D Demand") at the request of one of more of our shareholders holding ordinary shares representing in the aggregate a majority of ordinary shares resulting from conversion of our Series D preferred shares (the "D Registrable Securities") and all ordinary shares issued in respect of such shares; and

- • one registration (a "Preferred E Demand") at the request of one of more of our shareholders holding ordinary shares representing in the aggregate a majority of ordinary shares resulting from conversion of our Series E preferred shares (the "E Registrable Securities") and all ordinary shares issued in respect of such shares,

provided that (1) the aggregate proceeds from any such registration are estimated in good faith to be in excess of $5.0 million and (2) we are not required to effect a registration within 180 days after the effective date of the registration statement of which this prospectus forms a part or a registration statement for any subsequent offering.

Following a request to effect a registration by our shareholders as described above, we are required to offer the other shareholders that are entitled to registration rights an opportunity to include their shares in the registration statement. In the event that the managing underwriter advises the registering shareholders in writing that marketing factors require a limitation on the number of shares that can be included in the registration statement:

- • if the registration statement is being filed pursuant to a Preferred E Demand, the shares will be included in the registration statement in the following order of preference: first, the E Registrable Securities, second, the D Registrable Securities up to 30% of the aggregate number of shares included in the registration statement, third, registrable securities that are not E Registrable Securities or D Registrable Securities, fourth, to any shares that we wish to include for our own account, and fifth, any of our other securities; and

- • if the registration statement is not being filed pursuant to a Preferred E Demand, the shares will be included in the registration statement in the following order of preference: first, the D registrable securities up to 30% of the aggregate number of shares included in the registration statement, second, registrable securities that are not D Registrable Securities, including E Registrable Securities up to 10% of the aggregate number of shares included in the registration statement, third, securities that we wish to include for our own account, and fourth, any of our other securities.

*Registration on Form F-3 or S-3.*  After we become eligible under applicable securities laws to file a registration statement on Form F-3 or Form S-3, as applicable, which will not be until at least 12 months after the date of this prospectus, shareholders holding registrable securities may request that we register such registrable securities on Form F-3 or Form S-3, as applicable, provided that each such registration generates proceeds of at least $2.0 million. This right may be exercised up to twice in any twelve-month period. We are required to give notice of any such request to the other holders of registrable securities and offer them an

82

opportunity to include their shares in the registration statement. In the event that the managing underwriter advises in writing that marketing factors require a limitation on the number of shares that can be included in the registration statement, the shares will be included in the registration statement in the following order of preference: first, the E Registrable Securities up to 30% of the aggregate number of shares included in the registration statement, second the D Registrable Securities up to 30% of the aggregate number of shares included in the registration statement, third, registrable securities which are not D Registrable Securities or E Registrable Securities, fourth, securities that we wish to include for our own account, and fifth, any of our other securities.

*Piggyback registration rights.*  Following this offering, shareholders holding registrable securities will also have the right to request that we include their registrable securities in any registration statements filed by us in the future for the purposes of a public offering, subject to specified exceptions. In the event that the managing underwriter advises in writing that marketing factors require a limitation on the number of shares that can be included in the registration statement, the shares will be included in the registration statement in the following order of preference: first, the shares that we wish to include for our own account, second, the E Registrable Securities up to 30% of the aggregate number of shares included in the registration statement, third the D Registrable Securities up to 30% of the aggregate number of shares included in the registration statement, fourth, registerable securities which are not D Registrable Securities or E Registrable Securities, and fifth, any of our other securities.

*Termination.*  All registration rights granted to holders of registrable securities terminate on the fifth anniversary of the closing of this offering and, with respect to any of our holders of registrable securities, when the shares held by such shareholder can be sold within a 90-day period under Rule 144.

*Expenses.*  We will pay all expenses in carrying out the above registrations.

*Certain options and warrants.*  We have also granted the following registration rights to holders of certain warrants and options to purchase our preferred shares:

- 171,782 ordinary shares issuable upon the non-cashless exercise of warrants granted to an Israeli bank are entitled to the same registration rights as the B Registrable Securities, subject to first cutback as to the B Registrable Securities. An aggregate of 73,069 ordinary shares will be issued pursuant to the partial cashless exercise of these warrants upon the closing of this offering.

- 229,047 ordinary shares issuable upon the non-cashless exercise of warrants granted to an affiliate of another Israeli bank are entitled to notice of and inclusion in any registration statement that we file following this offering. An aggregate of 101,487 ordinary shares will be issued pursuant to the cashless exercise of one of these warrants, upon the closing of this offering. This right terminates with respect to 143,154 of such shares if they can be sold within a 180-day period under Rule 144.

- 14,094 ordinary shares issuable upon the exercise of an option to purchase Series B preferred shares held by our founder and Chairman, Yigal Jacoby, are entitled to the same registration rights as the B Registrable Securities. Mr. Jacoby has agreed to exercise this option upon the closing of this offering.

- 246,479 ordinary shares that have been issued, but are held in trust for the benefit of Mr. Jacoby pending his payment of the purchase price of such shares, will be entitled, upon the payment of the purchase price, to the same registration rights as the Series A preferred shares.

## Agreements with Directors and Officers

*Employment of Yigal Jacoby.*  In October 2006, we entered into an agreement with Mr. Jacoby governing the

terms of his employment with us for the provision of management and guidance services with regard to our strategy, long term vision and key objectives. Under the terms of the agreement, Mr. Jacoby is required to devote 75% of his time to his position with us. The agreement contains standard employment provisions, including provisions relating to confidentiality and assignment of inventions. We may terminate Mr. Jacoby's employment on 30 days' prior notice, or we may terminate Mr. Jacoby's employment without notice if we give him 30 days' pay in lieu of notice.

83

Prior to his transition to a direct employment relationship, Mr. Jacoby provided substantially identical services to us pursuant to a consulting agreement, dated December 2001. Under the agreement, Odem Rotem Holdings was solely responsible for the direct compensation and reimbursement of Mr. Jacoby. The agreement was terminated in October 2006. The agreement contained standard confidentiality provisions that survived the agreement's termination.

In August 2004 we entered into a non-competition agreement with Mr. Jacoby and Odem Rotem Holdings. Under this agreement, Mr. Jacoby and Odem Rotem Holdings are prohibited during the term of Mr. Jacoby's engagement with us and for a period of 12 months thereafter from directly or indirectly competing with our products or services or directly or indirectly soliciting our employees or consultants to engage in business which competes with our products or services. The non-competition agreement does, however, permit Mr. Jacoby, if he becomes an executive of a venture capital fund in the future to serve as a director of the venture capital fund's portfolio companies. Further, any employment or solicitation of our employees or consultants or solicitation of business opportunities by a company in which Odem Rotem Holdings or Mr. Jacoby are a director or shareholders are not be deemed, by itself, to violate the non-competition agreement so long as neither Odem Rotem Holdings nor Mr. Jacoby were actively involved in such employment or solicitation.

*Escrow Agreement with Yigal Jacoby.* A right to purchase Series A preferred shares which are convertible into 246,479 ordinary shares was granted to Mr. Jacoby in connection with our Series A financing. The underlying Series A preferred shares are issued, but are held in trust for the benefit of the Mr. Jacoby pursuant to an escrow agreement entered into on January 28, 1998, amended on October 26, 2006, by and among the Company, Mr. Jacoby and an escrow agent. Pursuant to the terms of this agreement, the escrow agent is holding such shares for which Mr. Jacoby has paid nominal value. While these shares are held in trust, neither Mr. Jacoby nor the trustee has voting or economic rights with respect to such shares. Mr. Jacoby may exercise his right to purchase the shares in trust, in whole or in part, by paying any portion of the full $600,000 purchase price (less $475 previously paid in respect of the nominal value of the shares) for the respective portion of the underlying Series A preferred shares. Following an initial public offering or a liquidity event, Mr. Jacoby will have the right to pay any portion of the purchase price for the respective portion of shares by "net payment" of his right to purchase. Mr. Jacoby's right to purchase expires upon the earlier of (1) two years following the closing of this offering, or (2) upon the consummation of a liquidity event. See Note 9d(1) to our consolidated financial statements for additional information.

*Consulting Agreement with Hess MarkITing Ltd.* In June 2005, we entered into a consulting agreement with Hess MarkITing Ltd., as consultant, for consulting services to be determined. All of the consulting service provided by the consultant will be provided through Sharon Hess, our Vice President — Marketing and the founder and owner of Hess MarkITing Ltd. The agreement contains a non-compete provision prohibiting the consultant from directly or indirectly having any connection with a business or venture that competes with us. Under the agreement, we have promised to pay Hess MarkITing a monthly consulting fee, provide use of one of our company cars and grant stock options to purchase our ordinary shares to Ms. Hess. Such monthly consulting fee is recorded as a sales and marketing expense. This agreement renews automatically at the end of each one year term, but may be terminated by either party on 90 days' prior written notice.

*Technical Training Services Agreement with Experteam.* We have received technical writing services from Experteam Ltd., a company owned and controlled by the wife of our Chairman, Yigal Jacoby. We began using Experteam in 2004 and our payments to Experteam were $17,000 in 2004, $14,000 in 2005 and $72,000 in the nine months ended September 30, 2006.

*Employment Agreements.* We have entered into employment agreements with each of our officers who work for us as employees. See "Management — Employment Agreements."

*Exculpation, Indemnification and Insurance.* Our articles of association permit us to exculpate, indemnify

424B1

and insure our office holders to the fullest extent permitted by the Companies Law. We have entered into agreements with each of our office holders, exculpating them from a breach of their duty of care to us to the fullest extent permitted by law and undertaking to indemnify them to the fullest extent permitted by law, including with respect to liabilities resulting from this offering to the extent that these liabilities are not covered by insurance. See "Management — Exculpation, Insurance and Indemnification of Directors and Officers."

84

## PRINCIPAL SHAREHOLDERS

The following table sets forth certain information regarding the beneficial ownership of our outstanding ordinary shares as of the date of this prospectus, as adjusted to reflect the sale of the ordinary shares in this offering:

- each person who we know beneficially owns 5.0% or more of the outstanding ordinary shares;

- each of our directors individually;

- each of our executive officers individually; and

- all of our directors and executive officers as a group.

Beneficial ownership of shares is determined under rules of the Securities and Exchange Commission and generally includes any shares over which a person exercises sole or shared voting or investment power. The information set forth in the table below gives effect to the conversion of all preferred shares and Series A ordinary shares into ordinary shares, including preferred shares issuable upon the closing of this offering upon the exercise of warrants, options or rights that are subject to irrevocable notices of exercise. The table also includes the number of ordinary shares underlying warrants, options or rights that are exercisable within 60 days of the date of this offering. Ordinary shares subject to these warrants, options or rights are deemed to be outstanding for the purpose of computing the ownership percentage of the person beneficially holding these warrants, options or rights, but are not deemed to be outstanding for the purpose of computing the ownership percentage of any other person. The table assumes 13,900,997 ordinary shares outstanding as of the date of this prospectus (excluding 246,479 shares held in trust for Mr. Jacoby) and 20,889,931 ordinary shares outstanding upon the completion of this offering. The "After Offering" columns also include additional ordinary shares issuable upon the closing of the offering based on the initial public offering price range pursuant to anti-dilution adjustments to our Series C preferred shares.

As of the date of this prospectus, we are aware of 14 U.S. persons that are holders of record of our ordinary shares holding an aggregate of 5,744,111 shares after giving effect to the conversion of our preferred shares.

Unless otherwise noted below, each shareholder's address is c/o Allot Communications Ltd., 22 Hanagar Street, Neve Ne'eman Industrial Zone B, Hod-Hasharon 45240, Israel.

85

| Name and Address | Number of Shares Beneficially Owned | | Percentage of Shares Beneficially Owned | | Percentage of Shares Owned Assuming Exercise of Option to Purchase Additional |
| --- | --- | --- | --- | --- | --- |
| | Before Offering | After Offering | Before Offering | After Offering | Ordinary Shares |
| **Principal shareholders:** | | | | | |
| Tamir Fishman Group (1) | 2,265,208 | 2,331,593 | 16.3% | 11.2% | 10.7% |
| Gemini Group(2) | 2,211,679 | 2,211,679 | 15.9 | 10.6 | 10.1 |
| Genesis Partners(3) | 2,028,510 | 2,028,510 | 14.6 | 9.7 | 9.3 |
| Yigal Jacoby(4) | 1,858,707 | 1,858,707 | 12.5 | 8.5 | 8.2 |
| Partech International Group(5) | 1,280,562 | 1,280,562 | 9.2 | 6.1 | 5.9 |
| Jerusalem Venture Partners(6) | 1,017,299 | 1,060,631 | 7.3 | 5.1 | 4.9 |
| **Directors and executive officers:** | | | | | |
| Rami Hadar | — | — | — | — | — |
| Amir Weinstein | * | * | * | * | * |
| Anat Shenig | * | * | * | * | * |
| Azi Ronen | * | * | * | * | * |
| Michael Shurman(7) | 236,058 | 236,058 | 1.7 | 1.1 | 1.1 |
| Larry Schmidt | * | * | * | * | * |
| Menashe Mukhtar | * | * | * | * | * |
| Sharon Hess | * | * | * | * | * |
| Ramy Moriah | * | * | * | * | * |
| Adi Sapir | * | * | * | * | * |
| Pini Gvili | * | * | * | * | * |
| Shai Saul(8) | 2,265,208 | 2,331,593 | 16.3 | 11.2 | 10.7 |
| Yossi Sela(9) | 2,211,679 | 2,211,679 | 15.9 | 10.6 | 10.1 |
| Eyal Kishon(10) | 2,028,510 | 2,028,510 | 14.6 | 9.7 | 9.3 |
| Erel Margalit(11) | 1,017,299 | 1,060,631 | 7.3 | 5.1 | 4.9 |
| Yosi Elihav | 480,038 | 480,038 | 3.5 | 2.3 | 2.2 |
| All directors and executive officers as a group | 10,576,866 | 10,686,583 | 68.9% | 47.9% | 45.9% |

* Less than 1.0%

(1) Following the closing of this offering consists of 1,165,014 shares held by Tamir Fishman Ventures II L. P., 804,842 shares held by Tamir Fishman Venture Capital II Ltd., 155,904 shares held by Tamir Fishman Ventures II (Israel) L.P., 138,370 shares held by Tamir Fishman Ventures II (Cayman Islands) L.P., 54,543 shares held by Tamir Fishman Ventures II CEO Funds (U.S.) L.P. and 12,980 shares held by Tamir Fishman Ventures II CEO Funds L.P. Tamir Fishman Ventures II, LLC is the sole general partner of each of the foregoing limited partnerships and has management rights over the shares held by Tamir Fishman Venture Capital II Ltd. by virtue of a management agreement with Tamir Fishman Ventures II, LLC. The managing members of Tamir Fishman Ventures II, LLC are Shai Saul, Michael Elias and Tamir Fishman & Co. Ltd. Eldad Tamir and Danny Fishman are Co-Presidents and Co-Chief Executive Officers of Tamir Fishman & Co. Ltd. and, by virtue of their positions, may be deemed to be beneficial owners of the securities held thereby. Each of the foregoing entities and individuals disclaims beneficial ownership of these securities except to the extent of its or his pecuniary

86

interest therein. The address of the Tamir Fishman entities and the foregoing individuals is 21 Haarbaa, Tel Aviv 64739 Israel.

(2) Consists of 1,143,448 shares held by Gemini Israel II L.P., 897,119 shares held by Gemini Israel II Parallel Fund L.P., 145,760 shares held by Advent PGGM Gemini L.P. and 25,352 shares held by Gemini Partner Investors L.P. Yossi Sela is a managing partner and a shareholder of Gemini Israel Funds Ltd., the sole general partner or the sole general partner of the general partner of Gemini Israel II L.P., Gemini Israel II Parallel Fund L.P., Advent PGGM Gemini L.P., Gemini Partner Investors L.P., Gemini Israel III L.P. and Gemini Israel III Parallel Fund L.P. The board of directors of Gemini Israel Funds Ltd. has sole investment control with respect to these entities and is comprised of Steve Kahn, Amram Rasiel, Dr. A.I. (Ed) Mlavsky, Yossi Sela and David Cohen. These individuals share voting power over the shares and held by the Gemini entities and may be deemed to be the beneficial owners of the securities held thereby. Each individual disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The address of the Gemini entities and the foregoing individuals is 9 HaMenofim Street, Herzliya Pituach 46725, Israel.

(3) Consists of 1,312,770 shares held by Genesis Partners I L.P. and 715,740 shares held by Genesis Partners (Cayman) L.P. Eddy Shalev and Dr. Eyal Kishon are the directors of E. Shalev Management Ltd., a general partner of these funds. These individuals each have voting, investment and dispositive power with respect to the shares held by the Genesis entities and may be deemed to be beneficial owners of the securities held thereby. Each individual disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The address of the Genesis entities and the foregoing individuals is 11 HaMenofim Street, Herzliya Pituach 46725, Israel.

(4) Consists of 895,410 shares held by Odem Rotem Holdings Ltd., a company wholly-owned and controlled by Yigal Jacoby, and an option to purchase 481,794 shares held by Odem Rotem Holdings. Also consists of options held directly by Mr. Jacoby to purchase 235,024 shares and a right held by Mr. Jacoby to purchase 246,479 shares currently held by a trustee. See "Certain Relationships and Related Party Transactions — Agreements with Directors and Officers — Escrow Agreement with Yigal Jacoby."

(5) Consists of 469,537 shares held by Partech International Growth Capital I LLC, 533,565 shares held by Partech International Growth Capital III LLC, 224,098 shares held by AXA Growth Capital II L.P., 32,016 shares held by Double Black Diamond II LLC and 21,346 shares held by Multinvest LLC. 46th Parallel, LLC is the managing member of each of Partech International Growth Capital I, LLC and Partech International Growth Capital III, LLC. 48th Parallel, LLC is the general partner of AXA Growth Capital II L.P. ParVenture Japan Managers, LLC is the managing member of Multinvest, LLC. Thomas G. McKinley and Vincent Worms are the managing members of Double Black Diamond II, LLC. PAR SF, LLC is the managing member of each of 46th Parallel, LLC and 48th Parallel, LLC. Vincent Worms and Vendome Capital, LLC are the managing members of each of PAR SF, LLC and ParVenture Japan Managers, LLC. Thomas G. McKinley is the managing member of Vendome Capital, LLC. Thomas G. McKinley and Vincent Worms share voting power over the shares held by the Partech International Group and may be deemed to be the beneficial owners of the securities held thereby. Each individual disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The address of the Partech International entities and the foregoing individuals is 50 California Street, Suite 3200, San Francisco, California.

(6) Following the closing of this offering consists of 1,018,403 shares held by Jerusalem Venture Partners IV L.P., 24,505 shares held by Jerusalem Venture Partners IV (Israel) L.P., 9,125 shares held by Jerusalem Venture Partners Entrepreneurs Fund IV L.P. and 8,598 shares held by Jerusalem Venture Partners IV-A L.P. Jerusalem Partners IV, L.P. is the general partner of Jerusalem Venture Partners IV, L.P., Jerusalem Venture Partners IV-A, L.P. and Jerusalem Venture Partners Entrepreneurs Fund IV, L. P. Jerusalem Partners IV-Venture Capital, L.P. serves as the general partner of Jerusalem Venture Partners IV (Israel), L.P. JVP Corp. IV is the general partner of Jerusalem Partners IV, L.P. and Jerusalem Partners IV-Venture Capital, L.P. Erel Margalit is an officer of JVP Corp. IV and, by virtue of his position, may be

87

deemed to be the beneficial owner of the securities held thereby. Mr. Margalit disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The address of the Jerusalem Venture Partners entities and the foregoing individuals is 7 West 22nd St., 7th Floor, New York, NY 10010.

(7)  Consists of 221,556 shares and options to purchase 14,502 shares.

(8)  Prior to the offering consists of 2,265,208 shares and following the offering consists of 2,331,593 shares held by the Tamir Fishman Group. Shai Saul is a managing partner of Tamir Fishman and, by virtue of his position, may be deemed to have voting and investment power, and thus beneficial ownership, with respect to the shares held by the Tamir Fishman Group. Mr. Saul disclaims such beneficial ownership except to the extent of his pecuniary interest therein.

(9)  Consists of 2,211,679 shares held by the Gemini Group. Mr. Sela is a managing partner of Gemini Israel Funds and, by virtue of his position, may be deemed to have voting and investment power, and thus beneficial ownership, with respect to the shares held by the Gemini Group. Mr. Sela disclaims such beneficial ownership except to the extent of his pecuniary interest therein.

(10)  Consists of 2,028,510 shares held by the Genesis Group. Eyal Kishon is a managing partner of Genesis Partners and, by virtue of his position, may be deemed to have voting and investment power, and thus beneficial ownership, with respect to the shares held by the Genesis Group. Mr. Kishon disclaims such beneficial ownership except to the extent of his pecuniary interest therein.

(11)  Prior to the offering consists of 1,017,299 shares and following the offering consists of 1,060,631 shares held by Jerusalem Venture Partners. Erel Margalit is a managing general partner and, by virtue of his position, may be deemed to have voting and investment power, and thus beneficial ownership, with respect to the shares held by Jerusalem Venture Partners. Mr. Margalit disclaims such beneficial ownership except to the extent of his pecuniary interest therein.

88

# DESCRIPTION OF SHARE CAPITAL

As of the date of this prospectus, our authorized share capital consists of 194,628,607 ordinary shares, 268,761 Series A ordinary shares and 5,102,632 preferred shares, each with a par value of NIS 0.10 per share. Upon the closing of this offering, all of our outstanding Series A ordinary shares and preferred shares, will automatically convert into ordinary shares. Upon the closing of this offering, our authorized share capital will consist of 200,000,000 ordinary shares, of which 20,889,931 will be issued and outstanding.

Our ordinary shares are not redeemable and following the closing of this offering will not have preemptive rights. The ownership or voting of ordinary shares by non-residents of Israel is not restricted in any way by our memorandum of association, our articles of association or the laws of the State of Israel, except that citizens of countries which are in a state of war with Israel may not be recognized as owners of ordinary shares.

Our current articles will be replaced by new articles of association to be effective upon the closing of this offering and which are attached as an exhibit to the registration statement of which this prospectus forms part. The description below reflects the terms of the new articles of association to be effective upon the closing of this offering.

## Voting

Holders of our ordinary shares have one vote for each ordinary share held on all matters submitted to a vote of shareholders at a shareholder meeting. Shareholders may vote at shareholder meeting either in person, proxy or by written ballot. Israeli law does not provide for public companies such as us to have shareholder resolutions adopted by means of a written consent in lieu of a shareholder meeting. Shareholder voting rights may be affected by the grant of any special voting rights to the holders of a class of shares with preferential rights that may be authorized in the future. The Companies Law provides that a shareholder, in exercising his or her rights and performing his or her obligations toward the company and its other shareholders, must act in good faith and in an acceptable manner, and avoid abusing his or her powers. This is required when voting at general meetings on matters such as amendments to the articles of association, increasing the company's authorized capital, mergers and approval of related party transactions that require shareholder approval. A shareholder also has a general duty to refrain from depriving any other shareholder of their rights as a shareholder. In addition, any controlling shareholder, any shareholder who knows that its vote can determine the outcome of a shareholder vote and any shareholder who, under a company's articles of association, can appoint or prevent the appointment of an office holder or has other power with respect to the company, is under a duty to act with fairness towards the company. The Companies Law does not describe the substance of this duty, except to state that the remedies generally available upon a breach of contract will apply also in the event of a breach of the duty to act with fairness, taking the shareholder's position in a company into account.

## Transfer of Shares

Fully paid ordinary shares are issued in registered form and may be freely transferred under our articles of association unless the transfer is restricted or prohibited by another instrument, Israeli law or the rules of a stock exchange on which the shares are traded.

## Election of Directors

Our ordinary shares do not have cumulative voting rights for the election of directors. Rather, under our articles of association our directors are elected by the holders of a simple majority of our ordinary shares at a

424B1

general shareholder meeting. As a result, the holders of our ordinary shares that represent more than 50.0% of the voting power represented at a shareholder meeting have the power to elect any or all of our directors whose positions are being filled at that meeting, subject to the special approval requirements for outside directors described under "Management — Outside Directors."

89

**Dividend and Liquidation Rights**

Under the Companies Law, shareholder approval is not required for the declaration of a dividend, unless the company's articles of association provide otherwise. Our articles of association provide that our board of directors may declare and distribute a dividend to be paid to the holders of ordinary shares without shareholder approval in proportion to the paid up capital attributable to the shares that they hold. Dividends may only be paid out of profits legally available for distribution, as defined in the Companies Law, provided that there is no reasonable concern that a payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. If we do not have profits legally available for distribution, we may seek the approval of the court to distribute a dividend. The court may approve our request if it is convinced that there is no reasonable concern that a payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due.

In the event of our liquidation, after satisfaction of liabilities to creditors, our assets will be distributed to the holders of ordinary shares in proportion to the paid up capital attributable to the shares that they hold. Dividend and liquidation rights may be affected by the grant of preferential dividend or distribution rights to the holders of a class of shares with preferential rights that may be authorized in the future.

**Shareholder Meetings**

We are required to convene an annual general meeting of our shareholders once every calendar year within a period of not more than 15 months following the preceding annual general meeting. Our board of directors may convene a special general meeting of our shareholders and is required to do so at the request of two directors or one quarter of the members of our board of directors or at the request of one or more holders of 5.0% or more of our share capital and 1.0% of our voting power or the holder or holders of 5.0% or more of our voting power. All shareholder meetings require prior notice of at least 21 days. The chairperson of our board of directors, or any other person appointed by the board of directors, presides over our general meetings. In the absence of the chairperson of the board of directors or such other person, one of the members of the board designated by a majority of the directors presides over the meeting. If no director is designated to preside as chairperson, then the shareholders present will choose one of the shareholders present to be chairperson. Subject to the provisions of the Companies Law and the regulations promulgated thereunder, shareholders entitled to participate and vote at general meetings are the shareholders of record on a date to be decided by the board of directors, which may be between four and 40 days prior to the date of the meeting.

**Quorum**

The quorum required for a meeting of shareholders consists of at least two shareholders present in person, by proxy or by written ballot, who hold or represent between them at least 25% of our voting power. A meeting adjourned for lack of a quorum generally is adjourned to the same day in the following week at the same time and place or any time and place as the directors designate in a notice to the shareholders. At the reconvened meeting, the required quorum consists of at least two shareholders present, in person, by proxy or by written ballot, who hold or represent between them at least 10% of our voting power, provided that if the meeting was initially called pursuant to a request by our shareholders, then the quorum required must include at least the number of shareholders entitled to call the meeting. See "— Shareholder Meetings."

**Resolutions**

An ordinary resolution requires approval by the holders of a simple majority of the voting rights represented at the meeting, in person, by proxy or by written ballot, and voting on the resolution.

Under the Companies Law, unless otherwise provided in the articles of association or applicable law, all resolutions of the shareholders require a simple majority. A resolution for the voluntary winding up of the company requires the approval by holders of 75.0% of the voting rights represented at the meeting, in person, by proxy or by written ballot and voting on the resolution. Under our articles of association (1) certain shareholders' resolutions require the approval of a special majority of the holders of at least 75.0% of the voting rights represented at the meeting, in person, by proxy or by written ballot and voting on the resolution,

90

and (2) certain shareholders' resolutions require the approval of a special majority of the holders of at least two-thirds of the voting securities of the company then outstanding.

## Access to Corporate Records

Under the Companies Law, all shareholders generally have the right to review minutes of our general meetings, our shareholder register, including with respect to material shareholders, our articles of association, our financial statements and any document we are required by law to file publicly with the Israeli Companies Registrar. Any shareholder who specifies the purpose of its request may request to review any document in our possession that relates to any action or transaction with a related party which requires shareholder approval under the Companies Law. We may deny a request to review a document if we determine that the request was not made in good faith, that the document contains a commercial secret or a patent or that the document's disclosure may otherwise impair our interests.

## Registration Rights

For a discussion of registration rights we have granted to shareholders, please see the section of this prospectus entitled "Certain Relationships and Related Party Transactions — Registration Rights."

## Acquisitions under Israeli Law

*Full Tender Offer.* A person wishing to acquire shares of a public Israeli company and who would as a result hold over 90.0% of the target company's issued and outstanding share capital is required by the Companies Law to make a tender offer to all of the company's shareholders for the purchase of all of the issued and outstanding shares of the company. A person wishing to acquire shares of a public Israeli company and who would as a result hold over 90.0% of the issued and outstanding share capital of a certain class of shares is required to make a tender offer to all of the shareholders who hold shares of the same class for the purchase of all of the issued and outstanding shares of the same class. If the shareholders who do not accept the offer hold less than 5.0% of the issued and outstanding share capital of the company or of the applicable class, all of the shares that the acquirer offered to purchase will be transferred to the acquirer by operation of law. However, a shareholder that had its shares so transferred may, within three months from the date of acceptance of the tender offer, petition the court to determine that tender offer was for less than fair value and that the fair value should be paid as determined by the court. If the shareholders who did not accept the tender offer hold at least 5.0% of the issued and outstanding share capital of the company or of the applicable class, the acquirer may not acquire shares of the company that will increase its holdings to more than 90.0% of the company's issued and outstanding share capital or of the applicable class from shareholders who accepted the tender offer.

*Special Tender Offer.* The Companies Law provides that an acquisition of shares of a public Israeli company must be made by means of a special tender offer if as a result of the acquisition the purchaser would become a holder of at least 25.0% of the voting rights in the company, unless one of the exemptions in the Companies Law is met. This rule does not apply if there is already another holder of at least 25.0% of the voting rights in the company. Similarly, the Companies Law provides that an acquisition of shares in a public company must be made by means of a tender offer if as a result of the acquisition the purchaser would become a holder of more than 45.0% of the voting rights in the company, if there is no other shareholder of the company who holds more than 45.0% of the voting rights in the company, unless one of the exemptions in the Companies Law is met.

In the event that a special tender offer is made, a company's board of directors is required to express its opinion on the advisability of the offer, or shall abstain from expressing any opinion if it is unable to do so,

provided that it gives the reasons for its abstention. An office holder in a target company who, in his or her capacity as an office holder, performs an action the purpose of which is to cause the failure of an existing or foreseeable special tender offer or is to impair the chances of its acceptance, is liable to the potential purchaser and shareholders for damages, unless such office holder acted in good faith and had reasonable grounds to believe he or she was acting for the benefit of the company. However, office holders of the target company

91

may negotiate with the potential purchaser in order to improve the terms of the special tender offer, and may further negotiate with third parties in order to obtain a competing offer.

If a special tender offer was accepted by a majority of the shareholders who announced their stand on such offer, then shareholders who did not announce their stand or who had objected to the offer may accept the offer within four days of the last day set for the acceptance of the offer.

In the event that a special tender offer is accepted, then the purchaser or any person or entity controlling it or under common control with the purchaser or such controlling person or entity shall refrain of making a subsequent tender offer for the purchase of shares of the target company and cannot execute a merger with the target company for a period of one year from the date of the offer, unless the purchaser or such person or entity undertook to effect such an offer or merger in the initial special tender offer.

*Merger.*   The Companies Law permits merger transactions if approved by each party's board of directors and, unless certain requirements described under the Companies Law are met, a certain percentage of each party's shareholders. The board of directors of a merging company is required pursuant to the Companies Law to discuss and determine whether in its opinion there exists a reasonable concern that as a result of a proposed merger, the surviving company will not be able to satisfy its obligations towards its creditors, such determination taking into account the financial status of the merging companies. If the board has determined that such a concern exists, it may not approve a proposed merger. Following the approval of the board of directors of each of the merging companies, the boards must jointly prepare a merger proposal for submission to the Israeli Registrar of Companies.

Under the Companies Law, if the approval of a general meeting of the shareholders is required, merger transactions may be approved by holders of a simple majority of our shares (including the separate vote of each class of shares, if we have issued shares of different classes) present, in person, by proxy or by written ballot, at a general meeting and voting on the transaction. In determining whether the required majority has approved the merger, if shares of the company are held by the other party to the merger, or by any person holding at least 25.0% of the voting rights or 25.0% of the means of appointing directors or the general manager of the other party to the merger, then a vote against the merger by holders of the majority of the shares present and voting, excluding shares held by the other party or by such person, or any person or entity acting on behalf of, related to or controlled by either of them, is sufficient to reject the merger transaction. If the transaction would have been approved but for the separate approval of each class or the exclusion of the votes of certain shareholders as provided above, a court may still approve the merger upon the request of holders of at least 25.0% of the voting rights of a company, if the court holds that the merger is fair and reasonable, taking into account the value of the parties to the merger and the consideration offered to the shareholders.

Under the Companies Law, each merging company must inform its secured creditors of the proposed merger plans. Unsecured creditors are entitled to notice of the merger pursuant to regulations to be adopted under the Companies Law (no such regulations have been adopted to date). Upon the request of a creditor of either party to the proposed merger, the court may delay or prevent the merger if it concludes that there exists a reasonable concern that, as a result of the merger, the surviving company will be unable to satisfy the obligations of any of the parties to the merger, and may further give instructions to secure the rights of creditors.

In addition, a merger may not be completed unless at least 50 days have passed from the date that a proposal for approval of the merger was filed with the Israeli Registrar of Companies and 30 days from the date that shareholder approval of both merging companies was obtained.

**Anti-Takeover Measures**

*Undesignated preferred stock.* The Companies Law allows us to create and issue shares having rights different to those attached to our ordinary shares, including shares providing certain preferred or additional rights to voting, distributions or other matters and shares having preemptive rights. Following the closing of this offering, we will not have any authorized or issued shares other than ordinary shares. In the future, if we

92

do create and issue a class of shares other than ordinary shares, such class of shares, depending on the specific rights that may be attached to them, may delay or prevent a takeover or otherwise prevent our shareholders from realizing a potential premium over the market value of their ordinary shares. The authorization of a new class of shares will require an amendment to our articles of association which requires the prior approval of the holders of a majority of our voting power voted at a general meeting. Shareholders voting at such a meeting will be subject to the restrictions under the Companies Law described in "— Voting."

*Supermajority voting.*  Our amended and restated articles of association require the approval of the holders of at least two thirds of our combined voting power to effect certain amendments to our articles of association.

*Classified board of directors.*  Our amended and restated articles of association provide for a classified board of directors. See "Management — Board of Directors and Officers."

## Establishment

We were incorporated under the laws of the State of Israel in November 1996 and commenced operations in July 1997. We are registered with the Israeli registrar of companies in Jerusalem. Our registration number is 51-239477-6. Our objects under our memorandum of association are to engage in the business of computers, hardware and software, including without limitation research and development, marketing, consulting and the selling of knowledge, and any other engagement which our board of directors shall determine.

## Transfer Agent and Registrar

The transfer agent and registrar for our ordinary shares is American Stock Transfer & Trust Company. Its address is 59 Maiden Lane, New York, New York 10038 and its telephone number is (718) 921-8200.

## Listing

We have applied to list our ordinary shares on The Nasdaq Global Market under the symbol "ALLT."

93

## ORDINARY SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of our ordinary shares in the public market following this offering, or the perception that such sales may occur, could adversely affect prevailing market prices of our ordinary shares. Assuming no exercise of options outstanding following this offering, we will have an aggregate of 20,889,931 ordinary shares outstanding upon completion of this offering. The 6,500,000 shares sold in this offering will be freely tradable without restriction or further registration under the Securities Act, unless purchased by "affiliates" as that term is defined under Rule 144 of the Securities Act, who may sell only the volume of shares described below and whose sales would be subject to additional restrictions described below.

The remaining 14,389,931 ordinary shares will be held by our existing shareholders and will be deemed to be "restricted securities" under Rule 144. Restricted securities may only be sold in the public market pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration under Rule 144 or Rule 701 under the Securities Act. These rules are summarized below.

### Eligibility of Restricted Shares for Sale in the Public Market

The following indicates approximately when the 14,389,931 ordinary shares that are not being sold in this offering, but which will be outstanding at the time this offering is complete, will be eligible for sale into the public market, under the provisions of Rule 144:

- upon the date of this prospectus, 218,864 ordinary shares will be available for resale under Rule 144 (k);

- beginning 90 days after the date of this prospectus, 161,302 ordinary shares will be available for resale under Rule 701 or pursuant to a Form S-8;

- beginning 180 days after the effective date of this prospectus, up to approximately 13,899,972 shares may be eligible for resale, approximately 9,828,102 of which would be subject to volume, manner of sale and other limitations under Rule 144; and

- the remaining 109,793 shares will be eligible for resale pursuant to Rule 144 upon the expiration of various one year holding periods during the six months following the 180 days after the completion of this offering.

### Lock-up Agreements

Our officers and directors, and holders of nearly all of our outstanding shares have signed lock-up agreements pursuant to which, subject to certain exceptions, they have agreed not to sell or otherwise dispose of their ordinary shares or any securities convertible into or exchangeable for ordinary shares for a period of 180 days after the date of this prospectus without the prior written consent of Lehman Brothers Inc. In addition to our outstanding shares, as of the date of this prospectus, we have granted options to purchase 3,451,439 ordinary shares under our share option plans. The holders of options to purchase 88,409 ordinary shares that are vested and exercisable as of the date of this prospectus are not required to sign lock-up agreements with respect to such shares in the event that they exercise options. Accordingly, following any such exercise, these optionholders will be able to sell the shares underlying the options into the public markets beginning 90 days after the date of this prospectus pursuant to Rule 701. The holders of nearly all of the remaining options that we have granted under the terms of our share option plans are required to sign a lock-up agreement upon our request and we have undertaken to the underwriters to require any such

424B1

optionholder exercising an option during the 180-day period following this offering to sign such a lock-up agreement. In addition, we have agreed that we will not file a registration statement on Form S-8 for the resale of securities underlying employee share options until at least 90 days after the date of this prospectus. The lock-up agreements may be extended under certain circumstances described under "Underwriting — Lock-Up Agreements."

94

## Rule 144

In general, under Rule 144 as currently in effect, beginning 90 days after the date of this prospectus, a person who has beneficially owned ordinary shares for at least one year is entitled to sell within any three-month period a number of shares that does not exceed the greater of:

- 1.0% of the number of ordinary shares then outstanding, which is expected to equal 208,899 ordinary shares immediately after this offering; or

- the average weekly trading volume of the ordinary shares on the Nasdaq Global Market during the four calendar weeks preceding the filing of a notice on Form 144 in connection with the sale.

Sales under Rule 144 are also subject to manner of sale provisions and notice requirements and to the availability of current public information about us. In addition, under Rule 144(k) as currently in effect, a person:

- who is not considered to have been one of our affiliates at any time during the 90 days preceding a sale; and

- who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than an affiliate,

is entitled to sell his shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless subject to a lock-up agreement or otherwise restricted, such "144(k) shares" may be sold immediately upon the closing of this offering.

## Rule 701

In general, under Rule 701, any of our employees, directors, officers, consultants or advisors who purchased ordinary shares from us under a compensatory stock option plan or other written agreement before the closing of this offering is entitled to resell these shares. These shares can be resold 90 days after the effective date of this offering in reliance on Rule 144, without having to comply with restrictions, including the holding period, contained in Rule 144.

The Securities and Exchange Commission has indicated that Rule 701 will apply to typical share options granted by an issuer before it becomes subject to the reporting requirements of the Securities Exchange Act of 1934, along with the shares acquired upon exercise of these options, including exercises after the date of this prospectus. Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this prospectus, may be sold:

- by persons other than affiliates subject only to the manner of sale provisions of Rule 144; and

- by affiliates under Rule 144 without compliance with its one year minimum holding period requirement.

## Options

Following the completion of this offering we intend to file a registration statement on Form S-8 under the Securities Act to register 4,217,644 ordinary shares reserved for issuance or previously issued under our share option plans. We have agreed with the underwriters that we will not file such registration statement until at least 90 days after the date of this prospectus. The registration statement on Form S-8 will become effective automatically upon filing. As of September 30, 2006, options to purchase 3,470,318 ordinary shares

were issued and outstanding, of which options to purchase 1,603,393 ordinary shares had vested and had not been exercised. Ordinary shares issued upon exercise of a share option and registered under the Form S-8 registration statement will, subject to vesting provisions, lock-up agreements with the underwriters and Rule 144 volume limitations applicable to our affiliates, be available for sale in the open market immediately following exercise. As described above under "— Lock-Up Agreements", nearly all of the shares underlying options that are currently vested or that will vest during the 180-day period following the date of this

95

prospectus will not be available for sale in the public markets until after the end of such 180-day period (as extended pursuant to the terms of the lock-up agreements with the underwriters).

**Registration Rights**

Following the completion of this offering, the holders of 11,520,845 ordinary shares and options and warrants to purchase ordinary shares are entitled to request that we register their shares for resale under the Securities Act and these shareholders, optionholders and warrantholders also have the right to include their shares in a registration statement for any public offering we undertake in the future subject, in each case, to cutback for marketing reasons. Registration of such shares under the Securities Act would result in such shares becoming freely tradable without restriction under the Securities Act, except for shares purchased by affiliates, immediately upon the effectiveness of such registration. Any sales of securities by these shareholders could have a material adverse effect on the trading price of our ordinary shares.

96

## TAXATION AND GOVERNMENT PROGRAMS

**The following description is not intended to constitute a complete analysis of all tax consequences relating to the ownership or disposition of our ordinary shares. You should consult your own tax advisor concerning the tax consequences of your particular situation, as well as any tax consequences that may arise under the laws of any state, local, foreign or other taxing jurisdiction.**

### Israeli Tax Considerations and Government Programs

The following is a summary of the material Israeli tax laws applicable to us, and some Israeli Government programs benefiting us. This section also contains a discussion of material Israeli tax consequences concerning the ownership and disposition of our ordinary shares in this offering. This summary does not discuss all the acts of Israeli tax law that may be relevant to a particular investor in light of his or her personal investment circumstances or to some types of investors subject to special treatment under Israeli law. Examples of this kind of investor include residents of Israel or traders in securities who are subject to special tax regimes not covered in this discussion. As some parts of this discussion are based on new tax legislation that has not yet been subject to judicial or administrative interpretation, we cannot assure you that the appropriate tax authorities or the courts will accept the views expressed in this discussion.

**The discussion below should not be construed as legal or professional tax advice and does not cover all possible tax considerations. Potential investors are urged to consult their own tax advisors as to the Israeli or other tax consequences of the purchase, ownership and disposition of our ordinary shares, including in particular, the effect of any foreign, state or local taxes.**

### *General Corporate Tax Structure in Israel.*

Israeli companies are generally subject to corporate tax at the rate of 31% of their taxable income in 2006. The corporate tax rate is scheduled to decline to 29% in 2007, 27% in 2008, 26% in 2009 and 25% in 2010 and thereafter. However, the effective tax rate payable by a company that derives income from an approved enterprise (as discussed below) may be considerably less. Capital gains derived after January 1, 2003 (ther than gains derived from the sale of listed securities that are taxed at the prevailing corporate tax rates) are subject to tax at a rate of 25%.

### *Tax Benefits and Grants for Research and Development.*

Israeli tax law allows, under certain conditions, a tax deduction for expenditures, including capital expenditures, for the year in which they are incurred. These expenses must relate to scientific research and development projects and must be approved by the relevant Israeli government ministry, determined by the field of research. Furthermore, the research and development must be for the promotion of the company and carried out by or on behalf of the company seeking such tax deduction. The amount of such deductible expenses is reduced by the sum of any funds received through government grants for the finance of such scientific research and development projects. No deduction under these research and development deduction rules is allowed if such deduction is related to an expense invested in an asset depreciable under the general depreciation rules of the income Tax Ordinance, 1961. Expenditures not so approved are deductible in equal amounts over three years.

We intend to apply the Office of the Chief Scientist for approval to allow a tax deduction for all research and development expenses during the year incurred. There can be no assurance that our application will be accepted.

*Law for the Encouragement of Industry (Taxes), 1969.*

The Law for the Encouragement of Industry (Taxes), 1969, generally referred to as the Industry Encouragement Law, provides several tax benefits for industrial companies. We believe that we currently qualify as an "Industrial Company" within the meaning of the Industry Encouragement Law. The Industry Encouragement Law defines "Industrial Company" as a company resident in Israel, of which 90% or more of

97

its income in any tax year, other than of income from defense loans, capital gains, interest and dividend, is derived from an "Industrial Enterprise" owned by it. An "Industrial Enterprise" is defined as an enterprise whose major activity in a given tax year is industrial production activity.

The following corporate tax benefits, among others, are available to Industrial Companies:

- Amortization of the cost of purchased know-how and patents and of rights to use a patent and know-how which are used for the development or advancement of the company, over an eight-year period;

- Accelerated depreciation rates on equipment and buildings;

- Under specified conditions, an election to file consolidated tax returns with additional related Israeli Industrial Companies; and

- Expenses related to a public offering are deductible in equal amounts over three years.

Eligibility for the benefits under the Industry Encouragement Law is not subject to receipt of prior approval from any governmental authority. We cannot assure that we qualify or will continue to qualify as an "Industrial Company" or that the benefits described above will be available in the future.

### *Special Provisions Relating to Taxation Under Inflationary Conditions.*

The Income Tax Law (Inflationary Adjustments), 1985, generally referred to as the Inflationary Adjustments Law, represents an attempt to overcome the problems presented to a traditional tax system by an economy undergoing rapid inflation. The Inflationary Adjustments Law is highly complex. Its features, which are material to us, can be generally described as follows:

- Where a company's equity, as calculated under the Inflationary Adjustments Law, exceeds the depreciated cost of its fixed assets (as defined in the Inflationary Adjustments Law), a deduction from taxable income is permitted equal to the excess multiplied by the applicable annual rate of inflation. The maximum deduction permitted in any single tax year is 70% of taxable income, with the unused portion permitted to be carried forward, based on the change in the consumer price index. The unused portion that is carried forward may be deducted in full in the following year.

- If the company's depreciated cost of fixed assets exceeds its equity, then the excess multiplied by the applicable annual rate of inflation is added to the company's ordinary income.

- Subject to certain limitations, depreciation deductions on fixed assets and losses carried forward are adjusted for inflation based on the change in the consumer price index.

The Minister of Finance may, with the approval of the Knesset Finance Committee, determine by decree, during a certain fiscal year (or until February 28th of the following year) in which the rate of increase of the Israeli consumer price index would not exceed or did not exceed, as applicable, 3%, that some or all of the provisions of the Inflationary Adjustments Law shall not apply with respect to such fiscal year, or, that the rate of increase of the Israeli consumer price index relating to such fiscal year shall be deemed to be 0%, and to make the adjustments required to be made as a result of such determination.

### *Law for Encouragement of Capital Investments, 1959.*

The Law for Encouragement of Capital Investments, 1959 (the "Investment Law") provides that capital investments in a production facility (or other eligible assets) may, upon approval by the Investment Center of the Israel Ministry of Industry, Trade and Labor (the "Investment Center"), be designated as an Approved

Enterprise. Each certificate of approval for an Approved Enterprise relates to a specific investment program, delineated both by the financial scope of the investment and by the physical characteristics of the facility or the asset. The tax benefits from any certificate of approval relate only to taxable profits attributable to the specific Approved Enterprise.

On April 1, 2005, a comprehensive amendment to the Investment Law came into effect. The amendment to the Investment Law includes revisions to the criteria for investments qualified to receive tax benefits. As

98

the amended Investment Law does not retroactively apply to investment programs having an approved enterprise approval certificate issued by the Investment Center prior to December 31, 2004, our current Approved Enterprises are subject to the provisions of the Investment Law prior to its revision, while new investment and tax benefits related thereof, if any, will be subject to and received under the provisions of the Investment Law, as amended. Accordingly, the following description includes a summary of the Investment Law prior to its amendment as well as the relevant changes contained in the Investment Law, as amended.

In December 1998, our first investment program in our facility in Hod-Hasharon was approved as an Approved Enterprise under the Investment Law, which entitles us to certain tax benefits. Our requests for our second Approved Enterprise were approved in December 2002. The Approved Enterprise Programs granted to us are defined in the Investment Law as Alternative Benefits Programs. Under the terms of our Approved Enterprise, once we begin generating taxable income, we will be entitled to a tax exemption with respect to the undistributed income derived from our Approved Enterprise program for two years and will be subject to a reduced company tax rate of between 10% and 25% for the following five to eight years, depending on the extent of foreign (non-Israeli) investment in us during the relevant year. The tax rate will be 20% if the foreign investment level is at least 49% but less than 74%, 15% if the foreign investment level is at least 74% but less than 90%, and 10% if the foreign investment level is 90% or more. The lowest level of foreign investment during a particular year will be used to determine the relevant tax rate for that year. The period in which we receive these tax benefits may not extend beyond 14 years from the year in which approval was granted and 12 years from the year in which operations or production by the Approved Enterprise began. We expect to utilize these tax benefits after we utilize our net operating loss carryforwards.

A company that has elected to participate in the alternative benefits program and that subsequently pays a dividend out of the income derived from the Approved Enterprise during the tax exemption period will be subject to corporate tax in respect of the amount distributed at the rate that would have been applicable had the company not elected the alternative benefits program (generally 10% to 25%, depending on the foreign (non-Israeli) investment in the company).

The Investment Law also provides that an Approved Enterprise is entitled to accelerated depreciation on its property and equipment that are included in an approved investment program. We have not utilized this benefit.

The tax benefits under the Investment Law also apply to income generated by a company from the grant of a license with respect to know-how developed by the approved enterprise, income generated from royalties, and income derived from a service which is ancillary to such license or royalties, provided that such income is generated within the approved enterprise's ordinary course of business. Income derived from other sources, other than the "Approved Enterprise," during the benefit period will be subject to tax at the regular corporate tax rate. If a company has more than one approval or only a portion of its capital investments is approved, its effective tax rate is the result of a weighted average of the applicable rates. The tax benefits under the Investments Law are not, generally, available with respect to income derived from products manufactured outside of Israel.

In addition, the benefits available to an Approved Enterprise are conditioned upon terms stipulated in the Investment Law and the regulations there under and the criteria set forth in the applicable certificate of approval. If we do not meet these conditions, in whole or in part, the benefits can be canceled and we may be required to refund the amount of the benefits, with the addition of the Israeli consumer price index linkage differences and interest. We believe that our Approved Enterprise currently operates in substantial compliance with all applicable conditions and criteria, but there can be no assurance that it will continue to do so.

Pursuant to the amendment to the Investment Law, only approved enterprises receiving cash grants require

the approval of the Investment Center. The Investment Center is entitled to approve such programs only until December 31, 2007. Approved Enterprises which do not receive benefits in the form of governmental cash grants, such as benefits in the form of tax benefits, are no longer required to obtain this approval (such enterprises are referred to as privileged enterprises). However, a privileged enterprise is required to comply with certain requirements and make certain investments as specified in the amended Investment Law.

99

A privileged enterprise may, at its discretion, in order to provide greater certainty, elect to apply for a pre-ruling from the Israeli tax authorities confirming that it is in compliance with the provisions of the amended Investment Law and is therefore entitled to receive such benefits provided under the amended Investment Law. The amendment to the Investment Law addresses benefits that are being granted to privileged enterprises and the length of the benefits period.

The amended Investment Law specifies certain conditions that a privileged enterprise has to comply with in order to be entitled to benefits. These conditions include among others:

- That the privileged enterprise's revenues during the applicable tax year from any single market (i.e. country or a separate customs territory) do not exceed 75% of the privileged enterprise's aggregate revenues during such year; or

- That 25% or more of the privileged enterprise's revenues during the applicable tax year are generated from sales into a single market (i.e. country or a separate customs territory) with a population of at least 12 million residents.

There can be no assurance that we will comply with the above conditions or any other conditions of the amended Investment Law in the future or that we will be entitled to any additional benefits under the amended Investment Law.

The amendment to the Investment Law changes the definition of "foreign investment" so that the definition now requires a minimal investment of NIS 5 million by foreign investors. Such definition now also includes acquisitions of shares of a company from other shareholders, provided that the total cost of such acquisitions is at least NIS 5 million and the company's outstanding and paid-up share capital exceeds NIS 5 million. These changes took effect retroactively from 2003.

As a result of the amendment, tax-exempt income generated under the provisions of the Investment Law, will subject us to taxes upon distribution of such income, purchase of shares from shareholder by the company or liquidation, and we may be required to record a deferred tax liability with respect to such tax-exempt income.

### Taxation of our Shareholders

*Taxation of Non-Israeli Shareholders on Receipt of Dividends.*  Non-residents of Israel are generally subject to Israeli income tax on the receipt of dividends paid on our ordinary shares at the rate of 20%, which tax will be withheld at source, unless a different rate is provided in a treaty between Israel and the shareholder's country of residence. With respect to a person who is a "substantial shareholder" at the time receiving the dividend or on any date in the 12 months preceding it the applicable tax rate is 25%. A "substantial shareholder" is generally a person who alone, or together with such person's relative or another person who collaborates with such person's on a permanent basis, holds, directly or indirectly, at least 10% of any of the "means of control" of the corporation. "Means of control" generally include the right to vote, receive profits, nominate a director or an officer, receive assets upon liquidation, or order someone who holds any of the aforesaid rights how to act, and all regardless of the source of such right. Under the U.S.-Israel Tax Treaty, the maximum rate of tax withheld in Israel on dividends paid to a holder of our ordinary shares who is a U.S. resident (for purposes of the U.S.-Israel Tax Treaty) is 25%. However, generally, the maximum rate of withholding tax on dividends, not generated by our Approved Enterprise, that are paid to a U.S. corporation holding 10% or more of our outstanding voting capital throughout the tax year in which the dividend is distributed as well as the previous tax year, is 12.5%. Furthermore, dividends paid from income derived from our Approved Enterprise are subject, under certain conditions, to withholding at the rate of 15%. We cannot assure you that we will designate the profits that are being distributed in a way that will reduce shareholders'

424B1

tax liability.

A non-resident of Israel who receives dividends from which tax was withheld is generally exempt from the duty to file returns in Israel in respect of such income, provided such income was not derived from a business conducted in Israel by the taxpayer, and the taxpayer has no other taxable sources of income in Israel.

100

*Capital Gains Taxes Applicable to Non-Israeli Resident Shareholders.*  Shareholders that are not Israeli residents are generally exempt from Israeli capital gains tax on any gains derived from the sale, exchange or disposition of our ordinary shares, provided that (1) such shareholders did not acquire their shares prior to our initial public offering, (2) the provisions of the Income Tax Law (inflationary adjustments), 1985 do not apply to such gain, and (3) such gains were not derived from a permanent establishment or business activity of such shareholders in Israel. However, non-Israeli corporations will not be entitled to the foregoing exemptions if an Israeli resident (i) has a controlling interest of 25% or more in such non-Israeli corporation, or (ii) is the beneficiary of or is entitled to 25% or more of the revenues or profits of such non-Israeli corporation, whether directly or indirectly.

Under the U.S.-Israel Tax Treaty, the sale, exchange or disposition of our ordinary shares by a shareholder who is a U.S. resident (for purposes of the U.S.-Israel Tax Treaty) holding the ordinary shares as a capital asset is exempt from Israeli capital gains tax unless either (i) the shareholder holds, directly or indirectly, shares representing 10% or more of our voting capital during any part of the 12-month period preceding such sale, exchange or disposition or (ii) the capital gains arising from such sale are attributable to a permanent establishment of the shareholder located in Israel.

## United States Federal Income Taxation

The following is a description of the material United States federal income tax consequences of the ownership and disposition of our ordinary shares. This description addresses only the United States federal income tax considerations of holders that are initial purchasers of our ordinary shares pursuant to the offering and that will hold such ordinary shares as capital assets. This description does not address tax considerations applicable to holders that may be subject to special tax rules, including:

- financial institutions or insurance companies;

- real estate investment trusts, regulated investment companies or grantor trusts;

- dealers or traders in securities or currencies;

- tax-exempt entities;

- certain former citizens or long-term residents of the United States;

- persons that received our shares as compensation for the performance of services;

- persons that will hold our shares as part of a "hedging" or "conversion" transaction or as a position in a "straddle" for United States federal income tax purposes;

- persons whose "functional currency" is not the United States dollar; or

- holders that own directly, indirectly or through attribution 10.0% or more, of the voting power or value, of our shares.

Moreover, this description does not address the United States federal estate and gift or alternative minimum tax consequences of the acquisition, ownership and disposition of our ordinary shares.

This description is based on the Code, existing, proposed and temporary United States Treasury Regulations and judicial and administrative interpretations thereof, in each case as in effect and available on the date hereof. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.

For purposes of this description, a "U.S. Holder" is a beneficial owner of our ordinary shares that, for United States federal income tax purposes, is:

- a citizen or resident of the United States;

- corporation, or other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the United States or any state thereof, including the District of Columbia;

101

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust if such trust has validly elected to be treated as a United States person for United States federal income tax purposes or if (1) a court within the United States is able to exercise primary supervision over its administration and (2) one or more United States persons have the authority to control all of the substantial decisions of such trust.

A "Non-U.S. Holder" is a beneficial owner of our ordinary shares that is not a U.S. Holder.

If a partnership (or any other entity treated as a partnership for United States federal income tax purposes) holds our ordinary shares, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Such a partner or partnership should consult its tax advisor as to its tax consequences.

**You should consult your tax advisor with respect to the United States federal, state, local and foreign tax consequences of acquiring, owning or disposing of our ordinary shares.**

### *Distributions*

Subject to the discussion below under "Passive Foreign Investment Company Considerations", if you are a U.S. Holder, for United States federal income tax purposes, the gross amount of any distribution made to you, with respect to your ordinary shares before reduction for any Israeli taxes withheld therefrom, will be includible in your income as dividend income to the extent such distribution is paid out of our current or accumulated earnings and profits as determined under United States federal income tax principles. Subject to the discussion below under "Passive Foreign Investment Company Considerations," non-corporate U.S. Holders may qualify for the lower rates of taxation with respect to dividends on ordinary shares applicable to long-term capital gains (*i.e.*, gains from the sale of capital assets held for more than one year) with respect to taxable years beginning on or before December 31, 2010, provided that certain conditions are met, including certain holding period requirements and the absence of certain risk reduction transactions. However, such dividends will not be eligible for the dividends received deduction generally allowed to corporate U.S. Holders. Subject to the discussion below under "Passive Foreign Investment Company Considerations", to the extent, if any, that the amount of any distribution by us exceeds our current and accumulated earnings and profits as determined under United States federal income tax principles, it will be treated first as a tax-free return of your adjusted tax basis in your ordinary shares and thereafter as capital gain. We do not expect to maintain calculations of our earnings and profits under United States federal income tax principles.

If you are a U.S. Holder, dividends paid to you with respect to your ordinary shares will be treated as foreign source income, which may be relevant in calculating your foreign tax credit limitation. Subject to certain conditions and limitations, Israeli tax withheld on dividends may be deducted from your taxable income or credited against your United States federal income tax liability. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, dividends that we distribute generally will constitute "passive income," or, in the case of certain U.S. Holders, "financial services income." U.S. Holders should note, however, that the "financial services income" category will be eliminated with respect to taxable years beginning after December 31, 2006. For such years, the foreign tax credit limitation categories are limited to "passive category income" and "general category income". The rules relating to the determination of the foreign tax credit are complex, and you should consult your personal tax advisors to determine whether and to what extent you would be entitled to this credit.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements,"

if you are a Non-U.S. Holder, you generally will not be subject to United States federal income or withholding tax on dividends received by you on your ordinary shares, unless you conduct a trade or business in the United States and such income is effectively connected with that trade or business.

102

*Sale or Exchange of Ordinary Shares*

Subject to the discussion below under "Passive Foreign Investment Company Considerations", if you are a U.S. Holder, you generally will recognize gain or loss on the sale, exchange or other disposition of your ordinary shares equal to the difference between the amount realized on such sale, exchange or other disposition and your adjusted tax basis in your ordinary shares. Such gain or loss will be capital gain or loss. If you are a non corporate U.S. Holder, capital gain from the sale, exchange or other disposition of ordinary shares is eligible for the preferential rate of taxation applicable to long-term capital gains, with respect to taxable years beginning on or before December 31, 2010, if your holding period for such ordinary shares exceeds one year (*i.e.* such gain is long-term capital gain). Gain or loss, if any, recognized by you generally will be treated as United States source income or loss for United States foreign tax credit purposes. The deductibility of capital losses for U.S. federal income tax purposes is subject to limitations.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," if you are a Non-U.S. Holder, you generally will not be subject to United States federal income or withholding tax on any gain realized on the sale or exchange of such ordinary shares unless:

- such gain is effectively connected with your conduct of a trade or business in the United States; or

- you are an individual and have been present in the United States for 183 days or more in the taxable year of such sale or exchange and certain other conditions are met.

*Passive Foreign Investment Company Considerations*

A non-U.S. corporation will be classified as a "passive foreign investment company," or a PFIC, for United States federal income tax purposes in any taxable year in which, after applying certain look-through rules, either

- at least 75% of its gross income is "passive income"; or

- at least 50% of the average value of its gross assets is attributable to assets that produce "passive income" or are held for the production of passive income.

Passive income for this purpose generally includes dividends, interest, royalties, rents, gains from commodities and securities transactions, the excess of gains over losses from the disposition of assets which produce passive income, and includes amounts derived by reason of the temporary investment of funds raised in offerings of our ordinary shares.

Based on certain estimates of our gross income and gross assets, the latter determined by reference to the expected market value of our shares when issued and assuming that we are entitled to value our intangible assets with reference to the market value of our shares, our intended use of the proceeds of this offering, and the nature of our business, we believe that we will not be classified as a PFIC for the taxable year ending December 31, 2005. However, because PFIC status is based on our income, assets and activities for the entire taxable year, it is not possible to determine whether we will have become a PFIC for the 2006 taxable year until after the close of the year. Moreover, we must determine our PFIC status annually based on tests which are factual in nature and our status in future years will depend on our income, assets and activities in those years. While we intend to manage our business so as to avoid PFIC status, to the extent consistent with our other business goals, we cannot predict whether our business plans will allow us to avoid PFIC status determination. We have no reason to believe that our income, assets or activities will change in a manner that would cause us to be classified as a PFIC, but there can be no assurance that we will not be considered a PFIC for any taxable year. In addition, because the market price of our ordinary shares is likely to fluctuate

after this offering and the market price of the shares of technology companies has been especially volatile, and because that market price may affect the determination of whether we will be considered a PFIC, there can be no assurance that we will not be considered a PFIC for any taxable year. If we were a PFIC, and you are a U.S. Holder, you generally would be subject to ordinary income tax rates, imputed interest charges and other disadvantageous tax treatment with respect to any gain from the sale, exchange or other disposition of, and certain distributions with respect to, your ordinary shares. See "— Distributions" above.

103

Under the PFIC rules, unless a U.S. Holder makes the election described in the next paragraph, a special tax regime will apply to both (a) any "excess distribution" by the Company (generally, the U.S. Holder's ratable portion of distributions in any year which are greater than 125% of the average annual distribution received by such U.S. Holder in the shorter of the three preceding years or the U.S. Holder's holding period) and (b) any gain realized on the sale or other disposition of the ordinary shares. Under this regime, any excess distribution and realized gain will be treated as ordinary income and will be subject to tax as if (a) the excess distribution or gain had been realized ratably over the U.S. Holder's holding period, (b) the amount deemed realized had been subject to tax in each year of that holding period, and (c) the interest charge generally applicable to underpayments of tax had been imposed on the taxes deemed to have been payable in those years. In addition, dividend distributions made to you will not qualify for the lower rates of taxation applicable to long term capital gains discussed above under "Distributions."

A U.S. Holder may elect, provided the Company complies with certain reporting requirements, to have the Company treated, with respect to such U.S. Holder's shareholding as a "qualified electing fund" ("QEF"), in which case, such U.S. Holder must include annually in his gross income his pro-rata share of the Company's annual ordinary earnings and annual net realized capital gains, whether or not such amounts are actually distributed to the U.S. Holder. These amounts are included by a U.S. Holder for the shareholder's taxable year in or with which the Company's taxable year ends. If the election is made, amounts previously included as income generally could be distributed tax-free, and to the extent not distributed, would increase the tax basis of the U.S. Holder's ordinary shares. The Company at present does not intend to comply with all of the accounting and record-keeping requirements that would allow a U.S. Holder to make such an election.

Under certain circumstances, ordinary shares owned by a Non-U.S. Holder may be attributed to a U.S. person owning an interest, directly or indirectly, in the Non-U.S. Holder. In this event, distributions and other transactions in respect of such ordinary shares may be treated as excess distributions with respect to such U.S. person, and a QEF election may be made by such U.S. person with respect to its indirect interest in the Company, subject to the discussion in the preceding paragraphs.

The Company may invest in stock of non-U.S. corporations that are PFICs. In such a case, provided that the Company is a PFIC, a U.S. Holder would be treated as owning its pro rata share of the stock of the PFIC owned by the Company. Such a U.S. Holder would be subject to the rules generally applicable to shareholders of PFICs discussed above with respect to distributions received by the Company from such a PFIC and dispositions by the Company of the stock of such a PFIC (even though the U.S. Holder may not have received the proceeds of such distribution or disposition). Assuming the Company receives the necessary information from the PFIC in which it owns stock, certain U.S. Holders may make the QEF election discussed above with respect to the stock of the PFIC owned by the Company, with the consequences discussed above. However, no assurance can be given that the Company will be able to provide U.S. Holders with such information.

A U.S. Holder may, in some circumstances, elect to mark to market its stock in a PFIC at the close of each taxable year, and to recognize as ordinary income or to deduct as ordinary loss, to the extent of prior income inclusions, the increase or the decrease in value of the stock during the taxable year. Gain or loss on the disposition of the PFIC shares also is treated as ordinary income. The election generally applies to the year in which it is made and all subsequent years and is available only with respect to "marketable stock", being stock which is regularly traded on a national securities exchange registered with the SEC or the national market system established under Section 11A of the Securities Exchange Act of 1934, as amended, or an exchange identified by the Internal Revenue Service ("IRS") as having rules sufficient to ensure that the market price represents fair market value, or, to the extent provided in regulations, if it is stock in a foreign corporation comparable to a regulated investment company and that offers stock which it has issued and which is redeemable at its net asset value.

If we were a PFIC, a holder of ordinary shares that is a U.S. Holder must file United States Internal Revenue Service Form 8621 for each tax year in which the U.S. Holder owns the ordinary shares.

104

### *Backup Withholding Tax and Information Reporting Requirements*

United States backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders of stock. Information reporting generally will apply to payments of dividends on, and to proceeds from the sale or redemption of, ordinary shares made within the United States, or by a United States payor or United States middleman, to a holder of ordinary shares, other than an exempt recipient (including a corporation, a payee that is not a United States person that provides an appropriate certification and certain other persons). A payor will be required to withhold backup withholding tax from any payments of dividends on, or the proceeds from the sale or redemption of, ordinary shares within the United States, or by a United States payor or United States middleman, to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is 28.0% for years through 2010.

In the case of such payments made within the United States to a foreign simple trust, a foreign grantor trust or a foreign partnership, other than payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that qualifies as a "withholding foreign trust" or a "withholding foreign partnership" within the meaning of the applicable United States Treasury Regulations and payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that are effectively connected with the conduct of a trade or business in the United States, the beneficiaries of the foreign simple trust, the persons treated as the owners of the foreign grantor trust or the partners of the foreign partnership, as the case may be, will be required to provide the certification discussed above in order to establish an exemption from backup withholding tax and information reporting requirements. Moreover, a payor may rely on a certification provided by a payee that is not a United States person only if such payor does not have actual knowledge or a reason to know that any information or certification stated in such certificate is incorrect.

**The above description is not intended to constitute a complete analysis of all tax consequences relating to acquisition, ownership and disposition of our ordinary shares. You should consult your tax advisor concerning the tax consequences of your particular situation.**

105

# UNDERWRITING

Lehman Brothers Inc. is acting as the representative of the underwriters and the sole book-running manager of this offering. Under the terms of an underwriting agreement, which is filed as an exhibit to the registration statement, each of the underwriters named below has severally agreed to purchase from us the respective number of ordinary shares shown opposite its name below:

| Underwriter | Number of Shares |
|---|---:|
| Lehman Brothers Inc. | 3,055,000 |
| Deutsche Bank Securities Inc. | 1,625,000 |
| CIBC World Markets Corp. | 1,170,000 |
| RBC Capital Markets Corporation | 650,000 |
| Total | 6,500,000 |

The underwriting agreement provides that the underwriters' obligation to purchase ordinary shares depends on the satisfaction of the conditions contained in the underwriting agreement, including:

- the obligation to purchase all of the ordinary shares offered hereby (other than those ordinary shares covered by their option to purchase additional ordinary shares as described below), if any of the ordinary shares are purchased;

- the representations and warranties made by us to the underwriters are true;

- there is no material change in our business or the financial markets; and

- we deliver customary closing documents to the underwriters.

The address of Lehman Brothers Inc. is 745 Seventh Avenue, New York, New York 10019.

## Commissions and Expenses

The following table summarizes the underwriting discounts and commissions we will pay to the underwriters. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional ordinary shares from us. The underwriting fee is the difference between the initial price to the public and the amount the underwriters pay to us for the ordinary shares.

| | No Exercise | Full Exercise |
|---|---:|---:|
| Per share | $ 0.84 | $ 0.84 |
| Total | 5,460,000 | 6,279,000 |

The representative of the underwriters has advised us that the underwriters propose to offer the ordinary shares directly to the public at the public offering price on the cover of this prospectus and to selected dealers, which may include the underwriters, at such offering price less a selling concession not in excess of $0.50 per share. After the offering, the representative may change the offering price and other selling terms.

The expenses of the offering that are payable by us are estimated to be $2.0 million (excluding underwriting discounts and commissions).

## Option to Purchase Additional Shares

We have granted the underwriters an option exercisable for 30 days after the date of the underwriting agreement, to purchase, from time to time, in whole or in part, up to an aggregate of 975,000 shares at the public offering price less underwriting discounts and commissions. This option may be exercised if the underwriters sell more than 6,500,000 shares in connection with this offering. To the extent that this option is exercised, each underwriter will be obligated, subject to certain conditions, to purchase its pro rata portion of these additional shares based on the underwriter's underwriting commitment in the offering as indicated in the table at the beginning of this Underwriting section.

106

## Lock-Up Agreements

We, all of our officers and directors, and the holders of nearly all of our outstanding shares have agreed that, without the prior written consent of Lehman Brothers Inc., we and they will not directly or indirectly, (1) offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any ordinary shares (including, without limitation, ordinary shares that may be deemed to be beneficially owned by us or them in accordance with the rules and regulations of the Securities and Exchange Commission and ordinary shares that may be issued upon exercise of any options or warrants) or securities convertible into or exercisable or exchangeable for ordinary shares, (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic consequences of ownership of the ordinary shares, (3) make any demand for or exercise any right or file or cause to be filed a registration statement, including any amendments thereto, with respect to the registration of any ordinary shares or securities convertible, exercisable or exchangeable into ordinary shares or any of our other securities, or (4) publicly disclose the intention to do any of the foregoing for a period of 180 days after the date of this prospectus.

The 180-day restricted period described in the preceding paragraph will be extended if:

- during the last 17 days of the 180-day restricted period we issue an earnings release or material news or a material event relating to us occurs; or

- prior to the expiration of the 180-day restricted period, we announce that we will release earnings results during the 16-day period beginning on the last day of the 180-day period,

in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the announcement of the material news or occurrence of a material event, unless such extension is waived in writing by Lehman Brothers Inc.

Lehman Brothers Inc., in its sole discretion, may release the ordinary shares and other securities subject to the lock-up agreements described above in whole or in part at any time with or without notice. When determining whether or not to release ordinary shares and other securities from lock-up agreements, Lehman Brothers Inc. will consider, among other factors, the holder's reasons for requesting the release, the number of ordinary shares and other securities for which the release is being requested and market conditions at the time.

## Offering Price Determination

Prior to this offering, there has been no public market for our ordinary shares. The initial public offering price will be negotiated between the representative and us. In determining the initial public offering price of our ordinary shares, the representative will consider:

- the history and prospects for the industry in which we compete;

- our financial information;

- the ability of our management and our business potential and earning prospects;

- the prevailing securities markets at the time of this offering; and

- the recent market prices of, and the demand for, publicly traded shares of generally comparable companies.

**Indemnification**

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, and to contribute to payments that the underwriters may be required to make for these liabilities.

107

**Stabilization, Short Positions and Penalty Bids**

The representative may engage in stabilizing transactions, short sales and purchases to cover positions created by short sales, and penalty bids or purchases for the purpose of pegging, fixing or maintaining the price of the ordinary shares, in accordance with Regulation M under the Securities Exchange Act of 1934:

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- A short position involves a sale by the underwriters of shares in excess of the number of shares the underwriters are obligated to purchase in the offering, which creates the syndicate short position. This short position may be either a covered short position or a naked short position. In a covered short position, the number of shares involved in the sales made by the underwriters in excess of the number of shares they are obligated to purchase is not greater than the number of shares that they may purchase by exercising their option to purchase additional shares. In a naked short position, the number of shares involved is greater than the number of shares in their option to purchase additional shares. The underwriters may close out any short position by either exercising their option to purchase additional shares and/or purchasing shares in the open market. In determining the source of shares to close out the short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through their option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- Syndicate covering transactions involve purchases of the ordinary shares in the open market after the distribution has been completed in order to cover syndicate short positions.

- Penalty bids permit the representative to reclaim a selling concession from a syndicate member when the ordinary shares originally sold by the syndicate member is purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of our ordinary shares or preventing or retarding a decline in the market price of the ordinary shares. As a result, the price of the ordinary shares may be higher than the price that might otherwise exist in the open market. These transactions may be effected on the Nasdaq Global Market or otherwise and, if commenced, may be discontinued at any time.

Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the ordinary shares. In addition, neither we nor any of the underwriters make representation that the representative will engage in these stabilizing transactions or that any transaction, once commenced, will not be discontinued without notice.

**Electronic Distribution**

A prospectus in electronic format may be made available on the Internet sites or through other online services maintained by one or more of the underwriters and/or selling group members participating in this offering, or by their affiliates. In those cases, prospective investors may view offering terms online and, depending upon the particular underwriter or selling group member, prospective investors may be allowed to place orders online. The underwriters may agree with us to allocate a specific number of shares for sale to online brokerage account holders. Any such allocation for online distributions will be made by the

representative on the same basis as other allocations.

Other than the prospectus in electronic format, the information on any underwriter's or selling group member's web site and any information contained in any other web site maintained by an underwriter or selling group member is not part of the prospectus or the registration statement of which this prospectus forms a part, has not been approved and/or endorsed by us or any underwriter or selling group member in its capacity as underwriter or selling group member and should not be relied upon by investors.

108

## Nasdaq Global Market

We have applied to list our ordinary shares for quotation on the Nasdaq Global Market under the symbol "ALLT."

## Stamp Taxes

If you purchase ordinary shares offered in this prospectus, you may be required to pay stamp taxes and other charges under the laws and practices of the country of purchase, in addition to the offering price listed on the cover page of this prospectus.

## Relationships/NASD Conduct Rules

The underwriters may in the future perform investment banking and advisory services for us from time to time for which they may in the future receive customary fees and expenses. Certain funds related to affiliates of RBC Capital Markets Corporation beneficially own, in the aggregate, in excess of 10.0% of our outstanding share capital, on an "as-converted" basis, and certain funds related to CIBC World Markets Corp. beneficially own, in the aggregate, in excess of 10.0% of our outstanding share capital, on an "as-converted" basis, which may be deemed a conflict of interest under the rules of the National Association of Securities Dealers, Inc., or the NASD. Because of these relationships, this offering is being conducted in accordance with Rule 2720 of the NASD. This rule requires that the initial public offering price for our shares cannot be higher than the price recommended by a "qualified independent underwriter," as defined by the NASD. Lehman Brothers Inc. is serving as a qualified independent underwriter and will assume the customary responsibilities of acting as a qualified independent underwriter in pricing the offering and conducting due diligence. We have agreed to indemnify Lehman Brothers Inc. against any liabilities arising in connection with its role as a qualified independent underwriter, including liabilities under the Securities Act.

Certain securities purchased by funds related to RBC Capital Markets Corporation during the 180-day period preceding the filing date of this prospectus with the Commission shall not be sold during the offering, or sold, transferred, assigned, pledged or hypothecated, or be the subject of any hedging, short sale, derivative, put or call transaction that would result in the effective economic disposition of the securities by any person for a period of 180 days immediately following the date of this prospectus.

## Discretionary Sales

The underwriters have informed us that they do not intend to confirm sales to discretionary accounts that exceed 5% of the total number of ordinary shares offered without the prior specific written approval of the customer.

## United Kingdom

This document is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) to investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (iii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (e) of the Order (all such persons together being referred to as "relevant persons"). The ordinary shares are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such ordinary shares will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

Each of the underwriters has represented and agreed that:

(a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 or FSMA) received by it in connection with the issue or sale of the shares in circumstances in which Section 21(1) of the FSMA does not apply to us, and

109

(b) it has complied with, and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

## European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of ordinary shares being offered hereby to the public in that Relevant Member State prior to the publication of a prospectus in relation to such shares which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive. However, with effect from and including the Relevant Implementation Date, it may make an offer of our ordinary shares to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c) to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representative for any such offer; or

(d) in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of ordinary shares shall result in a requirement for the publication by us or any underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any ordinary shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any ordinary shares to be offered so as to enable an investor to decide to purchase any ordinary shares, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

110

## LEGAL MATTERS

The validity of the ordinary shares being offered by this prospectus and other legal matters concerning this offering relating to Israeli law will be passed upon for us by Ori Rosen & Co., Tel Aviv, Israel. Certain legal matters in connection with this offering relating to United States law will be passed upon for us by White & Case LLP, New York, New York. Certain legal matters in connection with this offering relating to Israeli law will be passed upon for the underwriters by Herzog, Fox & Neeman, Tel Aviv, Israel. Certain legal matters concerning this offering relating to United States law will be passed upon for the underwriters by Morrison & Foerster LLP, New York, New York.

## EXPERTS

The consolidated financial statements of Allot Communications Ltd. included in this prospectus as of December 31, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005, have been included in this prospectus in reliance upon the report of Kost, Forer, Gabbay and Kasierer, a member of Ernst & Young Global, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

## ENFORCEABILITY OF CIVIL LIABILITIES

We are incorporated under the laws of the State of Israel. Service of process upon us and upon our directors and officers and the Israeli experts named in this prospectus, substantially all of whom reside outside the United States, may be difficult to obtain within the United States. Furthermore, because substantially all of our assets and substantially all of our directors and officers are located outside the United States, any judgment obtained in the United States against us or any of our directors and officers may not be collectible within the United States.

We have been informed by our legal counsel in Israel, Ori Rosen & Co., that it may be difficult to assert U. S. securities law claims in original actions instituted in Israel. Israeli courts may refuse to hear a claim based on a violation of U.S. securities laws because Israel is not the most appropriate forum to bring such a claim. In addition, even if an Israeli court agrees to hear a claim, it may determine that Israeli law and not U.S. law is applicable to the claim. If U.S. law is found to be applicable, the content of applicable U.S. law must be proved as a fact which can be a time-consuming and costly process. Certain matters of procedure will also be governed by Israeli law.

Subject to specified time limitations and legal procedures, Israeli courts may enforce a United States judgment in a civil matter which, subject to certain exceptions, is non-appealable, including judgments based upon the civil liability provisions of the Securities Act and the Exchange Act and including a monetary or compensatory judgment in a non-civil matter, provided that:

- the judgments are obtained after due process before a court of competent jurisdiction, according to the laws of the state in which the judgment is given and the rules of private international law currently prevailing in Israel;

- the prevailing law of the foreign state in which the judgments were rendered allows the enforcement of judgments of Israeli courts;

- adequate service of process has been effected and the defendant has had a reasonable opportunity to be heard and to present his or her evidence;

- the judgments are not contrary to public policy, and the enforcement of the civil liabilities set forth in the judgment does not impair the security or sovereignty of the State of Israel;

- the judgments were not obtained by fraud and do not conflict with any other valid judgment in the same matter between the same parties;

111

- an action between the same parties in the same matter is not pending in any Israeli court at the time the lawsuit is instituted in the foreign court; and

- the obligations under the judgment are enforceable according to the laws of the State of Israel and according to the law of the foreign state in which the relief was granted.

We have irrevocably appointed Allot Communications, Inc. as our agent to receive service of process in any action against us in any United States federal or state court arising out of this offering or any purchase or sale of securities in connection with this offering.

If a foreign judgment is enforced by an Israeli court, it generally will be payable in Israeli currency, which can then be converted into non-Israeli currency and transferred out of Israel. The usual practice in an action before an Israeli court to recover an amount in a non-Israeli currency is for the Israeli court to issue a judgment for the equivalent amount in Israeli currency at the rate of exchange in force on the date of the judgment, but the judgment debtor may make payment in foreign currency. Pending collection, the amount of the judgment of an Israeli court stated in Israeli currency ordinarily will be linked to the Israeli consumer price index plus interest at the annual statutory rate set by Israeli regulations prevailing at the time. Judgment creditors must bear the risk of unfavorable exchange rates.

112

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the Securities and Exchange Commission a registration statement on Form F-1 under the Securities Act relating to this offering of our ordinary shares. This prospectus does not contain all of the information contained in the registration statement. The rules and regulations of the Securities and Exchange Commission allow us to omit various information from this prospectus that is included in the registration statement. Statements made in this prospectus concerning the contents of any contract, agreement or other document are summaries of all material information about the documents summarized, but are not complete descriptions of all terms of these documents. If we filed any of these documents as an exhibit to the registration statement, you may read the document itself for a complete description of its terms.

You may read and copy the registration statement, including the related exhibits and schedules, and any document we file with the Securities and Exchange Commission without charge at the Securities and Exchange Commission's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549 and at the Securities and Exchange Commission's regional offices at 233 Broadway, New York, NY 10279 and Citicorp Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60661. You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the Securities and Exchange Commission at 100 F Street, N.E., Room 1580, Washington, DC 20549. Please call the Securities and Exchange Commission at 1-800-SEC-0330 for further information on the public reference room. The Securities and Exchange Commission also maintains an Internet site that contains reports and other information regarding issuers that file electronically with the Securities and Exchange Commission. Our filings with the Securities and Exchange Commission are also available to the public through this web site at http://www.sec.gov.

We are not currently subject to the informational requirements of the Securities Exchange Act of 1934. As a result of this offering, we will become subject to the informational requirements of the Exchange Act applicable to foreign private issuers and will fulfill the obligations of these requirements by filing reports with the Securities and Exchange Commission. As a foreign private issuer, we will be exempt from the rules under the Exchange Act relating to the furnishing and content of proxy statements, and our officers, directors and principal shareholders will be exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we will not be required under the Exchange Act to file periodic reports and financial statements with the Securities and Exchange Commission as frequently or as promptly as United States companies whose securities are registered under the Exchange Act. However, we intend to file with the Securities and Exchange Commission, within 180 days after the end of each fiscal year, an annual report on Form 20-F containing financial statements which will be examined and reported on, with an opinion expressed, by an independent public accounting firm. We also intend to file with the Securities and Exchange Commission reports on Form 6-K containing unaudited financial information for the first three quarters of each fiscal year, within 60 days after the end of each quarter.

113

# ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED FINANCIAL STATEMENTS

### U.S. DOLLARS IN THOUSANDS

### INDEX

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2004 and 2005 and September 30, 2006 | F-3 - F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2003, 2004 and 2005 and for the nine months ended September 30, 2005 and 2006 | F-5 |
| Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2003, 2004 and 2005 and for the nine months ended September 30, 2006 | F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2004 and 2005 and for the nine months ended September 30, 2005 and 2006 | F-7 - F-8 |
| Notes to Consolidated Financial Statements | F-9 - F-32 |

F-1



## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### To the Board of Directors and shareholders of

### ALLOT COMMUNICATIONS LTD.

We have audited the accompanying consolidated balance sheets of Allot Communications Ltd. (the "Company") and its subsidiaries as of December 31, 2004 and 2005, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, based on our audits, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company and its subsidiaries as of December 31, 2004 and 2005, and the consolidated results of their operations and cash flows, for each of the three years in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

Tel-Aviv, Israel
August 14, 2006, except for
Notes 9a, 9d and 14, as to which
the date is October 30, 2006

*kost, forer, Gabbay & kasierer*    KOST
FORER GABBAY & KASIERER
A Member of Ernst & Young Global

F-2

# ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

### U.S. dollars in thousands

| | December 31, 2004 | December 31, 2005 | September 30, 2006 Unaudited |
|---|---|---|---|
| **ASSETS** | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | $ 4,095 | $ 3,677 | $ 4,547 |
| Restricted cash | 65 | 62 | 69 |
| Marketable securities | 3,850 | 3,588 | 3,093 |
| Short-term bank deposit | 56 | 57 | 57 |
| Trade receivables (net of allowance for doubtful accounts of $217, $0 and $0 at December 31, 2004 and 2005 and at September 30, 2006 (unaudited), respectively) | 3,336 | 3,530 | 4,157 |
| Other receivables and prepaid expenses | 575 | 696 | 1,746 |
| Inventories | 1,427 | 1,544 | 2,509 |
| Total current assets | 13,404 | 13,154 | 16,178 |
| LONG-TERM ASSETS: | | | |
| Marketable securities | 996 | 993 | 5,804 |
| Severance pay fund | 1,266 | 1,538 | 2,135 |
| Deferred taxes | — | 196 | 237 |
| Other assets | 144 | 104 | 726 |
| Total long-term assets | 2,406 | 2,831 | 8,902 |
| PROPERTY AND EQUIPMENT, NET | 1,211 | 1,483 | 2,339 |
| GOODWILL AND INTANGIBLE ASSETS, NET | 146 | 123 | 105 |
| Total assets | $17,167 | $17,591 | $ 27,524 |

The accompanying notes are an integral part of the consolidated financial statements.

F-3

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

### U.S. dollars in thousands, except share and per share data

| | December 31, | | September 30, 2006 | Pro Forma Shareholders' Equity at September 30, 2006 |
|---|---|---|---|---|
| | 2004 | 2005 | Unaudited | Unaudited |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| CURRENT LIABILITIES: | | | | |
| Short-term bank credit and current maturities, net | $    116 | $    — | $    — | |
| Trade payables | 1,757 | 2,293 | 2,834 | |
| Employees and payroll accruals | 1,452 | 1,672 | 2,483 | |
| Deferred revenues | 2,333 | 3,247 | 3,841 | |
| Other payables and accrued expenses | 1,106 | 1,668 | 1,972 | |
| Total current liabilities | 6,764 | 8,880 | 11,130 | |
| LONG-TERM LIABILITIES: | | | | |
| Deferred revenues | 572 | 972 | 1,298 | |
| Accrued severance pay | 1,344 | 1,613 | 2,258 | |
| Other long-term liabilities | 294 | — | — | |
| Total long-term liabilities | 2,210 | 2,585 | 3,556 | |
| COMMITMENTS AND CONTINGENT LIABILITIES | | | | |
| SHAREHOLDERS' EQUITY: | | | | |
| Share capital — | | | | |
| Ordinary shares and Series A ordinary shares of NIS 0.01 par value — Authorized: 7,249,543 shares at December 31, 2004 and December 31, 2005, 8,297,393 shares at September 30, 2006 (unaudited); Issued and outstanding: 2,447,568 shares at December 31, 2004, 2,724,087 shares at December 31, 2005 and 2,815,439 shares at September 30, 2006 (unaudited); Authorized 200,000,000 (unaudited) shares pro forma; issued 14,335,661(unaudited) and outstanding 14,089,182 (unaudited) shares pro forma | 29 | 32 | 33 | $    151 |
| Convertible preferred shares of NIS 0.01 par value — Authorized: 4,650,475 shares at December 31, 2004 and December 31, 2005, 5,102,632 shares at September 30, 2006 (unaudited); Issued: 4,357,769 shares at December 31, 2004 and 2005, 4,809,926 shares at September 30, 2006 (unaudited); Outstanding: 4,249,412 shares at December 31, 2004 and 2005, 4,701,569 shares at September 30, 2006 (unaudited); Aggregate liquidation preference of approximately $ 36,060 at December 31, 2004 and 2005 and $ 41,560 at September 30, 2006 (unaudited); Authorized 0 (unaudited) shares pro forma; issued and outstanding 0 (unaudited) shares pro forma | 103 | 103 | 113 | — |
| Additional paid-in capital | 43,692 | 43,972 | 50,095 | 50,090 |
| Deferred stock compensation | (119) | (75) | (43) | (43) |
| Accumulated other comprehensive loss | (4) | (22) | (39) | (39) |

| | | | | |
|---|---|---|---|---|
| Accumulated deficit | (35,508) | (37,884) | (37,321) | (37,321) |
| Total shareholders' equity | 8,193 | 6,126 | 12,838 | 12,838 |
| Total liabilities and shareholders' equity | $ 17,167 | $ 17,591 | $ 27,524 | |

The accompanying notes are an integral part of the consolidated financial statements.

F-4

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**U.S. dollars in thousands, except share and per share data**

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | | Unaudited | |
| Revenues: | | | | | |
| Products | $ 13,122 | $ 14,638 | $ 18,498 | $ 12,576 | $ 20,718 |
| Services | 1,653 | 3,447 | 4,474 | 3,317 | 3,859 |
| Total revenues | 14,775 | 18,085 | 22,972 | 15,893 | 24,577 |
| Cost of revenues: | | | | | |
| Products | 3,229 | 3,942 | 4,481 | 3,237 | 4,562 |
| Services | 362 | 679 | 938 | 699 | 845 |
| Total cost of revenues | 3,591 | 4,621 | 5,419 | 3,936 | 5,407 |
| Gross profit | 11,184 | 13,464 | 17,553 | 11,957 | 19,170 |
| Operating expenses: | | | | | |
| Research and development, net | 2,959 | 3,957 | 5,925 | 4,382 | 5,642 |
| Sales and marketing | 8,164 | 10,104 | 11,887 | 8,797 | 10,859 |
| General and administrative | 1,832 | 2,081 | 2,380 | 1,709 | 2,260 |
| Impairment of intangible assets | — | 366 | — | — | — |
| Total operating expenses | 12,955 | 16,508 | 20,192 | 14,888 | 18,761 |
| Operating income (loss) | (1,771) | (3,044) | (2,639) | (2,931) | 409 |
| Financial and other income (expenses), net | (507) | (241) | 45 | 36 | 229 |
| Income (loss) before income tax expenses (benefit) | (2,278) | (3,285) | (2,594) | (2,895) | 638 |
| Income tax expenses (benefit) | 2 | 3 | (218) | (178) | 75 |
| Net income (loss) | $ (2,280) | $ (3,288) | $ (2,376) | $ (2,717) | $ 563 |
| Basic net earnings (loss) per share | $ (0.82) | $ (1.18) | $ (0.81) | $ (0.94) | $ 0.04 |
| Diluted net earnings (loss) per share | $ (0.82) | $ (1.18) | $ (0.81) | $ (0.94) | $ 0.04 |
| Weighted average number of shares used in computing basic net earnings (loss) per share | 2,774,639 | 2,787,554 | 2,943,500 | 2,903,356 | 13,310,355 |
| Weighted average number of shares used in computing diluted net earnings (loss) per share | 2,774,639 | 2,787,554 | 2,943,500 | 2,903,356 | 15,501,698 |

| | | | | |
|---|---|---|---|---|
| Pro forma basic and diluted net earnings (loss) per share of ordinary shares (Note 2r) (unaudited) | $ | (0.18) | $ | 0.04 |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
### U.S. dollars in thousands, except share data

| | Ordinary Shares | | Convertible Preferred Shares | | Additional Paid-in Capital | Deferred Stock Compensation | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at January 1, 2003 | 2,418,181 | $ 29 | 3,572,624 | $ 86 | $ 35,522 | $ (273) | $ — | $ (29,940) | $ 5,424 |
| Exercise of warrants and employee stock options | 19,520 | *)— | — | — | 4 | — | — | — | 4 |
| Compensation related to warrants granted to consultants | — | — | — | — | 72 | — | — | — | 72 |
| Cancellation of deferred stock compensation | — | — | — | — | (45) | 45 | — | — | — |
| Amortization of stock-based compensation | — | — | — | — | — | 225 | — | — | 225 |
| Net loss | — | — | — | — | — | — | — | (2,280) | (2,280) |
| Balance at December 31, 2003 | 2,437,701 | 29 | 3,572,624 | 86 | 35,553 | (3) | — | (32,220) | 3,445 |
| Issuance of share capital (net of expenses of $77) | — | — | 785,145 | 17 | 7,854 | — | — | — | 7,871 |
| Exercise of warrants and employee stock options | 9,867 | *)— | — | — | 11 | — | — | — | 11 |
| Compensation related to warrants granted to consultants | — | — | — | — | 151 | — | — | — | 151 |
| Deferred stock-based compensation | — | — | — | — | 123 | (123) | — | — | — |
| Amortization of stock-based compensation | — | — | — | — | — | 7 | — | — | 7 |
| Net unrealized loss on available-for-sale securities | — | — | — | — | — | — | (4) | — | (4) |
| Net loss | — | — | — | — | — | — | — | (3,288) | (3,288) |
| Balance at December 31, 2004 | 2,447,568 | 29 | 4,357,769 | 103 | 43,692 | (119) | (4) | (35,508) | 8,193 |
| Exercise of warrants and employee stock options | 276,519 | 3 | — | — | 19 | — | — | — | 22 |
| Compensation related to warrants and options granted to consultants | — | — | — | — | 54 | — | — | — | 54 |
| Deferred stock compensation | — | — | — | — | 2 | (2) | — | — | — |
| Amortization of stock-based compensation | — | — | — | — | 205 | 46 | — | — | 251 |
| Net unrealized loss on available-for-sale securities | — | — | — | — | — | — | (18) | — | (18) |
| Net loss | — | — | — | — | — | — | — | (2,376) | (2,376) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2005 | 2,724,087 | 32 | 4,357,769 | 103 | 43,972 | (75) | (22) | (37,884) | 6,126 |
| Issuance of share capital (net of expenses of $68) | — | — | 452,157 | 10 | 5,422 | — | — | — | 5,432 |
| Exercise of warrants and employee stock options | 91,352 | 1 | — | — | 51 | — | — | — | 52 |
| Compensation related to warrants and options granted to consultants | — | — | — | — | 305 | — | — | — | 305 |
| Amortization of stock-based compensation | — | — | — | — | 345 | 32 | — | — | 377 |
| Net unrealized loss on available-for-sale securities | — | — | — | — | — | — | (17) | — | (17) |
| Net income | — | — | — | — | — | — | — | 563 | 563 |
| Balance at September 30, 2006 (unaudited) | 2,815,439 | $ 33 | 4,809,926 | $ 113 | $ 50,095 | $ (43) | $ (39) | $ (37,321) | $12,838 |

*)  Represents an amount lower than $1.

The accompanying notes are an integral part of the consolidated financial statements.

F-6

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### U.S. dollars in thousands

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| | | | | Unaudited | |
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $(2,280) | $(3,288) | $(2,376) | $(2,717) | $    563 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation | 449 | 416 | 559 | 408 | 638 |
| Stock-based compensation related to options granted to employees and non-employees | 297 | 158 | 305 | 277 | 682 |
| Amortization and impairment of intangible assets | 172 | 505 | 23 | 18 | 18 |
| Capital loss (gain) | 28 | (3) | 6 | 4 | — |
| Accrued severance pay, net | 22 | (125) | (3) | 66 | 48 |
| Decrease (increase) in other assets | (1) | (58) | 19 | 25 | (1,226) |
| Accrued interest on marketable securities | — | — | (4) | — | (14) |
| Decrease in other long-term liabilities | (47) | (84) | (294) | (200) | — |
| Decrease (increase) in trade receivables, net | (342) | (642) | (194) | 95 | (627) |
| Decrease (increase) in other receivables and prepaid expenses | (189) | 134 | (15) | (20) | (417) |
| Increase in inventories | (141) | (337) | (271) | (16) | (965) |
| Increase in deferred taxes | — | — | (281) | (233) | (47) |
| Increase in trade payables | 161 | 457 | 536 | 70 | 541 |
| Increase in employees and payroll accruals | 187 | 150 | 219 | 298 | 811 |
| Increase in deferred revenues | 2,084 | 821 | 1,315 | 928 | 920 |
| Increase (decrease) in other payables and accrued expenses | (219) | (131) | 562 | (248) | 304 |
| Amortization of discount on bank credit-line | 397 | 318 | 50 | 50 | — |
| Net cash provided by (used in) operating activities | 578 | (1,709) | 156 | (1,195) | 1,229 |
| **Cash flows from investing activities:** | | | | | |
| Decrease (increase) in short-term bank deposit | 1,502 | (56) | (1) | — | — |
| Decrease (increase) in restricted cash | (62) | (3) | 3 | 3 | (7) |
| Purchase of property and equipment | (235) | (607) | (686) | (544) | (1,498) |
| Proceeds from sale of property and equipment | 86 | 41 | 4 | 5 | 4 |
| Purchase of marketable securities | — | (4,850) | (4,300) | (3,504) | (13,762) |
| Proceeds from redemption or sale of marketable securities | — | — | 4,550 | 3,350 | 9,420 |

| Net cash provided by (used in) investing activities | 1,291 | (5,475) | (430) | (690) | (5,843) |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
**U.S. dollars in thousands**

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | | **Unaudited** | |
| Cash flows from financing activities: | | | | | |
| Repayment of bank credit | (1,475) | (234) | (166) | (166) | — |
| Bank credit received | 400 | — | — | — | — |
| Issuance of share capital, net | 4 | 7,882 | 22 | 13 | 5,484 |
| Net cash provided by (used in) financing activities | (1,071) | 7,648 | (144) | (153) | 5,484 |
| Increase (decrease) in cash and cash equivalents | 798 | 464 | (418) | (2,038) | 870 |
| Cash and cash equivalents at the beginning of the period | 2,833 | 3,631 | 4,095 | 4,095 | 3,677 |
| Cash and cash equivalents at the end of the period | $ 3,631 | $4,095 | $3,677 | $ 2,057 | $4,547 |
| Supplementary cash flow information: | | | | | |
| (a) Non-cash activities: | | | | | |
| Capitalization of inventory to property and equipment | $    150 | $  238 | $  155 | $    — | $    — |
| (b) Cash paid during the period for: | | | | | |
| Interest | $    32 | $  18 | $    8 | $    6 | $    1 |
| Taxes | $    — | $  — | $  — | $    — | $  123 |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands**

## NOTE 1:- GENERAL

Allot Communications Ltd. (the "Company") was incorporated in November 1996 under the laws of the State of Israel. The Company is engaged in developing, selling and marketing broadband service optimization solutions using advanced deep packet inspection, or DPI, technology. Allot's solutions provide broadband service providers and enterprises with real-time, highly granular visibility into network traffic, and enable them to efficiently and effectively manage and optimize their networks. Allot's solutions are used to create policies to monitor network applications, enforce quality of service policies that guarantee mission-critical application performance, mitigate security risks and leverage network infrastructure investments. Allot's products are used by service providers to offer subscriber-based and application-based tiered services that enable them to optimize their service offerings.

The Company holds five wholly-owned subsidiaries (collectively "Allot"): Allot Communications, Inc. in Eden Prairie, Minnesota, United-States (the "US subsidiary"), which was incorporated in 1997 under the laws of the state of California, Allot Communication Europe SARL in Sophia, France (the "European subsidiary") which was incorporated in 1998 under the laws of France, Allot Communications Japan K.K. in Tokyo, Japan (the "Japanese subsidiary"), which was incorporated in 2004 under the laws of Japan, Allot Communications (UK) Limited (the "UK subsidiary") which was incorporated in 2006 under the laws of England and Wales and Allot Communications (Asia Pacific) Pte. Ltd. (the "Singaporean subsidiary") which was incorporated in 2006 under the laws of Singapore.

The US subsidiary commenced operations in 1997. It engages in the sale, marketing and technical support services in America of products manufactured by and imported from the Company. The European, Japanese, UK and Singaporean subsidiaries are engaged in marketing and technical support services of the Company's products in Europe, Japan and Asia Pacific.

During 2003, 2004 and 2005, approximately 13%, 12% and 9%, respectively, of Allot's revenues were derived from a single customer. During 2005, approximately 16% of Allot's revenues derived from a different customer.

Allot currently depends on a single subcontractor to manufacture and provide hardware warranty support for its NetEnforcer traffic management system. If it experiences delays, disruptions, quality control problem or a loss in capacity, it could materially adversely affect Allot's operating results (see also Note 8d). Certain components for the NetEnforcer traffic management systems come from single or limited sources, and Allot could lose sales if these sources fail to satisfy its supply requirements.

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP").

a. Use of estimates:

The preparation of financial statements, in conformity with U.S. GAAP requires Allot's management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from such estimates.

b. Financial statements in U.S. dollars:

The majority of the revenues of the Company and certain of its subsidiaries are generated in U.S. dollars ("dollar") or linked to the dollar. In addition, a majority portion of the Company's and certain of its subsidiaries' costs are incurred or determined in dollars. A portion of the Company and its subsidiaries' costs is paid in local currencies. The Company's management believes that the dollar is the

F-9

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

currency of the primary economic environment in which the Company and its subsidiaries operate. Thus, the functional and reporting currency of the Company and its subsidiaries is the dollar.

Accordingly, monetary accounts maintained in currencies other than the dollar are remeasured into U.S. dollars in accordance with Statement of Financial Accounting Standards No. 52, "Foreign Currency Translation". All transactions gains and losses from the remeasurement of monetary balance sheet items are reflected in the statements of operations as financial income or expenses as appropriate.

c. Principles of consolidation:

The consolidated financial statements include the accounts of the Company and its subsidiaries. Intercompany balances and transactions, including profits from intercompany sales not yet realized outside Allot, have been eliminated upon consolidation.

d. Cash and cash equivalents:

Allot considers all highly liquid investments which are readily convertible to cash with maturity of three months or less, at the date of acquisition, to be cash equivalents.

e. Marketable securities:

Allot accounts for its investments in marketable securities using Statement of Financial Accounting Standard No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("SFAS No. 115").

Allot's management determines the appropriate classification of marketable debt and equity securities at the time of purchase and evaluates such designation as of each balance sheet date. To date, all debt securities have been classified as available-for-sale and are carried at fair market value, based on quoted market prices with material unrealized gains and losses, if any, included as a separate component of shareholders' equity. Realized gains and losses considered declines in value of securities judged to be other than temporary are included in interest income and have not been material to date. The cost of securities sold is based on the specific identification method.

As of December 31, 2005, Allot held marketable securities in U.S. dollars in the United States which were classified as available for sale. The balance was composed of auction rate and government agency securities. The auction rate and government agencies securities bear interest at rates ranging from 2.95% to 4.38% per annum.

f. Short-term deposit:

A short-term bank deposit is a deposit with a maturity of more than three months but less than one year. The deposit is in U.S. dollars and bears interest at the rate of 2.25%. The short-term deposit is presented at cost, including accrued interest.

g. Inventories:

Inventories are stated at the lower of cost or market value. Inventory reserves are provided to cover risks arising from slow-moving items or technological obsolescence. Cost of inventories is determined as the cost of raw material, manufacturing cost and addition of allocable indirect costs. Cost is determined

using the "average cost" method. Inventory write-offs totaled $246, $397 and $179 in 2003, 2004 and 2005, respectively.

F-10

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

h. Property and equipment:

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is calculated by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 20-33 |
| Office furniture and equipment | 6-33 |
| Leasehold improvements | By the shorter of term of the lease or the useful life of the asset |

i. Goodwill and Intangible assets:

Goodwill reflects the excess of the purchase price of business acquired over the fair value of the net tangible and intangible assets acquired. Intangible assets consist mainly of acquired technology, trade names and customer relations.

Effective January 1, 2002, Allot adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"). Under SFAS No. 142, goodwill is no longer amortized but instead is tested for impairment at least annually (or more frequently if impairment indicators arise).

SFAS No. 142 prescribes a two-phase process for impairment testing of goodwill. The first phase screens for impairment while the second phase (if necessary) measures impairment. In the first phase of impairment testing, goodwill attributable to each of the reporting units is tested for impairment by comparing the fair value of each reporting unit with its carrying value. As of December 31, 2003 and 2005, no instances of impairment of goodwill were identified. See Note 6 for December 31, 2004.

Intangible assets are amortized over their useful lives using a method of amortization that reflects the pattern in which the economic benefits of the intangible assets are consumed or otherwise used up, in accordance with SFAS No. 142. The Company amortizes its intangible assets on a straight line basis. As of December 31, 2003 and 2005, no instances of impairment were identified. See Note 6 for December 31, 2004.

j. Impairment of long-lived assets:

Long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"), whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. As of December 31, 2003, 2004 and 2005, no instances of impairment were identified.

k. Revenue recognition:

Allot generates revenues mainly from the sale of hardware and software products and such provision of

maintenance and support services. Allot sells its products mostly through distributors, OEMs, system integrators and value added resellers, all of whom are considered customers from Allot's perspective.

The software components of Allot's products are deemed to be more than incidental to the products as a whole, in accordance with Statement of Position 97-2, "Software Revenue Recognition" ("SOP 97-2") and EITF 03-5, "Applicability of AICPA Statement of Position 97-2 to Non-Software Deliverables in an

F-11

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Arrangement Containing More-Than-Incidental Software". Therefore, Allot accounts for its product sales in accordance with SOP 97-2. Revenues from product sales are recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable and collectibility is probable.

SOP 97-2 generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative objective fair value of the elements. Allot has adopted Statement of Position 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions" ("SOP 98-9"). According to SOP 98-9, revenues should be allocated to the different elements in the arrangement under the "residual method" when Vendor Specific Objective Evidence ("VSOE") of fair value exists for all undelivered elements and no VSOE exists for the delivered elements. Under the residual method, at the outset of the arrangement with a customer, Allot defers revenue for the fair value of its undelivered elements (maintenance and support) and recognizes revenue for the remainder of the arrangement fee attributable to the elements initially delivered in the arrangement (hardware and software products) when all other criteria in SOP 97-2 have been met. Any discount in the arrangement is allocated to the delivered element.

Maintenance and support revenue included in multiple element arrangements is deferred and recognized on a straight-line basis over the term of the applicable maintenance and support agreement. The VSOE of fair value of the maintenance and support services is determined based on the price charged when sold separately or when renewed. Deferred revenues are classified as short and long terms and recognized as revenues at the time respective elements are provided.

Allot generally does not grant a right of return to its customers. However, when other customer incentives, such as trade-in or rebates, are expected and estimated, Allot records a provision at the time product revenues is recognized based on its experience. The provision has been deducted from revenues and amounted to $ 91, $50 and $73 for the years ended December 31, 2003, 2004 and 2005, respectively.

Allot grants a one-year hardware warranty and three-month software warranty on all of its products. Allot estimates the costs that may be incurred under its warranty arrangements and records a liability in the amount of such costs at the time product revenue is recognized. Factors that affect the Company's warranty liability include the number of installed units, historical and anticipated rates of warranty claims and cost per claim. Allot periodically assesses the adequacy of its recorded warranty liabilities and adjusts the amounts as necessary.

l. Research and development costs:

Statement of Financial Accounting Standard No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on Allot's product development process, technological feasibility is established upon the completion of a working model. Allot does not incur material costs between the completion of a working model and the point at which the products are ready for general release. Therefore, research and development costs are charged to the statement of operations as incurred.

424B1

m. Severance pay:

The Company's liability for severance pay for its Israeli employees is calculated pursuant to Israeli severance pay law, based on the most recent monthly salary of its employees multiplied by the number of years of employment as of the balance sheet date for such employees. The Company's liability is partly provided by monthly deposits with severance pay funds and insurance policies and the remainder by an accrual.

F-12

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israel's Severance Pay law or labor agreements. The value of the deposited funds and insurance policies is based on the cash surrendered value and includes profits accumulated up to the balance sheet date.

Severance expenses for the years ended December 31, 2003, 2004 and 2005, amounted to approximately $307, $433 and $426, respectively.

n. Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25") and FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" in accounting for its employee stock option plans.

Under APB No. 25, when the exercise price of the Company's stock options is less than the market price of the underlying shares on the date of grant, compensation expense is recognized.

The Company adopted the disclosure provisions of Statement of Financial Accounting Standards No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure", which amended certain provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123") to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation. The Company continues to apply the provisions of APB No. 25 in accounting for stock-based compensation.

Pro forma information regarding the Company's net loss and net loss per share is required by SFAS No. 123 and has been determined as if the Company had accounted for its employee stock options under the fair value method prescribed by SFAS No. 123.

The fair value of options granted in 2003, 2004 and 2005 is amortized over their vesting period and was estimated at the date of grant using the Minimum Value Model option pricing model with the following weighted average assumptions:

|  | Year Ended December 31, | | |
|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Dividend yield | 0.0% | 0.0% | 0.0% |
| Expected volatility | 0.0% | 0.0% | 0.0% |
| Risk free interest | 2.4% | 3.3% | 4.0% |
| Expected life of up to (in years) | 4.0 | 4.0 | 4.0 |

F-13

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table illustrates the effect on net loss and net loss per share, assuming that the Company had applied the fair value recognition provision of SFAS No. 123 on its stock-based employee compensation:

| | Year Ended December 31, | | |
| | 2003 | 2004 | 2005 |
|---|---|---|---|
| Net loss, as reported | $2,280 | $3,288 | $2,376 |
| Deduct — Stock-based employee compensation — intrinsic value | 225 | 7 | 251 |
| Add — Stock-based employee compensation — fair value | 252 | 30 | 293 |
| Pro forma — net loss | $2,307 | $3,311 | $2,418 |
| Basic and diluted net loss per share of ordinary shares, as reported | $ 0.82 | $ 1.18 | $ 0.81 |
| Pro forma basic and diluted net loss per share of ordinary shares | $ 0.83 | $ 1.19 | $ 0.82 |

The Company applies SFAS No. 123 and Emerging Issues Task Force No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services" ("EITF No. 96-18"), with respect to options and warrants issued to non-employees. SFAS No. 123 requires the use of option valuation models to measure the fair value of the options and warrants at the measurement date as defined in EITF No. 96-18.

Effective January 1, 2006, the Company adopted the fair value recognition provisions of FASB Statement No. 123(R), "Share-Based Payments" ("SFAS No. 123(R)"). For grants where the Company had previously presented the required SFAS No. 123 pro forma disclosures using the minimum value method, the Company adopted the new standard using the prospective transition method. As such, for those awards, the Company will continue to apply APB 25 in future periods.

As a result of adopting SFAS No. 123(R) on January 1, 2006, the Company's net income for the period ended September 30, 2006, is $ 252 lower with $0.01 negative effect on basic and diluted net earnings per share, than if it had continued to account for stock-based compensation under APB 25.

The following table sets forth the total stock-based compensation expense resulting from stock options included in the Consolidated Statements of Operations:

| | Nine Months Ended September 30, 2006 |
| | (Unaudited) |
|---|---|
| Cost of revenues | $    8 |
| Research and development expenses, net | 97 |
| Sales and marketing expenses | 330 |
| General and administrative expenses | 247 |
| Total stock-based compensation expense | $  682 |

F-14

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The fair value of stock-based awards was estimated using the Binomial model starting January 1, 2006 with the following weighted-average assumptions for the nine months ended September 30, 2006:

|  | Nine Months Ended September 30, 2006 (Unaudited) |
| --- | --- |
| Weighted average expected term (years) | 6.11 |
| Suboptimal exercise multiple | 2-3 |
| Forfeiture rate | 5%-12% |
| Interest rate | 4.53%-5.33% |
| Volatility | 85% |
| Dividend yield | 0% |
| Weighted-average fair value at grant date | $4.32 |

The computation of expected volatility is based on realized historical stock price volatility of peer companies. The computation of the suboptimal exercise multiple and the forfeiture rate are based on the employees expected exercise and on prior to and post vesting termination behavior. The interest rate for period within the contractual life of the award is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the employees stock option activity for the nine months ended September 30, 2006. The information for the nine months ended September 30, 2005 was not presented since options granted through December 2005 were measured using the Minimum Value Valuation Model.

|  | Number of Shares Upon Exercise | Weighted-Average Exercise Price | Aggregate Intrinsic Value |
| --- | --- | --- | --- |
| Outstanding at December 31, 2005 | 2,309,141 | $ 1.63 | |
| Granted | 1,076,404 | $ 3.66 | |
| Forfeited | (41,062) | $ 1.96 | |
| Exercised | (91,352) | $ 0.61 | |
| Outstanding at September 30, 2006 (unaudited) | 3,253,131 | $ 2.28 | $ 11,886 |
| Exercisable at September 30, 2006 (unaudited) | 1,497,051 | $ 1.40 | $ 6,787 |
| Vested and expected to vest | 3,123,708 | $ 2.25 | $ 11,510 |

The aggregate intrinsic value in the table above represents the total intrinsic value of the Company's ordinary shares (i.e., the difference between the estimated value on September 30, 2006 and the exercise price, times the number of options) that would have been received by the option holders had all option holders exercised their options on September 30, 2006. This amount changes based on the fair value of the Company's ordinary shares. The total intrinsic value of options exercised during the nine months ended September 30, 2006 was $486. The total fair value of options vested and forfeited during the nine months ended September 30, 2006 was immaterial since most of them were measured with the Minimum Value Valuation Method. The number of options vested during the nine months ended

September 30, 2006 was 500,386. The weighted-average remaining contractual term of the outstanding options at September 30, 2006 was 7.63 years. As of September 30, 2006, $2,492 of total unrecognized compensation cost related to stock options is expected to be recognized over a weighted-average period of approximately 3.5 years.

F-15

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

o. Concentration of credit risks:

Financial instruments that potentially subject Allot to concentrations of credit risk consist primarily of cash and cash equivalents, marketable securities, short-term deposits and trade receivables.

The majority of cash and cash equivalents, marketable securities and short-term deposits of Allot are invested in U.S. dollar deposits in major U.S. and Israeli banks. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Allot's management believes that the financial institutions that hold Allot's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

Allot's trade receivables are derived from sales to large and solid organizations located mainly in the United States, Europe and Asia.

Allot has no off-balance-sheet concentration of credit risk, such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

p. Royalty bearing grants:

Participation grants from the Office of the Chief Scientist of the Ministry of Industry and Trade in Israel ("OCS") for research and development activity are recognized at the time Allot is entitled to such grants on the basis of the costs incurred and included as a deduction of research and development costs. Research and development grants recognized amounted to $1,094, $894 and $ 727 in 2003, 2004 and 2005, respectively.

q. Income taxes:

Allot accounts for income taxes in accordance with Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes". This Statement prescribes the use of the liability method, whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. Allot provides a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value if it is more likely than not that some portion or all of the deferred tax assets will not be realized.

r. Basic and diluted net earnings (loss) per share:

Allot applies the two class method as required by EITF No. 03-6, "Participating Securities and the Two — Class Method under FASB Statement No. 128" ("EITF No. 03-6"). EITF No. 03-6 requires the earnings (loss) per share for each class of shares (ordinary shares and preferred shares) to be calculated assuming 100% of the Company's earnings are distributed as dividends to each class of shares based on their contractual rights.

In compliance with EITF 03-6, the series of preferred shares are not participating securities in losses, and therefore are not included in the computation of net loss per share.

Basic and diluted net earnings (losses) per share are computed based on the weighted average number of shares of ordinary shares outstanding during each year. Diluted net earnings (losses) per share is

computed based on the weighted-average number of ordinary shares outstanding during the period, plus dilutive potential shares of ordinary shares considered outstanding during the period, in accordance with Statement of Financial Standard No. 128, "Earnings Per Share".

For the years ended December 31, 2003, 2004 and 2005, all outstanding options, warrants and preferred shares have been excluded from the calculation of the diluted loss per share since their effect was anti-dilutive.

F-16

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Basic and diluted pro forma net earnings (loss) per share (unaudited), as presented in the statements of operations, has been calculated as described above and also gives effect to (1) the automatic conversion of the preferred shares (Series A, Series B, Series C, Series D and Series E) and the Series A ordinary shares, such that each preferred share and Series A ordinary share will be converted into one ordinary share and, as a result of the share dividend effected on October 29, 2006, an additional approximately 1.275 ordinary shares will be issued in respect of each such ordinary share and (2) the issuance of 900,658 and 236,537 ordinary shares at December 31, 2005 and September 30, 2006, respectively, pursuant to the anti-dilution provisions of the Series C preferred shares, including the accounting effects of the conversion of Series C preferred shares that will occur upon closing of the Initial Public Offering ("IPO"). (See also Note 2s)

The following table presents the calculation of pro forma basic and diluted net earnings (loss) per share:

1. Numerator:

| | Year Ended December 31, 2005 | Nine Months Ended September 30, 2006 |
| --- | --- | --- |
| | | Unaudited |
| Net income (loss) as reported | $    (2,376) | $      563 |

2. Denominator:

| | Year Ended December 31, 2005 | Nine Months Ended September 30, 2006 |
| --- | --- | --- |
| | Number of Shares | |
| | | Unaudited |
| | | (*) |
| Weighted average number of shares of ordinary shares | 2,943,500 | 13,310,355 |
| Denominator for basic net earnings (loss) per share of ordinary shares | | |
| Effect of dilutive securities: | | |
| Employees stock options and warrants | — | 2,191,343 |
| Dilutive potential shares of ordinary shares | 2,943,500 | 15,501,698 |
| Effect of weighted average potential ordinary shares assumed from conversion of preferred shares | 10,566,759 | 190,536 |
| Denominator for pro forma and diluted net earnings (loss) per share of ordinary shares | 13,510,259 | 15,692,234 |

(*)  Includes 10,220,632 preferred shares on an as-converted basis.

s. Unaudited pro forma shareholders' equity:

The Company's Board of Directors has authorized the filing of a Registration Statement with the U. S. Securities and Exchange Commission to register the Company's ordinary shares for an IPO. Upon the

424B1

consummation of the IPO, all of the authorized, issued and outstanding Series A ordinary shares and the Series A, B, C, D and E preferred shares will automatically be converted into ordinary shares as well as the additional ordinary shares issuable as a result of the anti-dilution provisions of the Series C preferred shares. Unaudited pro forma shareholders' equity at September 30, 2006, as adjusted for the

F-17

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

assumed conversion of such shares and the anti-dilution protection and the Company's authorized share capital (as described in Note 9a), is disclosed in the balance sheet.

The anti-dilution provisions of the Series C preferred shares (as more fully discussed in Note 9b), is dependent on the valuation of the Company upon the closing of an IPO. As such, the pro forma shareholders' equity reflects the number of ordinary shares issued as a result of the above mentioned anti-dilution adjustment.

t. Fair value of financial instruments:

The following methods and assumptions were used by Allot in estimating the fair value disclosures for financial instruments:

The carrying value of cash and cash equivalents, short-term deposits, trade receivables, other accounts receivable and prepaid expenses, trade payables and other liabilities approximate their fair values due to the short-term maturities of such instruments.

Long-term loans are estimated by discounting the future cash flows using current interest rates for loans of similar terms and maturities. The carrying amount of the long-term loans approximates their fair value.

u. Impact of recently issued accounting pronouncements:

In May 2005, the FASB issued Statement of Financial Accounting Standard No. 154, "Accounting Changes and Error Corrections" ("SFAS No. 154"), a replacement of APB No. 20, "Accounting Changes" ("APB No. 20") and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements". SFAS No. 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. APB No. 20 previously required that most voluntary changes in accounting principles be recognized by including in net income for the period of change the cumulative effect of changing to the new accounting principle. SFAS No. 154 requires retroactive application to prior periods' financial statements of a voluntary change in accounting principles unless it is impracticable. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005.

In November 2005, the FASB issued FASB Staff Position ("FSP") FAS 115-1. The FSP addresses the determination as to when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. The FSP also includes accounting considerations subsequent to the recognition of other than-temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. The guidance in this FSP amends SFAS No. 115, "Accounting for Certain Investments in Debt and Equity". The FSP replaces the impairment evaluation guidance of EITF Issue No. 03-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments," with references to the existing other-than-temporary impairment guidance. The FSP clarifies that an investor should recognize an impairment loss no later than when the impairment is deemed other-than-temporary, even if a decision to sell an impaired security has not been made. The guidance in this FSP is to be applied to reporting periods beginning after December 15, 2005. Allot does not expect that the adoption of FSP FAS 115-1 will have a material impact on its financial position or results of operations.

F-18

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### NOTE 3:- MARKETABLE SECURITIES

The following is a summary of available-for-sale securities:

| | December 31, 2004 | | | December 31, 2005 | | | September 30, 2006 Unaudited | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cost | Unrealized Losses | Market Value | Cost | Unrealized Losses | Market Value | Cost | Unrealized Losses | Market Value |
| Auction rate securities | $3,850 | $ — | $3,850 | $2,600 | $ — | $2,600 | $2,100 | $ — | $2,100 |
| Government agencies | 1,000 | (4) | 996 | 2,003 | (22) | 1,981 | 6,836 | (39) | 6,797 |
| Total securities | $4,850 | $ (4) | $4,846 | $4,603 | $ (22) | $4,581 | $8,936 | $ (39) | $8,897 |

| | December 31, 2004 | | December 31, 2005 | | September 30, 2006 Unaudited | |
|---|---|---|---|---|---|---|
| | Cost | Market Value | Cost | Market Value | Cost | Market Value |
| Matures in one year | $3,850 | $3,850 | $3,600 | $3,588 | $3,102 | $3,093 |
| Mature from one year | 1,000 | 996 | 1,003 | 993 | 5,834 | 5,804 |
| Total securities | $4,850 | $4,846 | $4,603 | $4,581 | $8,936 | $8,897 |

As of December 31, 2005, and September 30, 2006, Allot's investments in government agencies included continuous unrealized losses of $4 and $7, respectively, for a period greater than 12 months.

The unrealized losses in Allot's investments in government agencies were caused by interest rate increases. It is expected that the securities would not be settled at a price less than the amortized cost of Allot's investment. Based on Allot's intention to hold these investments until maturity, the securities were not considered to be other than temporarily impaired at December 31, 2005 and as of September 30, 2006.

### NOTE 4:- INVENTORIES

| | December 31, | | September 30, 2006 |
|---|---|---|---|
| | 2004 | 2005 | Unaudited |
| Raw materials | $ 370 | $ 496 | $ 545 |
| Finished products | 1,057 | 1,048 | 1,964 |
| | $1,427 | $1,544 | $ 2,509 |

F-19

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 5:- PROPERTY AND EQUIPMENT, NET

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Cost: | | |
| Computers and peripheral equipment | $1,671 | $2,120 |
| Office furniture and equipment | 1,439 | 1,802 |
| Leasehold improvements | 127 | 144 |
|  | 3,237 | 4,066 |
| Accumulated depreciation | 2,026 | 2,583 |
| Depreciated cost | $1,211 | $1,483 |

Depreciation expenses for the years ended December 31, 2003, 2004 and 2005, were $449, $416 and $559, respectively.

## NOTE 6:- INTANGIBLE ASSETS, NET

a. The following table shows the Company's intangible assets for the periods presented:

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Cost: | | |
| Customer base | $261 | $261 |
| Accumulated amortization: | | |
| Customer base | 214 | 237 |
| Amortized cost | $ 47 | $ 24 |

b. In September 2002, Allot acquired the tangible and intangible assets of NetReality Ltd. ("NetReality"), an Israeli manufacturer of traffic management solutions, following NetReality's receivership proceedings filed with an Israeli court. Allot also recruited NetReality's employees.

In the framework of the acquisition, Allot assumed the commitment to pay royalties to the OCS up to the amount of the contingent liabilities deriving from the grants that had been received by NetReality from the OCS. Under the OCS agreement, grants should be repaid based on actual revenues generated by Allot. If no revenues are generated, the Company may file a request for a write off of the contingent liability as a result of a "Project Failure".

In consideration for the assets acquired and liability assumed, Allot granted NetReality's receiver a fully-vested warrant to purchase 48,267 of Series B preferred shares (with an exercise price of $0.02 per share), and undertook to pay royalties at the rate of the higher of (i) 7% from the sales of the NetReality products; or (ii) 1% of the total sales of Allot. The royalties were set to be paid over a period of five years from the date of the acquisition with a minimum of $1,000 and maximum of $ 2,500. The purchase price was valued at approximately $1,254, based on the fair value of the warrant granted, and the minimum commitment to pay royalties.

The acquisition was accounted for in accordance with Statement of Financial Accounting Standards No. 141, "Business Combination", using the purchase method of accounting. Accordingly, the purchase price has been allocated to the assets acquired and the liability assumed based on their fair value at the date of acquisition. The fair values of the identified intangible assets were established based on an independent

F-20

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

valuation study performed by a third-party specialist, Vega Consultants Ltd. The excess of the purchase price over the fair value of the net assets acquired has been recorded as goodwill.

c. Impairment of long-lived assets and goodwill in 2004 (see also Note 2i):

During the fourth quarter of 2004, Allot decided to cease the development and sale of NetReality's products, and to continue solely the provision of maintenance and support services.

Consequently, Allot performed a recoverability test on its long-lived assets associated with its NetReality products. As a result, Allot recorded a non-cash charge of $366 in accordance with SFAS No. 144. This impairment was recorded in operating expenses. Management considered current and anticipated industry conditions, recent changes in its business strategies, and current and anticipated operating results.

The composition of the impairment was as follows:

| | |
|---|---|
| Technology(*) | $159 |
| Customer base(*) | 98 |
| Trade name(*) | 109 |
| | $366 |

(*) Related to the purchase of certain assets of NetReality, in September 2002.

As part of the goodwill annual impairment test and in connection with the evaluation Allot performed in accordance SFAS 142, no goodwill impairment was deemed necessary. The fair value of Allot, the sole reporting unit identified, was estimated based on the financing investment made in Allot during 2004.

d. Amortization expenses for the years ended December 31, 2003, 2004 and 2005, were $172, $139 and $23, respectively.

## NOTE 7:-  BANK CREDIT LINES AND RELATED WARRANTS

Through October 2002, Allot was granted credit lines from Bank Hapoalim B.M. ("Hapoalim"), and United Mizrahi Bank Ltd. ("Mizrahi"). The term of the credit lines was through June 2005, and Allot has repaid all amounts withdrawn at that date.

In connection with the credit lines, Allot granted Hapoalim's affiliates and Mizrahi several warrants to purchase up to 176,212 Series B preferred shares of the Company at an exercise price of $ 7.945 per share. The term of the warrants is 12 years commencing on the original grant dates of the respective warrants.

Allot recorded the fair value of these warrants using the Black-Scholes Option Valuation Model.

See also Note 9d.

## NOTE 8:-  COMMITMENTS AND CONTINGENT LIABILITIES

a. Royalties:

1. The Company received research and development grants from the OCS.

The Company is participating in programs sponsored by the Israeli Government for the support of research and development activities. Currently, the Company is obligated to pay royalties to the OCS, amounting to 3.5% of the sales of products of the Company and other related revenues generated, up to 100% of the grants received, linked to the U.S. dollar and for grants received after January 1, 1999 also

F-21

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

bearing interest at the rate of LIBOR. The obligation to pay these royalties is contingent on actual sales of products of the Company and in the absence of such sales no payment is required.

Through December 31, 2005, the Company has paid or accrued royalties to the OCS in the amount of $2,747, which was recorded to cost of revenues.

As of December 31, 2005, the Company had an outstanding contingent obligation to pay royalties to the OCS in the amount of approximately $5,581. The Company also had an outstanding contingent obligation to pay royalties to the OCS in the amount of approximately $4,870, deriving from purchase of the operations of NetReality (see also Note 6b).

2. The Company undertook to pay royalties to the receiver of NetReality.

The financial statements include a liability in the amount of the present value of the minimum amount that will be paid to the receiver. See Note 6b.

b. Lease commitments:

In 1999, the Company leased office space in Hod Hasharon, Israel for a period ending in 2006. On February 13, 2006, the Company signed an agreement to rent new offices for a period of seven years, starting July 2006. The rental expenses are $39 per month and a management fee of costs plus 15% of the expenses incurred by the building management company as stipulated in the lease agreement.

The US subsidiary has one operating lease for office facilities in Eden Prairie, Minnesota. The lease expires on August 31, 2008. The lease provides for a base monthly rent, adjusted annually for cost of living increases.

The Company's subsidiaries maintain smaller offices in Tokyo (Japan), Singapore, Sophia (France) and Madrid (Spain).

In addition, Allot signed motor vehicle operating lease agreements. The terms of the lease agreements range from 36 to 39 months.

Operating leases (offices and motor vehicles) expenses for the years ended December 31, 2003, 2004 and 2005, were $797, $950 and $1,116, respectively.

As of December 31, 2005, the aggregate future minimum lease obligations (offices and motor vehicles) under non-cancelable operating leases agreements were as follows:

| Year ended December 31, | |
| --- | --- |
| 2006 | $ 766 |
| 2007 | 824 |
| 2008 | 656 |
| 2009 | 513 |
| 2010 and thereafter | 1,612 |
| | $4,371 |

c. Liens and charges:

1. The Company has a fixed lien on a NIS deposit of $62 (December 31, 2004 — $65) in respect of its lease commitments regarding its offices in Israel.

2. The Company placed a floating charge in favor of Hapoalim Bank Ltd., on all its property, its assets and insurance rights in their respect, in return for credit lines which Hapoalim Bank Ltd. has granted the Company. On October 11, 2006, Hapoalim Bank Ltd. removed the floating charge.

F-22

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

d. Other:

The Company is dependent upon single subcontractor for acquiring components and assembling Allot's products. The subcontractor maintains net supplier's inventory in accordance with Allot's selling forecasts. In the event that Allot terminates its business connection with the subcontractor, it will be have to compensate the subcontractor for certain inventory costs, as specified in the agreement with the subcontractor.

## NOTE 9:- SHAREHOLDERS' EQUITY

a. On October 26, 2006, the Company's shareholders approved a 10-for-1 reverse share split by a way of consolidation of every 10 shares of each series of shares into one share of the same series and, accordingly, all shares (ordinary and preferred), options, warrants and earnings (losses) per share amounts were adjusted to reflect this reverse share split. Accordingly, all such amounts have been retroactively adjusted in these financial statements. Following such reverse share split, each share has a par value of NIS 0.1 instead of NIS 0.01.

Effective as of October 29, 2006, following the above shareholders' approval, the Company's Board of Directors approved, in accordance with the Company's Interim Articles of Association (as approved by the Company's shareholders on October 26, 2006), the following: (i) all ordinary shares, options to purchase ordinary shares and earnings (losses) per share amounts were adjusted to reflect a share dividend of approximately 1.275 ordinary shares for each ordinary share; and (ii) the conversion price of each Series A ordinary share and preferred share was adjusted to reflect such share dividend. Accordingly, all such amounts have been retroactively adjusted in these financial statements.

It was further resolved to increase the Company's registered share capital to NIS 20,000,000.

b. Composition of share capital:

| | Authorized | | | Issued | | | Outstanding | | |
|---|---|---|---|---|---|---|---|---|---|
| | December 31, | | September 30, | December 31, | | September 30, | December 31, | | September 30, |
| | 2004 | 2005 | 2006 | 2004 | 2005 | 2006 | 2004 | 2005 | 2006 |
| | | | Unaudited | | | Unaudited | | | Unaudited |
| | | | | Number of Shares | | | | | |
| Shares of NIS 0.01 par value: | | | | | | | | | |
| Ordinary shares(1) | 6,980,782 | 6,980,782 | 8,028,632 | 2,178,807 | 2,455,326 | 2,546,678 | 2,178,807 | 2,455,326 | 2,546,678 |
| Series A ordinary shares (2) | 268,761 | 268,761 | 268,761 | 268,761 | 268,761 | 268,761 | 268,761 | 268,761 | 268,761 |
| Series A preferred shares (3),(4) | 776,562 | 776,562 | 776,562 | 776,562 | 776,562 | 776,562 | 668,205 | 668,205 | 668,205 |
| Series B preferred shares (3) | 2,998,942 | 2,998,942 | 2,998,942 | 2,706,236 | 2,706,236 | 2,706,236 | 2,706,236 | 2,706,236 | 2,706,236 |
| Series C preferred shares (3) | 89,826 | 89,826 | 89,826 | 89,826 | 89,826 | 89,826 | 89,826 | 89,826 | 89,826 |
| Series D preferred shares (3) | 785,145 | 785,145 | 785,145 | 785,145 | 785,145 | 785,145 | 785,145 | 785,145 | 785,145 |
| Series E preferred shares (3) | — | — | 452,157 | — | — | 452,157 | — | — | 452,157 |
| | 11,900,018 | 11,900,018 | 13,400,025 | 6,805,337 | 7,081,856 | 7,625,365 | 6,696,980 | 6,973,499 | 7,517,008 |

(1) Ordinary shares confer upon their holders the right to receive notice of, and participate and vote such shares in general meetings of the Company, the right to receive dividends, if and when declared and the right to receive the remaining assets of the Company upon liquidation or deemed liquidation (as defined in the Articles of Association of the Company), subject to the preference in the distribution thereof to the holders of preferred shares (as described below).

(2) Series A ordinary shares confer upon their holders the same rights as those conferred by ordinary shares, except that the Series A ordinary shares shall automatically be converted into ordinary shares immediately upon the closing of an IPO and are entitled to a weighted average anti-dilution protection in the event that the Company issues additional securities (other than certain excluded issuances) at a price per share, lower than the then applicable conversion price of the Series A ordinary shares, as defined in the Articles of Association of the Company.

F-23

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(3)  Preferred shares:

*Conversion* — Each preferred share is convertible, at the option of the holder of such share, at any time after the original issuance date of such share, into ordinary shares of the Company, as is determined by dividing the applicable original issuance price of such preferred share by the conversion price prevailing at the time of conversion. The initial conversion price per share for preferred shares shall be the original issuance price for such share, provided that the conversion price for the preferred shares shall be subject to adjustment as defined in the Articles of Association of the Company.

The preferred shares will automatically be converted into ordinary shares immediately upon the closing of an IPO.

The preferred shares are entitled to a "weighted average" anti-dilution protection, in the event that the Company issues additional securities (other than certain excluded issuances) at a price per share lower than the then applicable conversion price of the applicable series of the preferred shares, as defined in the Articles of Association of the Company.

*Voting rights* — The preferred shares shall vote together with the other shares of the Company, and not as a separate class, in all shareholders meetings, with each preferred share having votes in such number as if then converted into ordinary shares.

*Liquidation preference* — In the event of any liquidation of the Company, it shall distribute to the holders of preferred shares, in a descending order from Preferred E Series to Preferred A Series, prior to and in preference to any payments to any of the holders of any other classes of shares of the Company, a per share amount equal to the original issue price, plus an amount equal to all declared but unpaid dividends thereon (such preference may not apply in the event that the distributed assets exceed certain values as stated in the Articles of Association). The remaining assets of the Company then available for distribution shall be distributed among all the shareholders of the Company in a pro-rata distribution.

With respect to the Series C preferred shares, in the event of an IPO, if the price per share of the Company established for the purpose of the IPO, multiplied by the number of ordinary shares issuable upon the conversion of all of the Series C preferred shares, shall not yield to the holders of the Series C preferred shares (assuming the conversion of all of the preferred shares into ordinary shares) an amount equal to at least three times the applicable original issue price per each Series C preferred share, multiplied by the number of Series C preferred shares, then the conversion ratio for the Series C preferred shares shall be adjusted, as set forth in the Company's Articles of Association.

(4)  Series A preferred shares held in trust:

108,357 Series A preferred shares, convertible into 246,479 ordinary shares, are held in trust for the benefit of the Chairman of the Company's Board pursuant to a right to purchase pending his payment of the full purchase price of approximately $600. For the purposes of calculating shareholders equity, the Company has not considered such Series A preferred shares to be outstanding because neither the Chairman of the Company's Board nor the trustee has voting or economic rights with respect to such shares. (See also Note 9d and Note 14.)

### ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

c. Stock option plans:

A summary of the Company's stock option activity, pertaining to its option plans for employees, and related information is as follows:

| | Year Ended December 31, | | | | | | Nine Months Ended September 30, 2006 | |
| | 2003 | | 2004 | | 2005 | | Unaudited | |
| | Number of Shares Upon Exercise | Weighted Average Exercise Price | Number of Shares Upon Exercise | Weighted Average Exercise Price | Number of Shares Upon Exercise | Weighted Average Exercise Price | Number of Shares Upon Exercise | Weighted Average Exercise Price |
|---|---|---|---|---|---|---|---|---|
| Outstanding at the beginning of the period | 520,879 | $ 0.95 | 1,707,831 | $ 1.16 | 1,828,853 | $ 1.17 | 2,309,141 | $ 1.63 |
| Granted | 1,285,313 | $ 1.27 | 167,912 | $ 1.34 | 986,097 | $ 2.24 | 1,076,404 | $ 3.66 |
| Forfeited | (78,841) | $ 1.8 | (37,023) | $ 1.12 | (229,290) | $ 1.42 | (41,062) | $ 1.96 |
| Exercised | (19,520) | $ 0.43 | (9,867) | $ 1.07 | (276,519) | $ 1.12 | (91,352) | $ 0.61 |
| Outstanding at the end of the period | 1,707,831 | $ 1.16 | 1,828,853 | $ 1.17 | 2,309,141 | $ 1.63 | 3,253,131 | $ 2.28 |
| Exercisable at the end of the period | 461,976 | $ 0.66 | 991,063 | $ 0.97 | 996,665 | $ 1.06 | 1,497,051 | $ 1.40 |

Allot's employees have the ability, subject to a vesting period, to exercise stock options (i.e., remit cash consideration to the Company for the exercise price) in exchange for ordinary shares. The Company recognizes the consideration received for the exercise of the options into ordinary shares in shareholders' equity.

The options outstanding as of September 30, 2006 have been classified by exercise price, as follows (unaudited):

| Exercise Price | Shares Upon Exercise of Options Outstanding as of September 30, 2006 | Weighted Average Remaining Contractual Life Years | Shares Upon Exercise of Options Exercisable as of September 30, 2006 |
|---|---|---|---|
| $5.930-5.934 | 35,267 | 9.90 | — |
| $4.612-4.616 | 42,542 | 9.80 | — |
| $4.167-4.176 | 246,835 | 9.68 | — |
| $3.509-3.517 | 634,017 | 9.47 | — |
| $2.237-2.242 | 1,049,811 | 8.56 | 382,975 |
| $1.362-1.363 | 248,672 | 2.56 | 248,392 |
| $1.228-1.231 | 861,202 | 6.70 | 731,004 |
| $0.009 | 33,033 | 4.75 | 33,029 |
| $0.00011 | 101,752 | 1.18 | 101,651 |
| | 3,253,131 | | 1,497,051 |

The Company has three option plans under which outstanding options as of September 30, 2006, are as

follows: (i) under the 1997 option plans, 896 options exercisable for 358,350 ordinary shares, and (ii) under the 2003 option plan, 2,894,781 options exercisable for 2,894,781 ordinary shares.

F-25

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The options granted during the 12 months prior to December 31, 2005 have been classified by exercise price as follows:

| Exercise Price | Grant Date | Fair Value of Ordinary Shares | Intrinsic Value | Number of Shares Upon Exercise |
|---|---|---|---|---|
| $      2.24 | January 26-December 20, 2005 | $      2.24 | $      — | 986,097 |

The fair value assigned to the ordinary shares in order to calculate the compensation resulting from employee option grants, was determined primarily by management. In determining fair value, management has considered a number of factors, including independent valuations and appraisals.

The fair value of options granted in 2003, 2004 and 2005 was estimated at the date of grant using the Minimum Value Model option pricing model with the weighted average assumptions as described in Note 2n.

The weighted average exercise prices and fair values of options granted during the years ended December 31, 2003, 2004 and 2005 were as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | 2004 | | 2005 | |
| | Weighted Average Fair Value | Weighted Average Exercise Price | Weighted Average Fair Value | Weighted Average Exercise Price | Weighted Average Fair Value | Weighted Average Exercise Price |
| Lower than market price at date of grant | $      — | $      — | $      0.2 | $  1.23 | $      — | $      — |
| Equals market price at date of grant | $  0.13 | $  1.23 | $      — | $      — | $  0.35 | $  2.24 |
| Greater than market price at date of grant | $      (*) | $  1.36 | $      (*) | $  2.24 | $      — | $      — |

(*)  Less than $0.01.

424B1

F-26

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

d. The Company's outstanding rights, warrants and options to investors and others as of December 31, 2005, are as follows:

| Issuance Date | Number of Shares to be Issued | Class of Shares | Exercise Price Per Share | Exercisable Through |
|---|---|---|---|---|
| January 1998(1) | 108,357 | Preferred A shares | $ 5.530 | The earlier of a Liquidity Event and two years after an IPO (see Note 14) |
| November 2001(2) | 6,196 | Preferred B shares | $ 0.020 | The closing of an IPO or an M&A transaction |
| April 2002(3) | 9,099 | Ordinary shares | $ 1.319 | 10 years |
| August 1999 - November 2002(4) | 176,212 | Preferred B shares | $ 7.945 | The earlier of: (i) 12 months following the closing of an IPO (subject to certain exceptions) or an M&A transaction as stipulated in the warrant agreements, and (ii) August 2011 - November 2014 as applicable (refer also to Note 7) |
| September 2002(5) | 48,267 | Preferred B shares | $ 0.020 | The closing of an IPO or an M&A transaction |
| March 1998(6) | 4,550 | Ordinary shares | $ 0.026 | March 2008 |
| January 1999(6) | 9,099 | Ordinary shares | $ 1.363 | January 2009 |
| July 2003(6) | 54,593 | Ordinary shares | $ 1.231 | July 2013 |
| May - September 2004(6) | 17,516 | Ordinary shares | $ 1.231 | May - September 2015 |
| July - December 2005(6) | 98,950 | Ordinary shares | $ 2.242 | July - December 2015 |

(1) Right to purchase Series A preferred shares granted to the Chairman of the Board who also served as Chief Executive Officer at the time of the grant. The underlined Series A preferred shares are issued and held in trust for the benefit of the Chairman of the Board, pending his payment of the full purchase price of approximately $600. The Company does not consider these shares to be outstanding since, while these shares are held in trust, neither the Chairman of the Board nor the trustee have voting or economic rights with respect to such shares. (See Note 9b4 and Note 14.)

(2) Options granted to the Chairman of the Board.

(3) Issued as a donation to Tmura (An Israeli Public Service Venture Fund — Non profit organization).

The fair value of these options was estimated at the date of grant using the Black-Scholes Option Valuation Model with the following assumptions for April 2002: expected volatility of 0.6867, risk free interest rates of 5.2%, dividend yields of 0%, and the expected life of the options of 10 years.

(4) Issued to Hapoalim's affiliates and Mizrahi, in connection with credit line agreements. Certain of the warrants were granted prior to November 2002 and certain of their terms were amended at such date.

The fair value of these options was estimated at the date of grant using the Black-Scholes Option Valuation Model with the following weighted-average assumptions for November 2002: expected

F-27

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

volatility of 0.673-0.686, risk free interest rates of 3.93-4.22%, dividend yields of 0%, and a weighted-average expected life of the options of 8.82-12 years. The fair value was recorded as debt issuance cost and amortized over the term of the credit line agreements through financial expenses.

(5) In connection with the acquisition of NetReality's assets. See to Note 6b for further details.

(6) 184,708 options were granted to contractors in connection with products and services provided to the Company. All the options granted have a contractual life of 10 years and the exercised price was determined based on the period the options were granted.

## NOTE 10:- TAXES ON INCOME

a. Tax benefits under Israel's Law for the Encouragement of Capital Investments, 1959 (the "Law"):

The facilities of the Company have been granted a status of an "Approved Enterprise" under the Law. According to the provisions of the Law, the Company's income is tax-exempt for a period of two years commencing with the year it first earns taxable income, and subject to corporate taxes at the reduced rate of 10% to 25%, for an additional period of five to eight years (depending upon the level of foreign ownership of the Company). The benefit period has not yet commenced.

The period of tax benefits, detailed above, is limited to the earlier of 12 years from the commencement of production (in 2000), or 14 years from the approval date, (December 8, 1998), (the limitation on the number of years does not apply to the exemption period).

The entitlement to the above benefits is conditional upon the fulfilling of the conditions stipulated by the above Law, regulations published there under and the letter of approval for the specific investment. In the event of failure to comply with these conditions, the benefits may be canceled and the Company may be required to refund the amount of the benefits, in whole or in part, including interest. As of December 31, 2005, management believes that the Company is meeting the aforementioned conditions.

The tax-exempt income attributable to the "Approved Enterprises" can be distributed to shareholders, without subjecting the Company to taxes, only upon the complete liquidation of the Company. If this retained tax-exempt income is distributed in a manner other than a complete liquidation of the Company, it would be taxed at the corporate tax rate applicable to such profits as if the Company had not elected the alternative tax benefits track (currently between 10% to 25% for an "Approved Enterprise").

The Company currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

Income from sources other than the "Approved Enterprise" during the benefit period will be subject to tax at the regular corporate tax rate.

On April 1, 2005, an amendment to the Investment Law came into effect (the "Amendment") and has significantly changed the provisions of the Investment Law. The Amendment limits the scope of enterprises which may be approved by the Investment Center by setting criteria for the approval of a facility as an Approved Enterprise, such as provisions generally requiring that at least 25% of the Approved Enterprise's income will be derived from export. Additionally, the Amendment enacted major changes in the manner in which tax benefits are awarded under the Investment Law so that companies

424B1

no longer require Investment Center approval in order to qualify for tax benefits.

However, the Investment Law provides that terms and benefits included in any certificate of approval already granted will remain subject to the provisions of the Law as they were on the date of such approval. Therefore the Company's existing Approved Enterprise will generally not be subject to the provisions of the Amendment.

F-28

## ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

b. Pre-tax income (loss) is comprised as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2004 | 2005 |
| Domestic | $(2,426) | $(3,354) | $(2,867) |
| Foreign | 148 | 69 | 273 |
|  | $(2,278) | $(3,285) | $(2,594) |

c. A reconciliation of the theoretical tax expenses, assuming all income is taxed at the statutory tax rate applicable to the income of the Company and the actual tax expenses is as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2004 | 2005 |
| Loss before taxes on income | $(2,278) | $(3,285) | $(2,594) |
| Theoretical tax benefit computed at the statutory tax rate (36%, 35% and 34% for the years 2003, 2004 and 2005, respectively) | $ (820) | $(1,150) | $ (882) |
| Tax exemption due to "Approved Enterprise" | 843 | 1,107 | 886 |
| Change in valuation allowance | 272 | 11 | (283) |
| Non-deductible expenses and other | (293) | 35 | 61 |
| Actual tax expenses (benefit) | $ 2 | $ 3 | $ (218) |

d. Net operating losses carryforwards:

The Company has accumulated losses for tax purposes as of December 31, 2005, in the amount of approximately $20,500, which may be carried forward and offset against taxable income in the future for an indefinite period. The Company expects that during the period in which these tax losses are utilized its income would be substantially tax exempt. Accordingly, there will be no tax benefit available from such losses and no deferred income taxes have been included in these financial statements.

As of December 31, 2005, the U.S. subsidiary had no U.S. net operating loss carryforward for income tax purposes.

e. Deferred income taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred income tax are as follows:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| Deferred tax assets: | | |
| Operating loss carry forward | $ 1,614 | $ 947 |
| Reserves and allowances | 283 | 281 |
| Deferred tax asset before valuation allowance | 1,897 | 1,228 |
| Valuation allowance | (1,897) | (947) |

| Net deferred tax asset | $ | — | $ | 281 |

Management currently believes that since one of the Company's subsidiaries has a history of losses, it is more likely than not that the deferred tax assets relating to the loss carryforwards and other temporary differences of that subsidiary will not be realized in the foreseeable future.

F-29

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

f. Israeli tax rates:

Until December 31, 2003, the regular tax rate applicable to income of companies (which are not entitled to benefits due to "Approved Enterprise", as described above) was 36%. In September 2004 and in July 2005, the "Knesset" (Israeli parliament) passed amendments to the Income Tax Ordinance (No. 140 and Temporary Provision), 2004 and (No. 147), 2005 respectively, which determine, among other things, that the corporate tax rate is to be gradually reduced to the following tax rates: 2004 — 35%, 2005 — 34%, 2006 — 31%, 2007 — 29%, 2008 — 27%, 2009 — 26% and 2010 and thereafter — 25%.

g. Income taxes for the nine months ended September 30, 2006 (unaudited):

Allot has recorded $75 tax expense during the nine months ended September 30, 2006.

h. Tax assessments:

The Company has final tax assessments through the year 2001.

## NOTE 11:- NET EARNINGS (LOSSES) PER SHARE

The following table sets forth the computation of the basic and diluted net earnings (loss) per share:

a. Numerator:

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | | **Unaudited** | |
| Net income (loss) as reported | $(2,280) | $(3,288) | $(2,376) | $ (2,717) | $ 563 |

b. Denominator:

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| | | | | **Unaudited** | |
| Weighted average number of ordinary shares | 2,774,639 | 2,787,554 | 2,943,500 | 2,903,356 | (*) 13,310,355 |
| Denominator for basic net losses per share of ordinary shares | 2,774,639 | 2,787,554 | 2,943,500 | 2,903,356 | (*) 13,310,355 |
| Effect of dilutive securities: | | | | | |
| Employee stock options and warrants | (**) | (**) | (**) | (**) | 2,191,343 |
| Denominator for diluted net earnings (losses) per share of ordinary shares | 2,774,639 | 2,787,554 | 2,943,500 | 2,903,356 | 15,501,698 |

(*)  Includes 10,220,632 preferred shares on an as-converted basis.

(**)  Anti-dilutive.

F-30

ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 12:- GEOGRAPHIC INFORMATION

Allot operates in a single reportable segment (see Note 1). Revenues are based on the customer's location:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| United Kingdom | $    750 | $ 2,116 | $ 5,781 |
| Europe (excluding United Kingdom) | 3,590 | 4,699 | 4,916 |
| MEA (Middle East and Africa) | 458 | 716 | 831 |
| United States of America | 5,654 | 6,439 | 6,563 |
| Americas (excluding United States of America) | 1,675 | 555 | 842 |
| AO (Asia and Oceania) | 2,648 | 3,560 | 4,039 |
| | $14,775 | $18,085 | $22,972 |

The following presents total long-lived assets as of December 31, 2004 and 2005:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Long-lived assets: | | |
| Israel | $1,329 | $1,462 |
| United States of America | 158 | 210 |
| Other | 14 | 38 |
| | $1,501 | $1,710 |

## NOTE 13:- FINANCIAL AND OTHER INCOME (EXPENSES)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Financial and other income: | | | |
| Interest income | $ 43 | $ 92 | $204 |
| Foreign currency transactions differences | — | 58 | — |
| Capital gain | — | 3 | — |
| Financial and other expenses: | | | |
| Interest expenses | (92) | (76) | (71) |
| Amortization of discount on bank credit-line | (397) | (318) | (50) |
| Foreign currency transactions differences | (33) | — | (32) |
| Capital loss | (28) | — | (6) |
| | $(507) | $(241) | $ 45 |

F-31

**ALLOT COMMUNICATIONS LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**NOTE 14:- SUBSEQUENT EVENTS**

In October 2006, the Company's shareholders and Board of Directors approved an amendment to the escrow agreement with the Chairman of the Board regarding the 108,357 Series A preferred shares that are held in trust for his benefit as described in Note 9a. According to the amendment, if the right is not exercised prior to the earlier of a Liquidity Event as defined in the escrow agreement, or two years following the closing of an IPO, the right and the underlying Series A preferred shares will be forfeited. It was further approved that the Chairman of the Board has the right to pay for any portion of the shares by "net payment" of his right to purchase such shares.

F-32

424B1

# 6,500,000 Shares



# Ordinary Shares

PROSPECTUS
November 15, 2006

**Lehman Brothers**

**Deutsche Bank Securities**

**CIBC World Markets**
**RBC Capital Markets**